FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2010 JUN -7 PM 1: 30

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **HORNBECK OFFSHORE SERVICES, L.L.C.,** | * | **CIVIL ACTION NO.** |
| **Plaintiff** | * | |
| | * | |
| **VERSUS** | * | **SECTION** 10-1663 |
| | * | |
| **KENNETH LEE "KEN" SALAZAR, IN HIS** | * | **JUDGE** SECT. F MAG. 2 |
| **OFFICIAL CAPACITY AS SECRETARY,** | | |
| **UNITED STATES DEPARTMENT OF THE** | | |
| **INTERIOR; UNITED STATES** | * | |
| **DEPARTMENT OF THE INTERIOR;** | | |
| **ROBERT "BOB" ABBEY, IN HIS OFFICIAL** | * | **MAGISTRATE** |
| **CAPACITY AS ACTING DIRECTOR,** | | |
| **MINERALS MANAGEMENT SERVICE;** | * | |
| **AND MINERALS MANAGEMENT SERVICE,** | | |
| | * | |
| **Defendants** | | |
| * * * * * * * * | | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Hornbeck Offshore Services, L.L.C. ("Hornbeck"), asserts the following

Complaint in accordance with 28 U.S.C. § 2201 and Rules 57 and 65 of the Federal Rules of

Civil Procedure against the named Defendants pursuant to the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701-706, for violations of the Outer Continental Shelf Lands Act

("OCSLA"), 43 U.S.C. § 1331 *et seq.*, and its implementing regulations, as follows:

Fee _350_
✓ Process _____
X Dktd _____
___ CtRmDep _____
___ Doc. No. _____

{N2162061.4}

## PARTIES

1.

Plaintiff, Hornbeck, is a Delaware limited liability company with its principal place of business in St. Tammany Parish, Louisiana. Its only member, Hornbeck Offshore Services, Inc., is a Delaware corporation with its principal place of business in St. Tammany Parish, Louisiana. Hornbeck's principal business is to provide vessel support to deepwater and ultra deepwater exploration, development, production, construction, installation, maintenance, repair and enhanced oil recovery requirements of the offshore oil and gas industry.

2.

a.

Defendant, Kenneth Lee "Ken" Salazar, is sued in his official capacity as the Secretary of the United States Department of the Interior ("Secretary Salazar"). As Secretary, pursuant to OCSLA, Mr. Salazar is the federal official ultimately responsible for the management and oversight of the leasing, exploration and production of oil and gas on the Outer Continental Shelf ("OCS") and for all official actions or inactions of the Department of the Interior and Minerals Management Service challenged in this Complaint.

b.

Defendant, United States Department of the Interior ("DOI"), is a department of the United States Government with supervisory and management responsibility over the Minerals Management Service that, pursuant to OCSLA, has responsibility for implementation and application of the federal laws, regulations and policies at issue in this Complaint.

{N2162061.4}

2

c.

Defendant, Robert "Bob" Abbey, is sued in his official capacity as the acting Director of the Minerals Management Service.   Pursuant to OCSLA and authority delegated by the Secretary, Mr. Abbey is the federal official responsible for the proper administration of the leasing, exploration and production of oil and gas on the OCS.

d.

Defendant, Minerals Management Service ("MMS"), is an agency of the United States Department of the Interior that, pursuant to OCSLA and authority delegated by the Secretary, has the responsibility for managing the administration of leasing, exploration and production of oil and gas on the OCS. (Secretary Salazar, DOI, Mr. Abbey and MMS are collectively referred to herein as "Defendants").

### JURISDICTION AND VENUE

3.

This Court has subject matter jurisdiction pursuant to 43 U.S.C. § 1349(a), as Hornbeck has a valid legal interest which is or may be adversely affected by a violation of 43 U.S.C. § 1331, *et seq.* or regulations promulgated under it.   Jurisdiction also exists by virtue of the APA, 5 U.S.C. §§ 701-706, and under 43 U.S.C. § 1349(b)(1), 28 U.S.C. § 2201 (declaratory relief) and 28 U.S.C. § 2202 (injunctive relief).

