## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **HORNBECK OFFSHORE SERVICES, LLC,** | **CIVIL ACTION No.  10-1663(F)(2)** |
| **Plaintiff,** | **SECTION F** |
| **v.** | **JUDGE FELDMAN** |
| **KENNETH LEE "KEN" SALAZAR, in his official capacity as Secretary, United States Department of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; ROBERT "BOB" ABBEY, in his official capacity as Acting Director, Mineral Management Service; and MINERALS MANAGEMENT SERVICE,** | **MAGISTRATE 2 MAGISTRATE WILKINSON** |
| **Defendants.** | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants, Kenneth Lee Salazar, the United States Department of the Interior, Robert Abbey, and the Mineral Management Service ("Defendants"), hereby file this Response in opposition to Plaintiffs' Motion for Preliminary Injunction.    On April 20, 2010, an explosion and fire erupted on an offshore drilling rig in the Gulf of Mexico called the Deepwater Horizon, causing the rig to sink to the ocean floor.  Eleven members of the Deepwater crew lost their lives.  In addition, the riser connecting the Deepwater rig to the well head ruptured, causing large amounts of oil to spew into the Gulf of Mexico.  It is not yet possible to determine the full impact of the spill on marine animals and the food webs they support.  Nonetheless, vast areas of some of the Nation's most productive fishing grounds have already been closed, and coastal ecosystems polluted, resulting in dire consequences for coastal communities that rely on fishing and tourism for their livelihood.

1

Investigations to determine the root causes of the explosion are ongoing, and what is learned in those investigations will help inform the Government's long-term efforts to improve safety and to modify the regulation of offshore drilling. The Department of the Interior ("Department") determined that it must also take immediate precautions in the interim to ensure that more lives are not lost, and that new blowouts and spills do not occur. This is vital, as current efforts to stem the flow of oil from the Deepwater Horizon and to clean up the spill have consumed enormous resources, thereby compromising many of the United States emergency response capabilities; a second deepwater blowout could overwhelm the efforts to respond to the current disaster, and dramatically set back recovery.

To this end, the Secretary of the Interior ("Secretary") and the Minerals Management Service ("MMS") exercised their regulatory authority to suspend oil and gas drilling operations in the Gulf of Mexico for a period of six months. The suspensions affect 33 active deepwater drilling rigs in the Gulf of Mexico, and put other operators on notice that MMS will not consider new Applications for Permits to Drill ("APDs") in water over 500 feet for the duration of the suspensions. Plfs' Ex. H at 1.[1] Contrary to plaintiffs' assertions, however, the suspensions do not "shut down" the Gulf's oil and gas industry. See Plfs' Br. at 5. There are nearly 7,000 active leases in the Gulf of Mexico (the "Gulf"), with approximately 3,600 structures that account for 31% of total domestic oil production in the United States. Plfs' Ex. A at 3. None of this ongoing production is affected.

Hornbeck Offshore Services, L.L.C. and other companies (hereinafter "Plaintiffs"), seek an order preliminarily enjoining the suspensions on grounds that they violate the Outer Continental Shelf Lands Act and the Administrative Procedure Act because they were issued

---

[1]    Citations to exhibits submitted with the Plaintiffs' Motion for Preliminary Injunction (Dkt. #7) are referenced as "Plfs' Ex ___."

without the benefit of any "fact finding or rational factual inquiry," and because they strike an inappropriate balance between "resource development" and the "protection of human, marine and coastal environments."  Plfs' Br. at 13-14, 16.  However, Plaintiffs make none of the showings necessary for a grant of injunctive relief.  They have not shown a substantial likelihood of prevailing on the merits because the Secretary's decision was a valid exercise of his discretion predicated on the need to ensure that no further drilling accidents occur pending review and implementation of safety protocols and procedures.  Moreover, the short-term economic harm asserted by Plaintiffs fails to meet their burden of demonstrating irreparable harm.  In contrast, the public interest is overwhelmingly served by the limited six-month suspensions.  The Court should therefore deny Plaintiffs' Motion for a Preliminary Injunction.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Following the explosion on the Deepwater Horizon drilling platform, the President created a bipartisan commission – the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("National Commission") – which he charged with examining the relevant facts and circumstances concerning the root causes of the blowout.  The National Commission will use its findings to develop options for guarding against, and mitigating the impacts of, oil spills associated with offshore drilling.  It is scheduled to submit a public report describing its findings and options for consideration within six months after the date of its first meeting.  Plfs' Ex A at 1.

In the interim, the President also ordered the Secretary of the Interior (the "Secretary") to conduct a thorough review of the Deepwater Horizon blowout and to report, within 30 days, on "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf."  See

3

Plfs' Ex A at Executive Summary page 1.  The 30-day examination – which was conducted in consultation with experts from state and Federal governments, academic institutions, and industry and advocacy organizations – culminated in the issuance of a report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf, May 27, 2010" (hereinafter "Safety Report").  The Safety Report recognizes that a more thorough investigation into the causes of the blowout and oil spill is ongoing, and that findings resulting from that investigation will serve as a basis to refine the current and recommended safety measures for deepwater oil and gas drilling.  Plfs' Ex. A at 18, 30 and Executive Summary page 3.  But the Safety Report also explains that information already available to the Department – and which was considered in the course of the 30-day investigation – supports an immediate implementation of new interim measures for equipment, systems, procedures, and practices in order to ensure the safe operation of offshore drilling activities. Plfs' Ex. A at 1, 18 and Executive Summary page 3.  To that end, the Safety Report recommends a number of specific measures designed to ensure the effectiveness of blowout preventers ("BOP"), to promote the integrity of wells, to enhance well control, and to facilitate a culture of safety through operational and personnel management.  Id. at Executive Summary page 3.

