UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HORNBECK OFFSHORE SERVICES, LLC, | * * | CIVIL ACTION NO.: 10-1663 |
| Plaintiff, | * | |
| VS | * | SECTION: "F" |
| | * | |
| KENNETH LEE "KEN" SALAZAR, in, his official capacity as Secretary, United States Department of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; ROBERT "BOB" ABBEY, in his Official capacity as Acting Director, Mineral Management Service; and MINERALS MANAGEMENT SERVICE, | * * * * * * * * * | MAGISTRATE: "2" |
| Defendants | * | |

### AMICUS BRIEF ON BEHALF OF BOBBY JINDAL, GOVERNOR OF THE STATE OF LOUISIANA, AND THE STATE OF LOUISIANA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The Governor and State of Louisiana, through the Louisiana Attorney General, James D. "Buddy" Caldwell, present this amicus brief in support of the Petitioner's request that this honorable Court order removal of the moratorium on deepwater drilling on the Outer Continental Shelf (OCS) off the coast of Louisiana. Offshore oil and gas exploration and production are critical components of Louisiana's economy, which was already weakened by Katrina and is now crippled by the Deepwater Horizon disaster. With each passing day, the MMS moratorium further threatens the economic livelihood of the State and its citizens. The State of Louisiana, therefore, has a real interest in the outcome of this litigation.

### THE STATE'S INTEREST IN THIS LITIGATION

The Governor and Attorney General, in their respective capacities as chief executive officer and chief legal officer of the State of Louisiana have a duty to protect the interests of the

State and its citizens. Implicit in that duty is the obligation to protect the economic wellbeing of the State and its citizens, as well as the environment and natural resources of the State. At the same time, especially in view of the ongoing harm the State is suffering from the Deepwater Horizon disaster, the State has an interest in making sure that offshore drilling is conducted with the utmost safety and regulatory oversight, and to ensure that the environment and natural resources of the State are protected.

The State believes, however, that these objectives can be achieved with a balanced approach to deepwater drilling that includes inspection, detection, and correction of any threats, without the necessity of shutting down an entire industry segment. As demonstrated below, a moratorium on deepwater drilling will have a severe impact on the economy of the State of Louisiana in both the short term and long term, which has been completely ignored in Defendants' decision-making process.

## STATEMENT OF THE CASE

The oil and gas industry is one of the leading industries in Louisiana in terms of economic impact, taxes paid, and people employed. Louisiana is the third leading producer of natural gas and the fourth leading producer of crude oil in the country. When OCS production is included, Louisiana ranks second in natural gas and third in crude oil production. There are 19 active refineries in Louisiana which rely significantly on offshore production in the Gulf of Mexico for their raw materials.

The offshore oil and gas industry, operating in the Gulf of Mexico outside of the territorial boundaries of Louisiana, has a tremendous economic impact on the State, estimated to be approximately $3 billion per year. This comes not only from salaries and wages of workers on the rigs, but also from the myriad of Louisiana companies doing business with the offshore

industry, including contract employment companies, boat companies, tool rental companies, equipment servicing companies, and offshore food service companies, among many others. Because of the pervasiveness of the oil and gas industry in Louisiana, the entire economy is affected, from grocery stores and restaurants to banks and schools. [insert something about Rainy Day funding coming from oil and gas revenues]

Effective May 30, 2010, the U.S. Department of the Interior, through the Minerals Management Service (MMS), issued a "six-month suspension of all pending, current, or approved offshore drilling operations of new deepwater wells in the Gulf of Mexico" in water depths exceeding 500 feet.[1] According to the Louisiana Mid-Continent Oil and Gas Association, the moratorium will take 33 floating rigs out of commission for at least six months.[2] The attached map prepared by the LSU Center for Energy Studies identifies and shows the location of 31 of the affected rigs, all off the Louisiana coast.[3] Each of those rigs employs Louisiana workers and is supplied and serviced by Louisiana companies.

The impact of the moratorium is neither speculative nor remote. According to the LSU Center for Energy Studies, within only five months the moratorium will result in the direct layoff of 3,339 Louisiana workers and the loss of an additional 7,656 jobs indirectly in the State.[4] The Louisiana Department of Economic Development estimates that the State risks losing more than 20,000 existing and potential new jobs over the next 12 to 18 months as a result of this moratorium.