4.

Venue is proper in this district pursuant to 43 U.S.C. § 1349(b)(2) and 28 U.S.C. § 1391(e).

## GENERAL ALLEGATIONS

5.

Hornbeck asserts that both the Memorandum entitled "Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells" (the "Moratorium") issued by Secretary Salazar on May 28, 2010 (Attachment 1), imposing a six month Moratorium on deepwater drilling on the OCS, and the MMS document entitled NTL No. 2010-N04, a "Notice to Lessees and Operators of Federal Oil and Gas Leases in the Outer Continental Shelf Regions of the Gulf of Mexico and the Pacific to Implement the Directive to Impose a Moratorium on All Drilling of Deepwater Wells" (the "NTL"), effective May 30, 2010 (Attachment 2), which implemented the Moratorium, are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the APA, OCSLA and its implementing regulations.

6.

Hornbeck owns and operates a fleet of United States flagged Jones Act vessels to perform services in connection with offshore oil and gas drilling, exploration and production activities at the Gulf of Mexico's OCS. A significant part of Hornbeck's work is directed to support deepwater and ultra deepwater activities. Hornbeck designed its business model to support oil and gas exploration and production companies drilling in the Gulf of Mexico's OCS by providing Jones Act-compliant vessels specifically built and maintained to engage in the deepwater OCS Jones Act trade. Each of Hornbeck's vessels has a limited useful life, and, accordingly, there is no way to recover time lost in the intended Jones Act trade of these vessels resulting from the Moratorium and the NTL.

7.

Hornbeck employs approximately 1300 individuals, many of whom reside in the State of Louisiana.

8.

To conduct its business, Hornbeck contracts with OCS oil and gas exploration and production companies under time charter agreements, which require Hornbeck, for a given period of time, to provide vessels, as called for, to the exploration and production companies to assist in their drilling activities.  Many of Hornbeck's customers hold permits that were affected by the industry-wide suspension imposed by the Moratorium and the NTL.

9.

On April 20, 2010, an explosion and fire erupted on an offshore drilling rig in the Gulf of Mexico called the Deepwater Horizon, which resulted in an oil spill that continues at the present time (the "Incident").

10.

On April 30, 2010, President Obama directed the DOI Secretary to conduct a review of the Incident and to report within 30 days on "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf."  Report, *infra*, at Overview, p. 1.

11.

On May 27, 2010, Secretary Salazar issued a Report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf" (the "Report"), as requested by the President.  (Attachment 3).  According to the Moratorium, the findings and recommendations in

the Report provided the basis for the Secretary's decision to issue the Moratorium suspending deepwater drilling.

12.

In addition to "[k]ey recommendations on BOPs [blowout preventers] and related safety equipment used on floating drilling operations," the Executive Summary to the Report contains recommendations for "a six-month moratorium on permits for new wells being drilled using floating rigs" and "an immediate halt to drilling operations on the 33 permitted wells, not including the relief wells currently being drilled by BP, that are currently being drilled using floating rigs in the Gulf of Mexico." The recommendations add that "Drilling operations should cease as soon as safely practicable for a 6-month period." Report at Executive Summary, pp. 2-3.

13.

The Report itself does not contain any facts, data, analysis or risk assessment concerning why the Secretary imposed a Moratorium on further drilling by the "33 permitted wells." Twenty-nine of these wells had been subjected to additional inspections following the Incident. According to the "MMS Deepwater Drilling Rig Inspection Report" (Attachment 4), issued on May 11, 2010, MMS found no violations of governing regulations or existing permit terms on 27 of the 29 drilling rigs inspected and only minor violations on the two others. Further, each of the 33 rigs had previously satisfied the rigors of the MMS permitting process. The Report does not reference this separate document or the results of the additional inspections. Further, the Report contains no finding or evidence of a systemic failure by the rig operators, drillers or other participants in offshore drilling operations to comply with current regulations or existing permits.