Based on the Safety Report, the recommendations contained therein, and further evaluation of the issue, the Secretary concluded that "offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . [and] that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment."   Plfs' Ex. G (Memorandum: Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells) (citing 30 C.F.R. § 250.172(b), (c)).  The Secretary, therefore,

4

directed the Minerals Management Service (MMS) to issue a six-month suspension of all pending, current, and approved offshore drilling operations involving deepwater wells. MMS implemented the Secretary's Directive by sending temporary suspension letters to each affected operator, see Montero Decl. Ex. A, and by issuing a Notice to Lessees ("NTL") on May 30, 2010. See Plfs' Ex. H. The suspensions will afford the Department the time it needs to implement the safety measures proposed in the Report and to consider the findings of ongoing investigations, such as the investigation being conducted by the National Commission. Plfs' Ex. A at Executive Summary page 2.

## II.   LEGAL BACKGROUND

The chief statute governing federal offshore oil and gas leasing is the Outer Continental Shelf Lands Act ("OCSLA"). 43 U.S.C. §§ 1331 *et seq.*

### A.   OCSLA's Multi-Stage Regulatory Process

The OCSLA prescribes a multi-stage process for development of offshore leases. This process provides a "continuing opportunity for making informed adjustments" that ensures that OCS oil and gas activities are conducted in an environmentally sound manner. Tribal Village of Akutan v. Hodel, 869 F. 2d 1185, 1188 (9th Cir. 1988) (citations omitted). The first stage is the development of a five-year program of OCS lease sales by MMS to best meet the nation's energy needs. 43 U.S.C. § 1344. The second stage is the lease sale itself, in which leases are offered and awarded through a competitive sealed-bid auction. See generally 43 U.S.C. §§ 1334, 1337. An OCS lease conveys the exclusive right to explore, develop, and produce the oil and gas contained within a specific OCS tract for a specific period of time, normally five or ten years. The third stage of the leasing process is the submission by the lessee and approval by MMS of an Exploration Plan. 43 U.S.C. § 1340(e)(2). The Exploration Plan describes all exploration

activities planned by the operator, the timing of these activities, how drilling is to be conducted, and the number and location of exploratory wells.[2]

Before drilling a well, whether an exploratory or a production well, an operator must first obtain MMS's approval of an Application for Permit to Drill.  43 U.S.C. § 1340(d); 30 C.F.R. § 250.281, 410.  The OCSLA requires that the Secretary determine, among other things, that the approval of an APD and corresponding issuance of a permit "will not be unduly harmful to aquatic life in the area, result in pollution, create hazardous or unsafe conditions, unreasonably interfere with other uses of the area, or disturb any site, structure, or object of historical or archeological significance."  43 U.S.C. § 1340(g).  The regulations governing APDs require technically detailed descriptions of items such as well design criteria; casing and cementing procedures; and blow-out prevention systems. 30 C.F.R. §§ 250.410-418.

**B.     The Department's Suspension Authority**

The challenged suspensions in the above-captioned case implicate the "APD stage" of the OCS regulatory process, by delaying the approval of new APDs and suspending operations under existing APDs pending MMS's implementation of new safety procedures.  Federal statutes and regulations governing the use of suspensions are found in 43 U.S.C. § 1334(a)(1) and 30 CFR §§ 250.168 through 250.177.  Those regulations authorize the Department to direct a suspension of operations whenever it determines that "activities pose a threat of serious, irreparable, or immediate harm or damage" to human or animal "life, property, any mineral deposit, or the marine, coastal, or human environment."  30 C.F.R. § 250.172(b).  The Department may also

---

[2]     The fourth and final stage of the leasing process – submission and approval of a Development and Production Plan ("DPP") – occurs if oil or gas is discovered in paying quantities during exploration.  The DPP addresses the number and location of the production wells, the type of platform to be used, and how the oil and gas will be brought onshore for processing.  See 30 C.F.R. § 250.241-295.

direct a suspension "when necessary for the installation of safety or environmental protection equipment." Id. § 250.172(c).

## IV.   ARGUMENT

### A.   Standards of Review

#### 1.   Standard of Review under the Administrative Procedure Act

The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), provides that an agency action may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 376 (1989); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971). The court's scope of review under this standard is "very narrow." Delta Found., Inc. v. United States, 303 F.3d 551, 563 (5th Cir. 2002). "The court's role is not to weigh the evidence pro and con but to determine whether the agency decision 'was based on a consideration of the relevant factors and whether there was a clear error of judgment.'" Id. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). "Thus, if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary or capricious." State of La., ex rel. Guste v. Verity, 853 F.2d 322, 327 (5th Cir. 1988).

#### 2.   Standard for Injunctive Relief

A preliminary injunction is an extraordinary remedy for which Plaintiffs bear the burden of proving the prerequisites by clear and convincing evidence. Granny Goose Foods, Inc. v. Bhd. Of Teamsters, 415 U.S. 423, 441 (1974). See also Anderson v. Jackson, 556 F.3d 351, 360 (5th Cir. 2009) ("Injunctive relief is 'an extraordinary and drastic remedy,' and should only be granted when the movant has clearly carried the burden of persuasion.") (quoting Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 997 (5th Cir.1985)). Accordingly, Plaintiffs must make a "clear showing" that four factors are met, namely that: (1) plaintiffs have a substantial

7

likelihood of success on the merits; (2) plaintiffs stand a substantial threat of irreparable harm if the injunction is not granted; (3) the balance of equities tips in their favor; and (4) that an injunction will not undermine the public interest.  Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374 (2008); Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1051 (5th Cir. 1997). Plaintiffs "must clearly carry the burden of persuasion on each factor." United Offshore Co. v. S. Deepwater Pipeline Co., 899 F.2d 405, 408 (5th Cir. 1990) (emphasis added) (citing Miss. Power and Light Co. v. United Gas Pipeline Co., 760 F.2d 618, 621 (5th Cir.1985)).