In the long run, this moratorium will have an even more devastating effect on Louisiana's

---

[1] Salazar Memorandum dated March 28, 2010, and accompanying Notice to Lessees and Operators (NTL), (DOC # 5-1, p. 2-4)
[2] See Louisiana Mid-Continent Oil and Gas Assn. fact sheet, at http://www.crt.state.la.us/GEST/FactsFigures.aspx
[3] See map at http://www.crt.state.la.us/GEST/Documents/IMPACTED_RIG_LOCATIONS_06-04-2010.pdf .
[4] See charts prepared by the LSU Center for Energy Studies, estimating job losses assuming three different recovery scenarios, at http://www.crt.state.la.us/GEST/Documents/FORECASTED_ACTIVITY_11.pdf

economy. The owners of these rigs will not let them sit idle for six months or more. Anadarko Petroleum Company and Cobalt International Energy have already invoked *force majeure* clauses in their contracts with drillers in the deepwater OCS, allowing the drillers to move as many as four rigs out of the Gulf of Mexico.[5] Once these companies move their rigs there is little chance for their immediate return at the end of the moratorium, as they will have made long-term commitments at their new locations in Brazil, Africa, or the Middle East. By the end of the six-month moratorium (which is scheduled but by no means certain), there will likely be no deepwater rigs available to resume drilling in the Gulf of Mexico. Having to wait an additional year or more for available rigs will turn the short-term adverse effects of the moratorium into a long-term economic disaster for Louisiana.

The Louisiana Workforce Commission ("LWC") administers Louisiana's unemployment compensation system, its workers' compensation system and its workforce programs, including job training and work search services. Because of the moratorium, many thousands of Louisiana workers have lost their employment and many more are at risk of losing it in the near future. All of the programs administered by the LWC have been and will continue to be heavily impacted by its effects. Every state agency has incurred and continues to incur costs from providing additional public services to the citizens of the state as a result of the Deepwater Horizon Event. The moratorium will add additional strain to systems that are already overloaded by the ongoing crises, all while the federal government schedules more meetings.

In addition, Louisiana stands to lose substantial tax revenues as a result of the moratorium. Income taxes will be lost from laid-off workers and closed businesses. Sales tax

---

[5] See news reports at: http://www.reuters.com/article/idUSN0322173420100603; and http://www.ogj.com/index/article-display/9161423238/articles/oil-gas-journal/drilling-production-2/2010/06/cobalt-international.html

revenues will be lost from reduced sales of goods and services. In addition to having an impact on the State's General Fund, the moratorium on drilling will also affect funding for the Budget Stabilization Fund, the Louisiana Investment Fund for Enhancement, and First Use Tax Trust Fund, to name just a few, which rely on oil and gas revenues for their funding. Compounding the impact of loss of revenue, the lack of these funds also threatens the State's bond rating. If the State's revenue stream for oil and gas, as well as sales and personal income tax revenues decline because of loss of jobs, the rating agencies will first put the State on negative credit watch and then begin the process of lowering its rating if the moratorium continues.

Most importantly, pursuant to the Gulf of Mexico Energy Security Act (GOMESA), the State of Louisiana is presently entitled to receive 32% of all mineral revenues generated from eight million acres recently opened for drilling in the Gulf of Mexico. All of this area is now subject to the drilling moratorium. Louisiana stands to lose enormous revenue-sharing income into the foreseeable future which, as set forth below, are dedicated for use in natural resource mitigation and protection.

## LEGAL ISSUES

Many of the legal issues have already been put before the Court by Plaintiffs and Defendants and will not be repeated here. Some, however, have not.

OCSLA, 43 U.S.C. § 1332 states that it is "declared to be the policy of the United States" that:

> (4) since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments-

5

...

>    (C) **such States**, and through such States, affected local governments, **are entitled to an opportunity to participate**, to the extent consistent with the national interest, **in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf**.
> (emphasis added)

In view of that stated policy, 43 U.S.C. § 1334(a) reads, in pertinent part, as follows: "**In the enforcement of safety, environmental, and conservation laws and regulations, the Secretary shall cooperate with** the relevant departments and agencies of the Federal Government and of **the affected States**." (emphasis added)  Inasmuch as the State of Louisiana was completely ignored by Defendants in the establishment of this moratorium for alleged safety reasons, the question arises whether that failure renders Defendants' action invalid.