14.

Likewise, the Report contains no facts, data or analysis that supports its recommendation that a blanket moratorium be imposed on any and all new deepwater drilling activity for a six-month period or that supports an arbitrary drilling depth of beyond 500 feet.

15.

Shortly after receiving the Report, the President adopted the recommendations in it and publicly announced that he would halt all new deepwater drilling for six months and shut down the 33 rigs currently drilling in water deeper than 500 feet.

16.

On May 28, 2010, Secretary Salazar issued the one-page Memorandum imposing the Moratorium. The Secretary stated, in conclusory terms:

> I find at this time and under current conditions that offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment as that is specified in 30 C.F.R. 250.172(b). I also have determined that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment. 30 C.F.R. 250.172(c).

Based on these findings, the Secretary directed the MMS to issue "a six month suspension of all pending, current, or approved offshore drilling operations of new deepwater wells in the Gulf of Mexico and the Pacific regions." He also directed that, "For those operators who are currently drilling new deepwater wells, they shall halt drilling activity at the first safe and controlled stopping point and take all necessary steps to close the well." He further directed: "MMS shall not process any new applications for permits to drill consistent with this directive." Finally, Secretary Salazar requested that the MMS "ensure that appropriate Letters of Suspension and any other appropriate documentation, including any additional instructions and details regarding this directive, are sent to all affected lessees, owners, and operators immediately." The

Moratorium itself did not set forth any facts to support these findings but rather relied upon the facts set forth in the Report.

17.

Following the Secretary's directives, the MMS issued NTL No. 2010-N04, effective May 30, 2010, which implemented the Secretary's directive.  In a section entitled "Directives," the NTL directs lessees and operators drilling deepwater wells "to cease drilling all new deepwater wells" and "prohibits . . . spudding any new deepwater wells . . ." during the six month deepwater drilling moratorium.  The NTL further directs lessees and operators:  "[i]f you are currently drilling any well covered by this Moratorium NTL, you must proceed at the next safe opportunity to secure the well and take all necessary steps to cease operations and temporarily abandon or close the well until you receive further guidance . . . ."

18.

The NTL's "Findings" state that "it is based on" the one-page Moratorium and its conclusory, generalized and limited finding that "under current conditions, deepwater drilling poses an unacceptable threat of serious and irreparable harm or damage to wildlife and the marine, coastal and human environment, as set forth in 30 C.F.R. 250.172(b)."  The NTL Findings further provide that the Secretary's "determination that deepwater drilling activities on new wells must cease for six months, and that MMS will not process permits for such activities accordingly, is based on the recommendations in" the Report.  Thus, the NTL itself did not set forth any facts to support this decision but relied instead on the Report.

19.

The Report generally sets forth an analysis of many known and expected risks involved in OCS drilling that have been and continue to be the subject of industry study and regulation by

MMS. There is nothing in the Report that suggests that OCS drilling is more dangerous today than it was on the day immediately preceding the tragic incident involving the Deepwater Horizon. While the NTL Findings conclude that the "Moratorium NTL is warranted because of the significant risks of OCS drilling in deepwater without implementation of the safety equipment, practices and procedures recommended in the Report," NTL at p. 2, the Report itself does not conclude that drilling risks will be eliminated by implementation of its recommendations. The Report only says that "[i]implementation of these recommendations is expected to *improve* safety of offshore drilling operations" (emphasis added) and that "these measures will be refined and supplemented based on recommendations from other reviews and investigations . . . ." Report at p. 18.

20.

Finally, under its "Authority" section, the NTL references 30 C.F.R. § 250.172(b), "which states that the Regional Supervisor may grant or direct a suspension when activities pose a threat of serious, irreparable, immediate harm or damage" and 30 C.F.R. § 250.172(c), "which states that the Regional Supervisor may grant or direct a suspension when necessary for the installation of safety or environmental protection equipment." There is nothing in the Authority section that explains why **all** OCS drilling operations in more than 500 feet of water pose a threat of harm or damage today that is any greater than the threat that existed on April 19. As noted, 29 of the 33 permitted drill sites affected by the Moratorium and NTL were inspected by the MMS after April 20, 2010, and no systemic problems were identified.