### B.     Plaintiffs Cannot Show a Substantial Likelihood of Success on the Merits

Plaintiffs have no likelihood of success on the merits because they have failed to provide adequate pre-suit notice as required under the OCSLA and, accordingly, this Court is without jurisdiction over Plaintiffs' claims.  See 43 U.S.C. § 1349(a)(2).  Nevertheless, even if their claims were properly before this Court, they would fail on the merits.  Plaintiffs' challenge to the suspensions boils down to this: First, Plaintiffs argue that the suspensions fail to strike an appropriate balance between "orderly resource development" and the "protection of human, marine and coastal environments."  Plfs' Br. at 16.  Second, Plaintiffs assert that the decision to impose suspensions pursuant to 30 C.F.R. § 250.172(b) and (c) was made without first "engaging in any fact finding or rational factual inquiry."  Id. at 13-14.  The first argument fails, however, because it relies on an overly constricted reading of the discretion provided to the Department by OCSLA.  The second argument also fails because the Secretary based his decision on a large number of facts, including – but by no means limited to – those presented in the Safety Report.

### 1.     Plaintiffs' claims are not properly before this Court

Plaintiffs cannot maintain their lawsuit in this Court because they have failed to provide the notice required by 43 U.S.C. § 1349 (a)(2).  Plaintiffs have invoked the citizen suit provision

of the OCSLA as the basis for their suit, Pls.' Am. Compl. at ¶¶ 20, 69-71, which requires that, no less than 60 days before bringing suit, plaintiffs must provide both DOI and the "alleged violator" a "notice of the alleged violation, in writing under oath." 43 U.S.C. § 1349(a)(2)(A).

Without this notification, "no action may be commenced." Id. The Supreme Court has held that 60-day notice provisions such as the one in OCSLA are "a mandatory precondition to suit" and not one that "can be disregarded by the district court at its discretion." Hallstrom v. Tillamook County, 493 U.S. 20, 23-26 & n.1 (1989). The Hallstrom Court held that the 60-day provision at issue in that case – which is identical in relevant part to the corresponding provision in OCSLA – required that the complaint be dismissed in the absence of proper notice, and that simply staying the case until notice had been provided was not permissible. Id. at 26-27.

Here, Plaintiffs have not even alleged that they have complied with the Notice requirements of OCSLA. Defendants, moreover, have not received any notice of the alleged violation from Plaintiffs. Accordingly, Plaintiffs' suit must be dismissed until such time as they provide the required notice, because "no action may be commenced" without the required notice.[3] Hallstrom, 493 U.S. at 26

### 2. The Temporary Suspensions Are a Valid Exercise of the Secretary's Broad Discretion to Protect Against Threats to the Marine, Coastal, or Human Environment

Even if this Court were to have jurisdiction over Plaintiffs' claims, their motion must be denied because they have no likelihood – much less a "substantial likelihood" – of succeeding on

---

[3]     While in certain cases OCSLA permits plaintiffs to bring suit without the 60-day waiting period, that exception itself is subject to the mandatory requirement that plaintiffs provide "notification of the alleged violation." 43 U.S.C. § 1349(a)(3) (a party may file suit immediately after notice when "the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff"). In this case, Plaintiffs could not establish either exception to the 60-day waiting period. Plaintiffs do not even claim there is an imminent threat to public health or safety, and, as explained more fully in section D, below, the suspension orders do not threaten any immediate effects to Plaintiffs' legal interests.

the merits of their claims.   Plaintiffs' primary argument rests on the assumption that the Secretary has limited discretion to suspend operations, and can only exercise this discretion after all studies are complete, a finding of "systematic failure" is made, and a balancing of interests is made between resource development and environmental production.   Plfs' Br at 14-16. Fortunately for the public interest, neither OCSLA nor the implementing regulations are so constrained.  Instead, the Act and the implementing regulations provide the Secretary with broad discretion to act to protect the environment and human health and safety.

While undoubtedly the Secretary has discretion to balance resource development and environmental production,[4] the Department's suspension of drilling activity reflects due consideration of both the environmental risks of drilling and the Congressional policy of fostering development of mineral resources in the OCS.  For example, while all OCS drilling presents some risk of environmental harm, the Department issued suspensions only for new and proposed wells in deep waters exceeding 500 feet.  The length of the challenged suspensions is also limited – to six months – despite the Department's regulatory authority to issue suspensions for a period of up to five years, and the Department reserves the discretion and authority to terminate a suspension at any time if it determines that circumstances justifying the suspension no longer exist.   See 30 C.F.R. § 250.170(a), (e).   Through this grant of authority, the Department can ensure that the challenged suspensions do not last any longer than necessary to implement the safety protocols recommended in the 30-day Report or in the National Commission's six-month report.  Finally, it bears noting that while deepwater drilling operations have been suspended for a period of six months, nothing in the challenged suspensions prevents

---

[4]        Plaintiffs cite the statement of policy in 43 U.S.C. § 1332(3) as somehow constraining the Secretary's discretion.  The Congressional policy statement does not in any way limit the Secretary's discretion under the provisions of Section 1334 and the implementing regulations to invoke the suspension authority in 30 C.F.R. § 250.172.

the ongoing production of oil through established wells, nor do the suspensions prevent certain drilling activities that are necessary for the ongoing maintenance, repair, and closure of wells. See Plfs' Ex. H at 2.  Thus, the challenged suspensions reflect appropriate consideration of both resource development and safety concerns.