The Gulf of Mexico Energy Security Act (GOMESA), P.L. 109-432, provides for Federal/State revenue sharing of mineral royalties in areas of the Gulf of Mexico covered by the drilling moratorium. Section 105(d) of GOMESA restricts the use of a state's revenue share exclusively to one of the following:

>    (A) Projects and activities for the purpose of coastal protection, including conservation, coastal restoration, hurricane protection, and infrastructure directly affected by coastal wetland losses.
>    (B) Mitigation of damages to fish, wildlife, or natural resources.
>    (C) Implementation of a federally-approved marine, coastal, or comprehensive conservation management plan.
>    (D) Mitigation of the impact of outer Continental Shelf activities through the funding of onshore infrastructure projects. and
>    (E) Planning assistance and the administrative costs of complying with this section.

Given that a stated justification for the Defendants' drilling moratorium is "an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human

environment,"[6] and given that the moratorium has and will deprive the State of Louisiana of revenues which would be dedicated to the protection of the very same natural resources the moratorium purports to protect, the question arises as to the legality and legitimacy of Defendants' action in light of GOMESA. Nothing in the report relied upon by the Department of the Interior appears to have taken these statutes into account or taken the effects of the moratorium on the State into account at all.

As discussed above, this moratorium has and will have a significant adverse effect on thousands of small businesses in the State of Louisiana. The Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) requires Defendants to have considered the effect of its actions on these small businesses.
In Section 202 of SBREFA, Congress made specific findings that:

> (1) a vibrant and growing small business sector is critical to creating jobs in a dynamic economy;
>
> (2) small businesses bear a disproportionate share of regulatory costs and burdens;
>
> (3) fundamental changes that are needed in the regulatory and enforcement culture of Federal agencies to make agencies more responsive to small business can be made without compromising the statutory missions of the agencies;
>
> (4) three of the top recommendations of the 1995 White House Conference on Small Business involve reforms to the way government regulations are developed and enforced, and reductions in government paperwork requirements;
>
> (5) the requirements of chapter 6 of title 5, United States Code, have too often been ignored by government agencies, resulting in greater regulatory burdens on small entities than necessitated by statute; and
>
> (6) small entities should be given the opportunity to seek judicial review of agency actions required by chapter 6 of title 5, United States Code.

---

[6] Salazar Memorandum, Attachment 1 to Plaintiffs' First Supplemental and Amended Complaint for Declaratory and Injunctive relief. (DOC # 5-1, p. 2)

In keeping with those findings, Congress said in Section 203 of SBREFA that the purpose of the Act was:

(1) to implement certain recommendations of the 1995 White House Conference on Small Business regarding the development and enforcement of Federal regulations;

(2) to provide for judicial review of chapter 6 of title 5, United States Code;

(3) <u>**to encourage the effective participation of small businesses in the Federal regulatory process**</u>;

(4) to simplify the language of Federal regulations affecting small businesses;

(5) to develop more accessible sources of information on regulatory and reporting requirements for small businesses;

(6) <u>**to create a more cooperative regulatory environment among agencies and small businesses that is less punitive and more solution- oriented**</u>; and

(7) <u>**to make Federal regulators more accountable for their enforcement actions by providing small entities with a meaningful opportunity for redress of excessive enforcement activities**</u>. (emphasis added)

Under SBREFA, Defendants were required to conduct regulatory flexibility analyses to determine the adverse effect of its moratorium on small businesses and to insure that their actions had the least adverse economic impact on them. Defendants' suspension documents neither mentions SBREFA, nor attempts to comply with the Act. Once again, the question arises as to the legality and legitimacy of Defendants' action in light of SBREFA .

## ARGUMENT ON THE ISSUES

**1. <u>No rational reason for defendants' action.</u>**

Defendants justify the moratorium on the ground that it gives the Department of the Interior "time to step back and investigate both the root causes of the Deepwater Horizon disaster and to implement additional safety measures to ensure that we don't fall victim to another

disastrous oil spill."[7]

The prevention of future oil spills requires (1) a detailed set of rules and regulations designed to require drilling operations be conducted in accordance with the strictest safety standards, (2) oil and drilling companies truly dedicated to following those rules and regulations, **and** (3) a watchdog Federal agency intent on policing the industry to make sure the rules and regulations are followed.