21.

Although the Moratorium directs "a six month suspension," the NTL suggests that the suspension could extend beyond six months. As the NTL sets forth, "MMS will not consider for

six months from the date of this Moratorium NTL drilling permits for deepwater wells and related activities as set forth herein" and, with respect to the 33 currently permitted wells, the operators must "cease operations and temporarily abandon or close the well until" they receive "further guidance from the Regional Supervisor for Field Operations." NTL at p. 1. In addition, while the NTL does not purport to suspend drilling in water at depths under 500 feet, MMS has, in fact, denied new drilling permits in those water depths. In a June 2, 2010 press release, Mr. Abbey stated that "operations in waters less than 500 feet deep may move forward if they satisfy new safety and environmental requirements identified in Secretary Salazar's report to the President."

22.

The imposition of compliance with the Report's requirements at all water depths is effectively a moratorium on all drilling because it may take months if not years for the industry to come into compliance with the standards, some of which have not yet been determined, set forth in the Report.

23.

The Report's requirements, which are in effect a moratorium on all drilling, are not supported by the evidence or findings in the Report.

24.

Hornbeck has current, existing contracts with all or nearly all of the operators of the 33 permitted wells for which the Moratorium and NTL require temporary abandonment and closure. In addition, a substantial part of Hornbeck's opportunity for future business relates to its performance of services for operators that drill in depths of water greater than 500 feet.

25.

One of the operators of the 33 deepwater wells that has a current, existing permit and with which Hornbeck has current, existing contract has indicated to Hornbeck that it intends to terminate its contract with Hornbeck as a result of the Moratorium and NTL, and Hornbeck has reason to believe that other operators of the 33 wells with which it has contracts may also do so.

26.

Termination of Hornbeck's contracts with the operators of the 33 deepwater wells, coupled with Hornbeck's lack of any prospective contracting opportunities to provide service for new deepwater drilling with its Jones Act-complaint vessels, will harm Hornbeck's business in ways that are irreparable.

## **STATUTORY FRAMEWORK**

Administrative Procedure Act (APA)

27.

The APA waives sovereign immunity of the United States and its federal agencies for challenges to final agency action that seek relief other than monetary damages. 5 U.S.C. §§ 702, 704. It authorizes courts reviewing an agency action to "hold unlawful and set aside final agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Moratorium and NTL, issued pursuant to OCSLA, are subject to review under these provisions for compliance with the APA and with OCSLA and its implementing regulations.

28.

Outer Continental Shelf Lands Act (OCSLA)

In 1953, Congress enacted OCSLA to authorize federal leasing of the OCS for oil and gas development beyond the state territorial sea belt. In 1978, Congress amended OCSLA (Pub. L. No. 95-372, 92 Stat. 632 *et seq.*) to provide, in part, for the "expeditious and orderly development" of resources on the OCS "subject to environmental safeguards." 43 U.S.C. § 1332(3). The 1978 and 1990 Amendments to OCSLA were designed to strengthen the role of the states in ensuring that activities under OCSLA do not adversely affect state coastal resources.

29.

OCSLA, as amended, requires the Defendants to **balance** orderly resource development with protection of the human, marine and coastal environments. 43 U.S.C. § 1332(3) ("the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs"); 43 U.S.C. § 1344(a).

30.

OCSLA, as amended, creates four stages for oil and gas development activities on the OCS: (a) the development of a five-year leasing program; (b) the issuance of lease sales; (c) approval of exploration plans by lessees; and (d) approval of development and production plans by lessees. 43 U.S.C. §§ 1331-1356a.

## REQUEST FOR DECLARATORY JUDGMENT AND
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

31.

OCSLA authorizes the Secretary to prescribe regulations "for the suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit . . . (B) if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment . . . ."  43 U.S.C. § 1334(a)(1)(B).