Plaintiffs also argue that the suspensions are arbitrary and capricious because the Department failed to identify a "systemic failure" to comply with current regulations or existing permits.  See Plfs' Br. at 2, 14, 17; see also id. at 2, 7 (asserting that inspections following the Deepwater Horizon blowout revealed that 27 of the 29 rigs examined were in compliance with then-existing regulations and permit terms).  "Systemic failure," however, is not one of the findings required by 30 C.F.R. § 250.172(b), (c).  Nor does a favorable result in previous inspections limit the Department's discretion and authority to impose heightened safety standards in response to catastrophic events.  As the Department has explained, "the BP Oil Spill . . . underscored that as drilling activity moves increasingly into very deep water environments, it is important to reevaluate whether the best practices for safe drilling and operations developed over the years need to be bolstered to account for the unique challenges" posed by that environment.  Plfs' Ex. A. at 18.  The 30-day investigation served as a first step in this "reevaluation" process, and the corresponding Safety Report revealed that new equipment, systems, and procedures – including new inspection protocols – need to be established to reduce the risk of another event like the BP Oil Spill.  Id. at 2, 18.  Therefore, it is of limited consequence that 27 of the 29 rigs inspected immediately after the Deepwater Horizon blowout passed inspections based on then-existing protocols.  What is important now is ensuring that those same rigs will comply with any new protocols determined to be necessary in light of the changed circumstances described in the Safety Report and the Department's rapidly evolving

assessment of risk.  See Plfs' Ex. A at 19-20, 21-22 (recommending new inspection procedures, reporting requirements, and certification requirements above and beyond those reflected in Plaintiffs' Exhibit E).

> **3.  The Documents and Materials Considered in the Course of the Department's Decision-Making Process Provide Adequate Support for the Challenged Suspensions**

Plaintiffs assert that the Safety Report, the Secretarial Directive, and the NTL provide insufficient facts, data, or analysis to support the Secretary's finding that OCS operations pose a threat of "'serious, irreparable, or immediate harm or damage' to life or property."  See Plfs' Br. at 13; see also id. at 15 ("[T]he Report is devoid of any facts to support the Secretary's conclusory assertions.").  Plaintiffs further complain that those three documents insufficiently explain why the Department determined to impose suspensions at depths exceeding 500 feet instead of 1000 feet.  Id. at 14.

Plaintiffs' arguments have no merit.  To begin, Plaintiffs are incorrect in asserting that the Department may impose suspensions "only upon a finding that operations . . . pose a 'threat of serious, irreparable, or immediate harm or damage' to life or property.'"  See Plfs' Br. at 13, 15.  While the Department's finding of such a threat is indeed a valid basis for suspending operations, see 30 C.F.R. § 250.172(b), the Department is also authorized to impose a suspension whenever "necessary for the installation of safety or environmental protection equipment."  See id. § 250.172(c).  The Department invoked both regulatory provisions, by identifying threats of serious and irreparable harm and by identifying a need for revised equipment and well-design standards.  See Plfs' Ex. A at 19-21, 23-24, 29.  Each serves as an independent and adequate basis for the suspensions and each will be fully supported by the Administrative Record.

Plaintiffs' insistence on seeking the full analytical and factual basis for the suspensions in the Safety Report, Secretarial Directive, and NTL is also misguided. No relevant provisions in the APA, OCSLA, or its implementing regulations require the Department to prepare a formal decision document or findings of fact prior to issuing a suspension. See Madison County Bldg. and Loan Ass'n v. Fed. Home Loan Bank Bd., 622 F.2d 393, 396 (8th Cir. 1980) ("Overton makes it clear that [APA] 706(2)(A) does not require that the agency make any formal findings of fact"); accord Empresa Cubana Exportadora de Alimentos v. U.S. Dept. of Treasury, 606 F. Supp.2d 59, 68 (D.D.C. 2009). Rather, while an agency must articulate a rational connection between the facts found and the choice made, Motor Vehicle Mfrs., 463 U.S. at 52, the challenged action will be upheld if the requisite basis and explanation can be discerned from the administrative record.[5] See Miller v. Lehman, 801 F.2d 492, 496-97 (D.C. Cir. 1986) ("[I]f the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, we will make the reference.") (quoting Envtl. Def. Fund, Inc. v. EPA, 465 F.2d 528, 537 (D.C.Cir.1972)); see also Plfs' Br. at 11-12 (conceding that the APA is satisfied when the agency's "[a]dministrative [r]ecord . . . contain[s] evidence and factual support for the decision made"). This is particularly true in cases where, as here, the presence of an emergency presented a grave threat to public health and the human environment, thereby forcing the agency to act expeditiously. See White Eagle Co-op. Ass'n v. Conner, 553 F.3d 467, 481 (7th Cir. 2009) (upholding rule despite USDA's failure to articulate

_____

[5]   As a general matter, a reviewing court in an APA case is charged only with determining whether the challenged decision "was based on a consideration of the relevant factors and whether there was a clear error of judgment." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. In the context of motions seeking preliminary relief, this same standard of review applies to determine which party has shown a likelihood of success on the merits. Am. Bioscience v. Thompson, 243 F.3d 579, 582-83 (D.C. Cir. 2001). The focal point for judicial review in both contexts is the administrative record already in existence. See Indep. Turtle Farmers of La., Inc. v. United States, 1:07-cv-00856, 2010 WL 1286392, at *4 (W.D. La. Mar. 30, 2010); accord Camp v. Pitts, 411 U.S. 138, 142 (1973).

clearly the basis for the decision reached because the rule was both interim and had been issued on an emergency basis); Cf. Asbestos Info. Ass'n/N. Am. v. Occupational Safety and Health Admin., 727 F.2d 415, 421 (5th Cir. 1984) ("A record [for promulgation of an emergency temporary standard] cannot be reviewed as a record in which adversary proceedings have narrowly focused the facts and issues in dispute.").