It is clear from the testimony in the joint MMS/Coast Guard hearings, and the recent hearings before Congress, that the Deepwater Horizon disaster was the result of the abject failure of (2) **and** (3) above.  More studies and investigation will not make the Deepwater Horizon disaster go away; Louisiana will have to suffer with that for decades to come. Nor will more studies and investigation insure that the MMS will enforce the rules and regulations that have been in place long before the Mississippi Canyon was even put out to lease.

The existing rules and regulations required these studies **before** leases were let and **before** drilling started in the Mississippi Canyon.  These **existing regulations** require that: exploration plans must be prepared and approved (30 C.F.R. § 250.211-118); development and production plans must be prepared and approved (30 C.F.R. § 250.241-262); deepwater operations plans must be prepared and approved (30 C.F.R. § 250.286-295); well drilling design criteria must be prepared and approved (30 C.F.R. § 250.413); a detailed drilling prognosis must be prepared and approved (30 C.F.R. § 250.414); a casing and cementing program must be prepared and approved (30 C.F.R. § 250.415); diverter and BOP systems must be approved (30 C.F.R. § 250.416);  an application for a permit for drilling must be prepared and approved (30 C.F.R. § 250.418); if a MODU is used, it must meet rigorous inspection requirements (30 C.F.R. § 250.417); reservoir testing must be submitted and approved. (30 C.F.R. §250.407). *A drilling*

---

[7] Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction at p. 24 (DOC # 28)

***moratorium simply is not necessary to enforce the extensive rules and regulations already in place.***

The State's Gulf Economic Survival Team (GEST) was formed at the request of Governor Jindal to specifically address alternatives to the drilling moratorium. GEST recommends that the moratorium could be reduced to thirty days through a more efficient procedure. GEST's recommendations include:

- Minerals Management Service inspectors maintain a full-time presence on all ongoing deepwater drilling locations, with all MMS inspection reports reviewed by the U.S. Coast Guard;
- strict compliance with American Petroleum Institute (API) standards on all equipment used in well construction;
- implement all of the prescriptive safety recommendations as set forth in the DOI safety report which can be implemented within 30 days;

- Re-certify all BOP equipment used in floating drilling operations and ensure their suitability for the rig and well design;
- Ensure rig personnel are trained to industry- and government-accepted standards for well-control procedures;
- Review operator well plans, with particular emphasis on casing and cementing designs to ensure sufficient pressure barriers and that designs are fit for purpose;
- After confirming the correctness and preparedness of each rig and well design, these deepwater rigs should be permitted to resume work, and the DOI should resume issuing permits for new deepwater work. Meanwhile, industry and government can work through additional recommendations outlined in DOI's Safety Report.

In essence, the State of Louisiana believes that with strict enforcement of the rules and regulations already in place and by immediately implementing the recommendations in the DOI's Safety Report which can be implemented within 30 days, deepwater drilling may promptly resume in a reasonably safe manner.

The Director of GEST, Louisiana's Lt. Governor Scott Angelle, has obtained 144,586 signatures on a petition asking Defendants to lift the moratorium. Many of these are the owners of the small businesses affected by the moratorium, who Defendants failed to consider as

required by SBREFA. Many of these individuals are the very individuals who should have been heard before the Department of the Interior issued a hasty and self-serving edict to shut down an entire segment of an industry.

## 2. No rationale for a six month period.

The Defendants have articulated no reason at all why this moratorium should last six months, other that the vague statement that they need "time to step back and investigate both the root causes of the Deepwater Horizon disaster and to implement additional safety measures."[8] Louisiana in a state of environmental and economic crisis, and time is the enemy.

Defendants have had two months to investigate this disaster. The MMS/Coast Guard hearings are over; the evidence has been taken. There is no reasonable basis for needing more time to "investigate the root causes" of the Deepwater Horizon disaster, and enforcing a moratorium while the investigation persists.

As set forth in the preceding section, most of the recommendations of the DOI Report can be implemented immediately. Strict enforcement of existing regulations, immediate implementation of DOI Report recommendations, together with adoption of the GEST recommendations, will allow reasonably safe drilling, while Defendants conduct studies and investigate improved safety regulations. This approach strikes the correct balance of preserving economic livelihoods and ensuring safe operations.