32.

30 C.F.R. § 250.168(a) delegates authority to the MMS Regional Supervisor and provides that this official "may direct a suspension (Directed Suspension), for all or any part of a lease or unit area."

33.

30 C.F.R. § 250.172(b) also delegates authority to the Regional Supervisor and provides that this official may grant or direct an SOO (Suspensions of Operations) "When activities pose a threat of serious, irreparable, or immediate harm or damage."  It specifies that "This would include a threat to life (including fish and other aquatic life), property, any mineral deposit, or the marine, coastal, or human environment."

34.

30 C.F.R. § 250.172(c) further delegates authority to the Regional Supervisor and provides that this official may grant or direct an SOO "When necessary for the installation of safety or environmental protection equipment."

35.

While Hornbeck acknowledges Defendants' authority under OCSLA and the regulations promulgated pursuant to it to direct Suspensions of Operations with respect to OCS drilling activities based on appropriate findings and in compliance with governing procedures, the Moratorium and NTL violate the procedures established by law, exceed the authority and discretion granted to Defendants and are arbitrary, capricious, an abuse of discretion and otherwise contrary to law.

36.

Under the APA, this case will be resolved based on the Administrative Record before the Secretary when he made the challenged decision.  The Moratorium and the NTL demonstrate that the Record consists of those two documents, plus the Report that the Secretary submitted to the President, which, according to the Moratorium and the NTL, provides the factual basis for the Secretary's action.

37.

To comply with the standards set forth in the APA, Defendants' direction of a suspension of OCS operations under OCSLA must be based on an appropriate factual finding to support a conclusion of a "threat of serious, irreparable, or immediate harm or damage" to life or property. In other words, to comply with APA standards DOI and MMS must weigh relevant facts and data and articulate an explanation for their decision to suspend OCS operations that demonstrates a rational connection between the facts found and the choice made.

38.

Issuance of the Moratorium and NTL exceeded the authority granted to Defendants under OSCLA to direct suspensions of OCS operations because they ordered an industry-wide six-

month cessation of all OCS drilling beyond water depths of 500 feet – which effectively shuts down all OCS industry activity beyond water depths of 500 feet – despite an Administrative Record that contains no facts, data or analysis whatsoever to satisfy the statutory or regulatory standards for such a suspension.  Defendants therefore acted arbitrarily and capriciously.

39.

The key document in the Administrative Record, the Report, contains no factual information that addresses the statutory standard that requires a suspension or temporary prohibition on drilling to be based on a showing of "a threat of serious, irreparable, or immediate harm or damage to life . . . to property, to any mineral deposits . . ., or to the marine, coastal, or human environment."  43 U.S.C. § 1334(a)(1)(B).  In fact, the Report itself admits the lack of any completed study, stating that it "has of necessity been conducted without the results of ongoing investigations into the precise causes of the event."  Report at p. 18.  In addition, despite the order to cease all OCS drilling in water depths that exceed 500 feet, the Report sets forth no facts concerning Defendants' analysis of the risks presented by drilling in waters over 500 feet deep.

40.

Additionally, in the Moratorium, although the Secretary recites the terms of the regulations and represents that the Report presents material sufficient to satisfy the conditions of those regulatory standards, the Report is devoid of any facts to support the Secretary's conclusory assertions.  And the Secretary's mere recitation of the terms of the regulations cannot fill the vacuum because the APA demands rational inquiry and facts, not statutory recitation and unsupported conclusions.

41.

In contrast to the absence of any facts concerning the risks presented by drilling at water depths that exceed 500 feet, the post-Incident investigation of the 29 deepwater drilling rigs with subsea blowout preventer stacks, as set forth in the MMS Deepwater Drilling Rig Inspection Report, showed that 27 of the rigs were fully compliant, while the remaining 2 had only minor violations.

42.