Once lodged, that Administrative Record will show that the Department's issuance of suspensions is adequately supported and that it was based on a thorough consideration of relevant factors. In the interim, however, Defendants have submitted the declarations of David J. Hayes, Deputy Secretary of the Department of the Interior, and Steven Black, Counselor to the Secretary, both of whom who were involved in the challenged decision-making process. Their declarations describe (and in some cases, attach) some of the documents or groups of documents that were used to assess the adequacy of existing OCS regulation and the risk of potential accidents. See, e.g., Black Decl. ¶ 11. Those documents, which form part of the factual record underlying the challenged suspensions,[6] provide ample support for the Secretarial Directive and NTL and completely undermine Plaintiffs' substantive arguments.

For example, while Plaintiffs repeatedly assert that the Safety Report does not justify a suspension of drilling operations at depths of less than 1000 feet, see, e.g., Plfs' Br. at 10, 14, documents considered by Department officials, and which will form part of the Administrative Record, show that suspensions for rigs deeper than 500 feet were justified by the technical limitations of "jack up" rigs. Jack up rigs, which can be used in depths up to 500 feet, provide a

---

[6]    Each of the proffered documents will ultimately be included in the Administrative Record consistent with the relevant legal standard. See Exxon Corp. v. Dep't of Energy, 91 F.R.D. 26, 33 (N.D. Tex. 1981) (defining the "whole" administrative record as consisting of "all documents and materials directly or indirectly considered by agency decision-makers"); Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs, 448 F. Supp.2d 1, 4 (D.D.C. 2006) (defining the "whole record" to include "all documents and materials that the agency 'directly or indirectly considered,' . . . and nothing more nor less").

substantial safety benefit as compared to floating rigs, which are used in deeper waters.  <u>See</u> Hayes Decl. ¶ 13.

More generally, the documents described in the declarations fully substantiate the Department's conclusions (1) that deepwater drilling "at this time and under the current conditions . . . poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment . . . ," <u>see</u> Plfs' Ex. G, and (2) that the installation of additional safety or environmental protection is necessary.  <u>See</u>, <u>e.g.</u>, Hayes Decl. ¶ 11(a) (indicating that evidence revealed a need to implement new safety measures and to install additional safety equipment); <u>id.</u> ¶ 11(b) (indicating that reports and information produced by ongoing studies will allow the Department to refine and supplement its safety measures in the near future); Black Decl. ¶ 12(a)-(c) (identifying safety issues including the unique challenges associated with drilling in deepwater); <u>id.</u> ¶ 13(a)-(i) & Exs. B-E (presenting recommendations concerning the quality and effectiveness of blowout preventers); <u>id.</u> ¶ 14(a)-(b) (identifying recommendations to promote well integrity and to enhance well control); <u>id.</u> ¶ 15(a)-(c) (identifying necessary systemic improvements in the operational and personnel management associated with offshore drilling).  Taken together, the Safety Report and other Administrative Record documents – only some of which are described in the proffered declarations – demonstrate that the Department considered the factors relevant to its invocation of the suspension authority in 30 C.F.R. § 250.172(b) and (c), and that the facts presented in the Record support the suspension of deepwater drilling operations.  The APA requires nothing more.

Finally, Plaintiffs criticize the suspension of drilling operations because the suspensions were issued despite disagreement by some of the Safety Report's reviewers, and because they were issued before studies to determine the cause of the BP blowout could be completed.  The

fact that some reviewers disagreed with the proposed suspensions, however, is not relevant here. The discretion to invoke or not invoke the suspension authority in 30 C.F.R. § 250.172 is entrusted to the Department.  To survive judicial review, the Department need only identify its factual basis for determining that the standards in 30 C.F.R. § 250.172 are satisfied.  Nothing in the dissenting reviewers' statement undermines the findings in the Safety Report.  See Plfs' Ex. F at 3-4 (expressing disagreement with the proposal to issue suspensions, but otherwise praising the quality of the Safety Report).  Accordingly, their disagreement does nothing to undermine the factual basis that led the Department to conclude that the suspensions were appropriate.

Plaintiffs' assertion that suspensions were issued without the results of ongoing investigations also does nothing to undermine the appropriateness and adequacy of the challenged suspensions.  The Secretary reasonably determined that allowing further operations in deepwater conditions was not prudent until safety procedures, some of which will require notice and comment rulemaking, are developed and implemented.

In addition, while Defendants do not dispute that additional analysis is needed, and that ongoing studies will provide vital information relevant to deepwater drilling, the interim safety measures in the Safety Report and the corresponding suspension of deepwater drilling are appropriately supported by the Administrative Record in existence on the day the decision was made.  Various courts have recognized that an agency's thoroughness of investigation or choice of methodology is entitled to broad deference where – as here – the agency is responding to an emergency, is acting on an interim basis, or both.  See, e.g., Cal. v. NHTSA, 848 F.2d 256, 268 (D.C. Cir. 1986) ("Appreciating that the question is close, we decline to indict as arbitrary and capricious the agency's decision, made in view of time and resource constraints, to ignore in this case possible increases in emissions within the Clean Air Act limits.") (emphasis in original);

16

Miccosukee Tribe of Indians of Fla. v. United States, 420 F. Supp. 2d 1324, 1337 (S.D. Fla. 2006) ("Armed with the information it did have, and taking into account the time constraints imposed by the onset of the rainy season, the Corps did not act arbitrarily or capriciously by relying on the limited modeling information."); Cf. Oceana, Inc. v. Evans, 384 F. Supp.2d 203, 220 (D.D.C. 2005) ("[T]he regrettable fact is that the necessary data simply does not exist . . . [and the agency] has reasoned that in the absence of the necessary data, the [agency's alternative methodology] is the next best alternative."). The Department's decision to act on the results of its preliminary study was therefore appropriate and should be similarly upheld. In sum, Plaintiffs have failed to show "a substantial likelihood of success on the merits." See Rapides Parish Sch. Bd., 118 F.3d at 1051. Their Motion for a Preliminary Injunction must therefore be denied.