Furthermore, there is no guarantee that six months would be an outside limit on Defendants' moratorium. The Defendants have not identified any specific objectives other than conducting further studies and having more meetings. In fact, under the regulations, Defendants could conceivably extend this drilling suspension up to five years. Given the glacial pace of the federal government's decision-making in the Deepwater Horizon disaster so far, one cannot draw

---

[8] Defendants' Opposition, p. 24.

much comfort from Defendants' assurance "that the challenged suspensions do not last any longer than necessary to implement the safety protocols recommended in the 30-day Report or in the National Commission's six-month report."[9]

In addition, several of the Defendants' own "peer review panel" have repudiated the DOI's conclusion that a six month moratorium was necessary to implement the recommendation those same industry experts agreed would be beneficial. Even after the catastrophic events of September 11, the government only shut down the airlines for three days. There simply is no precedent for the government's action and no justification for it.

### 3. Agency decision was arbitrary and capricious.

Defendants contend that "temporary harm to Plaintiffs' short-term financial interests is far outweighed by the potential for harm to the people and public lands of the United States if the challenged suspensions are prematurely lifted" and that Plaintiffs' losses "cannot compare to the potential costs and lost opportunity of failing to prevent another Deepwater Horizon disaster sometime in the next six months."[10]

Any estimation of "potential for harm" in deciding to take action should always include a risk benefit analysis, weighing the potential for harm against actual harm that may result from not taking the action. Defendants clearly failed to do this when deciding to impose the moratorium without considering the actual harm that will befall Louisiana and its citizens.

Nowhere in the Defendants' documents or in any of the papers filed with this Court, is there any mention, much less consideration, of the potential adverse economic impact this drilling moratorium may have on the State of Louisiana and its citizens. Recitation of regulations and platitudes in briefs, do not raise the quality of Defendants' analysis beyond the level of pure

---

[9] *Id.* p. 10.
[10] Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction at p. 24, 25 (DOC # 28)

speculation.

If, as conceded by Defendants, an agency's action may be overturned if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[11] then the moratorium must be lifted immediately. The Court's role in that regard is to determine if the agency considered the "relevant factors" and "articulates a rational relationship between the facts found and the choice made."[12] The Defendants certainly knew that Louisiana was the state most affected, both positively and negatively, by this moratorium. They had a legal obligation under OCSLA to consult with the State. Yet they never contacted the State about the moratorium, nor did they seek any information about the potential negative effects of the moratorium on the State. In other words, **Defendants never considered the most relevant factor of all**, namely, how will this action affect the State of Louisiana and its citizens.

### 4. Agency decision did not comply with the law.

The clear Congressional intent of OCSLA was to encourage participation of adjacent coastal states in the management of production of minerals on the OCS. 43 U.S.C. § 1334(a) specifically requires Defendants to cooperate with affected states in the enforcement of its safety laws and regulations. Defendants failed in this requirement by not even communicating with the State of Louisiana on this important regulatory matter, until after the fact.

Furthermore, Defendants were required by SBREFA to consider the adverse impact of its action on the thousands of small businesses adversely affected by the moratorium. They did not do so.

### 5. An alternative remedy.

The parties appear to be locked in an "all or nothing" battle, asking the Court to either lift

---

[11] *Id.*, p. 6-7.
[12] *Id.* p. 7, and cases cited therein.

13

the moratorium immediately without restriction, or leave it in place for at least six months as directed by the MMS.  Faced with only those two choices, the State believes that lifting the moratorium is the proper option.  However, there may be rational alternatives the Court could employ to enable deepwater drilling in a much shorter period of time.

Pursuant to the APA [5 U.S.C. § 706(1)], the Court shall "compel agency action unlawfully withheld or <u>unreasonably delayed</u>;" (emphasis added)  At the very least the Court should find that six plus months is an unreasonable delay, and order that the moratorium be lifted in 30 days from the date of its imposition, absent a clear showing by MMS why the moratorium should not be extended.  During that time, the DOI Report and the GEST recommendations may be implemented, and safe drilling resumed in a more reasonable timeframe.

## **CONCLUSION**

The State of Louisiana, more than any other public or private entity, has been most adversely affected by the Deepwater Horizon disaster.  The drilling moratorium imposed by Defendants will only compound the State's problems, effectively turning an environmental disaster into an economic catastrophe for the State.  Every day that the moratorium is in effect costs the State untold millions of dollars.