Although the Report's Executive Summary states that its recommendations "have been peer-reviewed by seven experts identified by the National Academy of Engineering," Executive Summary at p. 3, according to press accounts, six of those seven experts have issued a statement in which they state that, while they "broadly agree with the detailed recommendations in the report," they "do not agree with the six-month blanket moratorium" and that they did not "peer-review" that recommendation as it "was added after final review and was never agreed to" by them.

43.

Issuance of the Moratorium and NTL also exceeded the authority granted to Defendants under OCSLA to direct suspensions of OCS activities because they ordered all drilling to halt at the 33 permitted wells being drilled at depths beyond 500 feet without providing any factual findings to show any systemic noncompliance by the operators of the 33 affected wells. To the contrary, Defendants' post-Incident inspections of those wells found no violations at 27 of the 29 rigs inspected and only minor violations at the other two. Defendants therefore acted arbitrarily and capriciously.

44.

Further, in requiring that a suspension may be directed "for all or any part of a lease or unit area," 30 C.F.R. § 250.168(a), OCSLA's implementing regulations reflect that any suspension directed by the MMS must be based on an individualized determination, *i.e.*, a determination by particular lease or unit area, that there is a "threat of serious, irreparable, or immediate harm or damage" to life or property based on safety and environmental concerns posed by activities on that particular lease or unit area.

45.

In violation of statutory and regulatory requirements, the Report, the Moratorium and NTL fail to set forth or refer to any empirical data or factual findings that show Defendants made any individualized determination that operations on any particular "lease or unit area" posed a threat of serious immediate harm to life or property.

46.

In addition, under OCSLA, the Defendants are required to balance orderly resource development with protection of the human, marine and coastal environments. 43 U.S.C. § 1332(3). In issuing the blanket Moratorium and NTL without consideration of any factual findings concerning the risks currently presented by deepwater drilling or any risk analysis addressing the magnitude of the risks presented, Defendants failed to conduct the required balancing. Instead, they concluded that no OCS drilling in water depths greater than 500 feet will be permitted for six months, and perhaps longer, thereby ignoring their statutory obligation to factor "expeditious and orderly" resource development into their decision-making equation.

47.

The Moratorium and NTL exceeded the authority granted to Defendants under OCSLA and the regulations promulgated pursuant to it based on: (a) the complete lack of any factual finding or data to support their decision to halt all OCS drilling activity in depths of water greater than 500 feet for at least six months; (b) their failure to set forth any facts to support that any particular drilling activity in depths of water greater than 500 feet posed a serious threat of serious immediate harm to life or property; and (c) their absolute failure to engage in the required balancing to factor in the importance of the nation's interest in orderly development of OCS resources.

48.

The Moratorium and NTL are arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law in at least the following ways:

a.

According to the Report, "[o]ffshore operations provide direct employment estimated at 150,000 jobs." Report at p. 4. These workers represent an industry that depends upon robust OCS drilling activities. The loss of jobs in the industry will drive away the labor force required by companies such as Hornbeck to ensure the continued safe and orderly resource development on the OCS. The Moratorium and NTL place these jobs at risk without any weighing of the impact that the loss of an experienced and available workforce will have on future OCS resource development. The Defendants have risked the loss of crucial human capital that is depended upon by all companies working on the OCS without a shred of analysis or an articulated rational connection between the facts found with respect to the Incident and the choice made to risk the loss of this workforce.

b.

Without any finding of any systemic failure with respect to OCS deepwater drilling and, in fact, with a finding of only "minor problems," if any, at 29 of the 33 currently-permitted wells that MMS inspected post-Incident, the Moratorium and NTL prohibit the consideration of any new applications for permits to drill and require the cessation of all drilling at the 33 permitted wells. The Moratorium and NTL are therefore overly broad and not based on any rational factual inquiry.

c.

The MMS issued the NTL to halt all drilling in water depths beyond 500 feet despite the lack of any evidence to show any specific circumstances of noncompliance by any particular operator or drilling service entity with MMS safety standards for deepwater drilling or with any other relevant safety and environmental regulations either before or after the Incident.

d.