### C.   Plaintiffs Cannot Show Irreparable Injury in the Absence of Preliminary Relief

Plaintiffs also fail to make the requisite showing of irreparable harm. The mere possibility of irreparable harm is insufficient to establish a plaintiff's right to the extraordinary remedy of a preliminary injunction. Winter v. Natural Res. Def. Council, 129 S. Ct. 365, 375 (2008); see also Holland Am. Ins. Co. v. Roy, 777 F. 2d 992, 997 (5th Cir. 1985) (vacating District Court's temporary injunction premised on insurance companies' speculation that it might face multiple lawsuits and inconsistent judgments by claimants to policy proceeds at issue). "'To be entitled to an injunction, the plaintiff must establish that he…is immediately in danger of sustaining, some direct injury as a result of the challenged conduct.'" United States v. Emerson, 270 F.3d 203, 262 n.64 (5th Cir. 2003) (quoting 42 Am Jur. 2d, Injunctions, § 32 at 606-08); see also Holland Am., 777 F.2d at 997 ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."); Wis. Gas Co. v. F.E.R.C., 758 F.2d 669, 674 (D.C. Cir. 1985) ("Injunctive relief 'will not be granted against something merely feared as liable

to occur at some indefinite time.') (quoting <u>Conn. v. Mass.</u>, 282 U.S. 660, 674 (1931)).   In addition, "the injury must be both certain and great; it must be actual and not theoretical."  <u>Wis. Gas Co.</u>, 758 F.2d at 674 (D.C. Cir. 1985).  Finally, it is well established that "'[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.'"  <u>Morgan v. Fletcher</u>, 518 F.2d 236, 240 (5th Cir. 1975) (quoting <u>Va. Petroleum Jobbers Assoc. v. Fed. Power Comm'n</u>, 259 F.2d 921, 925 (D.C. Cir. 1958)).   "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weights heavily against a claim of irreparable harm."  <u>Id.</u>

> **1.    Plaintiffs' Allegations of Injury Do Not Support The Issuance of a Preliminary Injunction**

The essence of Hornbeck's and the other Plaintiffs' entities' claims of irreparable injury is that the Secretary's narrowly tailored six-month suspensions "<u>threaten the continued viability of the entire Gulf of Mexico deepwater industry</u>."  Plfs' Br. at p. 21 (emphasis added).  Plaintiffs further allege that the suspensions will cause a cataclysmic collapse of every shoreside shipyard, maintenance facility, and the entire network of "service vendors, suppliers, and other third parties that provide key services to Hornbeck."  <u>Id</u>

The facts do not support Plaintiffs' rhetoric.  The Secretary's Directive affects 33 active deepwater drilling wells in the Gulf of Mexico.  As noted in the Safety Report, there are nearly 7,000 active leases in the Gulf of Mexico, with approximately 3,600 structures in the Gulf that account for 31% of total domestic oil production in the United States.  Plfs' Ex. A at 3.  The Secretary's temporary suspensions therefore affect less than 1% of the existing structures in the Gulf dedicated to oil exploration and production.  <u>Id</u>  Moreover, it is clear that Plaintiffs are not solely dependent on the 33 affected operating drilling platforms to stay in business for the next six months, nor does the "viability of the entire Gulf of Mexico deepwater industry" depend

18

solely on those 33 drilling wells.  Finally, Plaintiffs' argument, that the temporary suspensions will cause a long term shut down of all operations in the Gulf, is without merit.  Six months from now the OCS will continue to be available for resource development.  The industry for Gulf of Mexico oil production is not so fragile as Plaintiffs would have this Court believe.  Its development projects are measured in terms of years and even decades, so Plaintiffs' claim of massive economic destruction by a temporary six-month pause in one segment of Gulf operations is highly speculative and unlikely.

Here, a close review of the actual injuries alleged by Hornbeck and the other Plaintiff entities reveals that they may claim the loss or cancellation of contracts, and that they fear a general slow-down in business as a result of the six-month suspensions.  Neither of these claims satisfies their burden.  The only concrete allegations of injury to Plaintiffs are as follows:

- One of Hornbeck's customers has indicated that it intends to terminate its contract with Hornbeck as a result of the Moratorium and NTL.  *See* Am. Compl. at ¶ 58.

- Three vessels owned by the Bollinger entities, named Bee Sting, Bayou Bee, and Busy Bee, have had their contracts cancelled, and two of them (Bee Sting and Busy Bee) have thus far been unable to secure additional work.  *See* Bollinger and Chouest Entities' Mem. in Support of Motion for Preliminary Injunction at p. 6; Am. Compl. ¶¶ 61-62.

Apart from these two specific allegations of contracts that have been affected by the temporary suspensions, Hornbeck and the other Plaintiff entities speculate that additional contracts might be impacted or that other customers might no longer need their services.  See Bollinger and Chouest Entities' Mem. in Support of Motion for Preliminary Injunction, at pp. 6-7; Plfs' Br., at pp. 20-21.[7]  Plaintiffs attempt to elevate these isolated claims of contract termination, which they fail to

---

[7]      None of the Plaintiffs claim that they exclusively support deepwater drilling activities in the Gulf.  For example, Plaintiffs Hornbeck, Bee-Mar Deepwater Vessel Companies and Chouest Vessel Companies "perform services in connection with offshore oil and gas drilling, exploration, and production activities."  Am. Compl. at ¶ 23(emphasis added).  The Bollinger Shipyard Companies and Chouest Shipyard Companies claim only that "a significant part of

distinguish from ordinary business risks, into a claim that the suspensions will cause a massive collapse of the deepwater drilling industry.