The Federal Government's failures in allowing the Deepwater Horizon disaster to occur cannot be used as an excuse for compounding the problems by *carte blanche* suspending all deepwater drilling pending studies and investigations into those failures.  Extensive regulations already exist which, if properly administered, would allow deepwater drilling with reasonable assurances of safety.   Additional recommendations of the DOI's Safety Report may be immediately implemented to bolster drilling safety in deep water off the coast of Louisiana.

The State of Louisiana encourages Defendants to undertake a comprehensive analysis of

what went wrong on the Deepwater Horizon rig in order to ensure the future safety of OCS activity. However, the implementation of the current moratorium is overly broad and not properly tailored to the stated goal. Indeed, had Defendants conducted a proper risk-benefit analysis and afforded the affected states an opportunity to comment on its proposed actions, Louisiana could have aided Defendants in the creation of a more narrowly tailored limitation on activity to achieve a better balance between the risks associated with OCS activity and the benefits of that same activity.

Therefore, the State of Louisiana supports the Petitioner's request for relief and requests that this Court issue the requested preliminary injunction, immediately lifting the moratorium on deepwater drilling in the Gulf of Mexico. Alternatively, the Court should order the lifting of the moratorium within 30 days from the date of its inception, absent a clear showing by Defendants why the moratorium should not be extended.

Respectfully submitted,

James D. "Buddy" Caldwell
Louisiana Attorney General
James Trey Phillips
First Assistant Attorney General
Megan K. Terrell
Assistant Attorney General
Section Chief – Environmental
State of Louisiana
P.O. Box 94005
Baton Rouge, Louisiana  70804-9005
Tel: (225) 326- 6708
Fax: (225) 326-6797


By: __/s/ Henry T. Dart_____
Henry T. Dart, Esq. (La. Bar # 4557)
Grady J. Flattmann, Esq.
Henry Dart, Attorneys at Law P.C.
510 N. Jefferson St.
Covington, LA 70433
Tel: 985-809-8093

Fax: 985-809-8094

Special Counsel to the Attorney General

and


__/s/ Elizabeth Baker Murrill____
Elizabeth Baker Murrill
Deputy Executive Counsel
Governor Bobby Jindal
Lousiana State Capitol, 4th Fl
600 N. Third Street
Baton Rouge, Lousiana 70802
(225) 342-2884
Bar Roll No. 20685

and


__/s/ Allan Kanner_____
Allan Kanner, Esq.
Elizabeth B. Petersen, Esq.
Rebecca J. Davis, Esq.
Kanner & Whiteley, L.L.C.
701 Camp Street
New Orleans, Louisiana 70130
Tel: (504) 524-5777
Fax: (504) 524-5763

Special Counsel to the Attorney General

and


__/s/ Bradley M. Marten_____
Bradley M. Marten, Esq.
Linda R. Larson, Esq.
Marten Law PLLC
1191 Second Avenue, Suite 2200
Seattle, WA 98101
Tel: (206) 292-2600
Fax: (206) 292-2601

Of Counsel, Pro Hac Vice Pending

and

__/s/ T. Allen Usry_____
T. Allen Usry, Esq.
Usry, Weeks, & Matthews, APLC

1615 Poydras St., Ste. 12
New Orleans, LA 70112
Tel: (504) 592-4600
Fax: (504) 592-4641

Special Counsel to the Attorney General

and

__/s/ E. Wade Shows_____
E. Wade Shows, Esq.
Shows, Cali, Berthelot & Walsh LLP
628 St. Louis Street
Baton Rouge, LA 70802
Tel: (225) 346-1461
Fax: (225) 346-1467

Special Counsel to the Attorney General

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this 20th day of June, 2010 served the foregoing **AMICUS BRIEF ON BEHALF OF BOBBY JINDAL, GOVERNOR OF THE STATE OF LOUISIANA, AND THE STATE OF LOUISIANA IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** on the Court's electronic docketing system. Therefore, the undersigned upon information and belief certifies that all counsel of record as noted below, will receive a copy of these papers through the Court's electronic notice system:

Carl D. Rosenblum
Jones, Walker, Waechter,
  Poitevent, Carrere, & Denegre, L.L.P.
201 St. Charles Avenue, 49th Floor
New Orleans, LA. 70170
crosenblum@joneswalker.com
Counsel for Plaintiffs

Guillermo A. Montero
U.S. Department of Justice
Environmental and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20016
Guillermo.montero@usdoj.gov
Counsel for Defendants

_____/s/ Henry T. Dart_____
Henry T. Dart