Although the Report specifies that "risks associated with operating in water depths in excess of 1,000 feet of water are significantly more complex than in shallow water," Report at p. 2, the NTL, without any factual support, relevant data or analysis, defines "deepwater" and halts all drilling activities at water "depths greater than 500 feet." In fact, the Moratorium itself makes no mention of any specific water depth and rather simply references "new deep water wells."

e.

Despite that the Incident occurred with use of a subsea blowout preventer stack, the Moratorium and NTL fail to exclude from their application wells drilled using surface blowout preventer stacks.

f.

Although the Moratorium and NTL specify that they are based on the "recommendations in the Report," the Report, with the exception of its general recommendations for "a six-month moratorium on permits for new wells being drilled using floating rigs" and "an immediate halt to drilling operations on the 33 permitted wells, not including the relief wells currently being drilling by BP, that are currently being drilled using floating rigs," provides no factual findings, data or analysis to support issuance of the Moratorium under the governing statutory and regulatory standards.   Indeed, the Report justified its Recommendations on another basis altogether – that the changes in policies, practices, and procedures it recommends are those "which the Department identified as important for workplace and environment safety even before completion of the investigation into the event."  Report at p. 18.  But a finding of "importance" does not satisfy the heightened statutory or regulatory standards for an immediate suspension of drilling established by 43 U.S.C. § 1334(a)(1) and 30 C.F.R. § 250.172.

49.

If maintained, the Moratorium and NTL would result in intentional interference with Hornbeck's existing contracts with respect to the operators of the 33 currently permitted wells and otherwise with Hornbeck's contractual relations with respect to deepwater exploration and production companies, all in violation of the Maritime law of the United States.

50.

In addition, unless this Court overturns the Moratorium and NTL, they would violate Hornbeck's vested property rights as protected by the Fifth Amendment of the United States Constitution.

51.

Hornbeck applies for and moves this Court under Rule 65 of the Federal Rules of Civil Procedure to issue a Preliminary Injunction and thereafter a Permanent Injunction enjoining the Moratorium and NTL as applied to all drilling activities for any wells in depths of water greater than 500 feet.  A separate Motion for Preliminary Injunction will be filed shortly.

52.

As a result of Defendants' actions, Hornbeck is suffering immediate irreparable harm and will continue to suffer immediate irreparable harm to its business, including the irretrievable loss of its vessel fleet's useful life, loss of its crews that have long been associated with their particular vessels, loss of Hornbeck's shore-side teams and disruption of Hornbeck's longstanding contractual relationships with its offshore service vendors and other services for the operation of Hornbeck's fleet.

53.

Further, Defendants' actions serve to disrupt, without appropriate factual inquiry or any rational connection between facts found and the Moratorium issued, the exploration and development of the OCS, "a vital national resource reserve" essential to security of the United States and its energy independence.

**RELIEF REQUESTED**

WHEREFORE, Hornbeck respectfully requests that this Court order the following relief: preliminarily, and after a full trial on the merits, permanently,

1.      Declare both the Moratorium and NTL invalid and unenforceable;

2.  Declare that Defendants have violated and continue to violate OCSLA and its implementing regulations, and, accordingly, that Defendants have violated the APA;

3.  Enjoin the Moratorium and NTL as applied to all drilling in water at depths of greater than 500 feet, and;

4.  Grant Hornbeck such further relief as the Court deems just, proper and equitable.

Respectfully submitted,

CARL D. ROSENBLUM, T.A. (2083)
GRADY S. HURLEY (13913)
ALIDA C. HAINKEL (24114)
MARJORIE A. MCKEITHEN (21767)
Jones, Walker, Waechter,
    Poitevent, Carrère & Denègre, L.L.P.
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
crosenblum@joneswalker.com

And

JOHN F. COONEY
(Pro Hac Vice Application being made)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 344-4812

**Attorneys for Plaintiff,
Hornbeck Offshore Services, L.L.C.**

{N2162061.4}

22