Notably, however, Hornbeck did not believe its business was in danger of imminent collapse just five days prior to filing suit.  In its most recent 8-K statement filed with the Securities and Exchange Commission, on June 4, 2010, Hornbeck stated that of its "upstream" fleet of 55 new generation vessels, only 21 are currently involved in supporting deepwater drilling operations in the Gulf of Mexico.  See  June 4, 2010 Form 8-K for Hornbeck Offshore Services, Inc., attached hereto as Montero Ex. B.  Of these 21 vessels, only nine are operating under time charter contracts[8], and the company sees little threat to these contracts:

> [Hornbeck] has reviewed its time charters for these nine vessels and does not believe that any of them can be validly cancelled for force majeure as a result of the recently announced Drilling Moratorium. To the extent that any customer should assert force majeure for either the oil spill or the moratorium, the Company intends to defend the enforcement of its contracts against such claims.[9]

their business is related to the construction and repair of vessels used to support Gulf of Mexico OCS deepwater exploration and production."  Am. Compl at ¶ 28 (emphasis added).  The Secretary's targeted, temporary suspensions do not threaten these Plaintiffs' entire businesses.  Rather they may at most have a short-term temporary economic impact on one particular segment of their operations, which does not amount to irreparable injury.  See  Wash. Metro. Area Transit Comm'n v. D.C. Holiday Tours, Inc., 559 F.2d 841, 843 n.2 (D.C. Cir. 1977) (the only instance where economic loss can give rise to irreparable harm, and thus a preliminary injunction, is when such loss "threatens the very existence of the movant's business.").

[8]      Of the remaining 12 vessels, five are involved in the oil spill cleanup efforts, and seven "are operating in the [Gulf] spot market."  Montero Ex. B.

[9]      Insofar as Plaintiffs' claimed injuries amount to nothing more than breach of contract claims against parties other than the United States, and since none of Plaintiffs' entities appear to be lessees directly affected by the Notice to Lessees, it is questionable whether they can even establish standing to bring this suit.  In contrast, section 1334(a)(1)(B) is focused on protecting against "serious, irreparable, or immediate harm or damage" to life, property, mineral deposits, or the environment.  43 U.S.C. § 1334(a)(1)(B).  Plaintiffs' alleged business-related economic injuries do not fall within the life, property, mineral deposit, or environmental interests that Section 1334(a) seeks to protect.  Thus, the requirements for prudential standing are not satisfied here where Plaintiffs are not themselves the subject of the contested agency action and their alleged economic interests are only "marginally related" to the purposes implicit in the statutory provision upon which they base their claim.  Bonds v. Tandy, 457 F.3d 409, 414 (5th Cir.2006) ("'In cases where the plaintiff is not . . . the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit suit.'") (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987)).

<u>Id.</u> (emphasis added).  More generally, Hornbeck appears upbeat about its prospects for future business in spite of the six-month suspensions:

> Overall, the Company estimates that roughly 35% of its total revenue comes from Upstream vessels, including OSVs and MPSVs, operating in support of deepwater drilling in the GoM [Gulf of Mexico]….More importantly, given the 180-day Drilling Moratorium in the GoM, the composition of the Company's second-half 2010 and fiscal 2011 OSV contract coverage is heavily weighted (67% and 85%, respectively) to vessels working in international waters or in support of non-oilfield customers….Meanwhile, the Company will also proactively seek to mitigate its exposure to the increasing near-term uncertainty in the GoM market conditions by bidding additional vessels into foreign markets and domestic non-oilfield markets. Based on currently available customer opportunities, the Company is reasonably optimistic about its ability to further diversify its revenue base… and projected cash flows from operations for the remainder of 2010 will be sufficient to meet its anticipated operating needs, its debt service and the total remaining cash requirements under its capital programs.

Montero Ex. B at pp. 6-7. In short, Hornbeck, in its 8-K statement to the SEC, filed just five days before its Complaint in this litigation, believed that the suspension of drilling operations would not cause it any irreparable injury, especially not in the next six months.

> ### 2.     Plaintiffs' Claimed Incalculable Injury Amounts to Simple Conjecture and Speculation

In order to manufacture an irreparable injury, Plaintiffs resort to speculating that within six months, a hypothetical chain of events might lead to the death of the entire deepwater industry in the Gulf of Mexico.  Hornbeck first claims that because of the six-month suspensions, it faces "the lack of <u>any prospective contracting opportunities to provide services for new deepwater drilling</u>…."  Plfs' Br. at 20 (emphasis added).  Then, once it deploys its ships to foreign projects, it will have to re-flag them in foreign jurisdictions thereby permanently losing their Jones-Act privileges in the United States.  <u>Id.</u>  It then claims that because it made the decision to transfer its vessels abroad and forfeit their Jones Act privileges, the loss of

employees, its vendors, and shipyard facilities that know its vessels, constitutes an incalculable, and therefore irreparable, injury.  Id.[10]

There are two fatal flaws in Plaintiffs' arguments.  First, Plaintiffs assume that all of the mariners, employees, vendors, and other shoreside businesses would simply disband their businesses in the Gulf of Mexico and no longer be capable of supporting Hornbeck ships.  Given the multi-billion dollar oil production industry in the Gulf of Mexico (separate and apart from the deep water exploration and drilling industry) that still require ongoing support, it cannot simply be assumed that all of the mariners, service vendors, suppliers and other third parties would be forced to shut down within the six months during which deepwater drilling operations are suspended.  Second, if Hornbeck were to make the decision to re-flag its vessels and commit them to projects in international jurisdictions, then they would no longer have need of or be able to use mariners, suppliers, service vendors and other third parties in the Gulf of Mexico.  These are precisely the types of alleged harms that are "merely feared as liable to occur at some indefinite time in the future" which courts have held to insufficient grounds on which to grant a preliminary injunction.   Conn. v. Mass., 282 U.S. 660, 674 (1931).   This hypothetical, speculative loss premised on Hornbeck's postulated future business decision to cease operations in the Gulf cannot constitute the direct, imminent, irreparable injury required to meet Plaintiffs' burden on a preliminary injunction.

In short, there is nothing incalculable, imminent, or irreparable about Plaintiffs' claimed injuries.  They are at best hypothetical and can be remedied through a claim for money damages

---

[10]     The decision in CSX Transp., Inc. v. Williams, 406 F.3d 667 (D.C. Cir. 2005), does not support Plaintiffs' argument that their claimed injury is irreparable.  First, in CSX, the court conditioned its holding on irreparable harm by explaining that "given its strong likelihood of success on the merits" CSX has "sufficiently demonstrated irreparable injury."  Id. (emphasis added).  In addition, the finding of CSX's irreparable injury was premised on affidavit evidence detailing the harms to CSX.  Id.  Plaintiffs here are unlikely to succeed on the merits, and have not provided a evidence of anything approaching the sort harms that CSX alleged.  Even Plaintiffs' unverified arguments do not rise to the level of injury described in CSX.

if appropriate. Aside from hypotheticals, Plaintiffs have alleged nothing more than that they face a short six-month period of uncertainty in one particular segment of their operations. Moreover, they do not explain whether their contracts entitle them to recover through liquidated damages or other forms of relief, or whether they have elected to assume injury from contract termination as a business risk. In fact, it appears that at least one of the Plaintiffs believes that it has potential breach of contract causes of action against customers and vendors who may choose to breach their contracts, and at least one of the Plaintiffs has stated that it intends to defend such breaches in court. As a result, the injuries alleged by Plaintiffs amount to nothing more than money damages for which they have an adequate remedy at law against the breaching party. As such, under the law of this Circuit they cannot constitute irreparable injury for the purposes of seeking a temporary injunction. Morgan, 518 F.2d at 240.

### D.    An Injunction Would Not Be in the Public's Interest

While potential short-term job loss and economic impacts to the OCS drilling industry are indeed cause for concern, the Department has an obligation to manage the public lands and minerals for the long term interests of the United States. Unlike a corporation, whose view might be limited to the next financial quarter, the Department has to make sure not only that Gulf of Mexico OCS drilling operations are safe and secure but also that the Nation's fisheries, coastal ecosystems, and other public lands continue to provide jobs, recreation opportunities, habitat for wildlife, healthy ecosystems, and economic resources for all of the public. The Department does this with a view not just for this year or this quarter, but for the long-term future as well.

The temporary suspension of drilling operations was ordered with this long-term view in mind. By assessing the safety and regulation of deepwater drilling in the Gulf of Mexico in the next six months, the Department is engaging in a deliberate and considered effort to reduce the

risk of another disaster like the Deepwater Horizon for the long-term benefit of local economic, social, and ecological health.  The public's interest weighs heavily in favor of making sure that a tragedy like this does not occur again.  Enjoining the challenged suspensions before the Department has had the chance to complete its investigation of the causes of the explosion and before it can implement additional safety measures would inhibit this critical endeavor.

### E. The Balance of Equities Does Not Favor the Plaintiffs

Contrary to Plaintiffs' allegation, the temporary harm to Plaintiffs' short-term financial interests is far outweighed by the potential for harm to the people and public lands of the United States if the challenged suspensions are prematurely lifted.  The decision to suspend drilling operations grew out of a tragedy of historic proportions.  The Deepwater Horizon explosion and ensuing oil spill continues to have devastating social, economic, and environmental impacts on communities throughout the entire Gulf Coast Region.  The suspensions will provide lessees and the Department of the Interior time to step back and investigate both the root causes of the Deepwater Horizon disaster and to implement additional safety measures to ensure that we do not fall victim to another disastrous oil spill. Safety Report at 1-2; LaBelle Decl. ¶ 4.  Given the efforts that are being directed at trying to stem the flow of oil from the Deepwater Horizon and to clean up the oil that has already been released, a second deepwater blowout could overwhelm the efforts to respond to the current disaster, and dramatically set back recovery.  LaBelle Decl. ¶¶ 3. Vast areas of some of the Nation's most productive fishing grounds have been closed to fishing because of the oil spill.  <u>See</u> NOAA Southeast Fishery Bulletin, June 7, 2010, attached hereto as Montero Ex. C; La. Dept. of Wildlife and Fisheries, Oyster and Fishing Closure Areas, June 12, 2010, attached hereto as Montero Ex. D; Ala. Dept. of Conservation and Natural Res., Additional State Waters Closed to Fishing, June 10, 2010, attached hereto as Montero Ex. E; Miss. Dept. of

Marine Resources, Revised Precautionary Closure, June 12, 2010, attached hereto as Montero Ex. F; see also LaBelle Decl. ¶ 5 (describing effects on marine animals).  There is an increased potential for even further spreading of the effects of the oil through a hurricane which could force oil contaminated seawater far inland through storm surges, compounding the existing impacts of the spill.  LaBelle Decl. ¶ 6.

The suspensions reduce the risk of a second spill by providing the time needed for further investigation and the implementation of any needed corrective measures.  The alleged costs to Plaintiffs of two fiscal quarters of decreased revenues from Gulf operations cannot compare to the potential costs and lost opportunity of failing to prevent another Deepwater Horizon disaster sometime in the next six months.  The balance of the equities therefore weighs strongly in favor of the United States and against the grant of preliminary injunctive relief.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: June 16, 2010

IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division

/s/ Guillermo A. Montero
GUILLERMO A. MONTERO (T.A.)
BRIAN COLLINS
U.S. Department of Justice
PO Box 663
Washington, DC 20016
Tel: (202)305-0443

SHARON SMITH
Assistant United States Attorney
Eastern District of Louisiana
500 Poydras Street, Suite B-210
New Orleans, Louisiana 70130
Tel: (504)680-3000

ATTORNEYS FOR FEDERAL DEFENDANTS