UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

HORNBECK OFFSHORE SERVICES,                    CIVIL ACTION
L.L.C ET AL.

VERSUS                                         NO. 10-1663

KENNETH LEE "KEN" SALAZAR                      SECTION "F"
ET AL.

<u>ORDER AND REASONS</u>

This case asks whether the federal government's imposition of a general moratorium on deepwater drilling for oil in the Gulf of Mexico was imposed contrary to law. Before the Court is the plaintiffs' motion for preliminary injunction. For the following reasons, the motion is GRANTED.

**<u>Background</u>**

The plaintiffs in this case provide a myriad of services to support offshore oil and gas drilling, exploration, and production activities in the Gulf of Mexico's Outer Continental Shelf.[1] They

---

[1]Hornbeck Offshore Services owns and operates a fleet of Jones-Act compliant vessels that support deepwater and ultra deepwater exploration in the Gulf of Mexico. The Bollinger Entities own and operate shipyards for the construction and repair of vessels with a significant part of their business (50% in 2009) involving vessels used to support deepwater exploration and production in the Gulf. The Bee Mar Deepwater Vessel Companies own and operate vessels that support Gulf of Mexico deepwater exploration and production activities. The Chouest Shore Side Companies perform various support services necessary for Gulf deepwater exploration and production. The Chouest Vessel Companies own and operate vessels that support deepwater exploration and production in the Gulf. The Chouest Shipyard Companies construct vessels intended for Gulf of Mexico deepwater operations. Over 10,000 employees in a variety of trades are employed.

1

challenge the six-month moratorium on offshore drilling operations of new and currently permitted deepwater wells that was imposed on May 28, 2010 by the Department of the Interior and the Minerals Management Service.

The government edict was in reaction to the Deepwater Horizon drilling platform explosion on April 20, 2010, and the resulting devastation. In response to this unprecedented disaster,[2] the President of the United States formed a bipartisan commission–the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling–and tasked it with investigating the facts and circumstances concerning the cause of the blowout. The President also ordered the Secretary of the Interior to conduct a thorough review of the Deepwater Horizon blowout and to report, within thirty days, "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf."

A thirty-day examination was conducted in consultation with respected experts from state and federal governments, academic institutions, and industry and advocacy organizations. On May 27,

---

[2]The all-too-familiar tragic facts include the senseless deaths of eleven crew members, the horrible losses of their families and loved ones, many injured workers, a broken pipe on the sea floor that continues to spew endless gushes of crude oil into the Gulf, and oil muck that has spread across thousands of square miles and persists in damaging sensitive coastlines, wildlife, and the intertwined local economies. As a result, nearly one-third of the Gulf of Mexico has been closed to commercial and recreational fishing.

2010 the Secretary issued a Report, which reviews all aspects of drilling operations and recommends immediate and long term reforms to improve drilling safety. In the Executive Summary to the Report, the Secretary recommends "a six-month moratorium on permits for new wells being drilled using floating rigs." He also recommends "an immediate halt to drilling operations on the 33 permitted wells, not including relief wells currently being drilled by BP, that are currently being drilled using floating rigs in the Gulf of Mexico." Much to the government's discomfort and this Court's uneasiness, the Summary also states that "the recommendations contained in this report have been peer-reviewed by seven experts identified by the National Academy of Engineering." As the plaintiffs, and the experts themselves, pointedly observe, this statement was misleading. The experts charge it was a "misrepresentation." It was factually incorrect. Although the experts agreed with the safety recommendations contained in the body of the main Report, five of the National Academy experts and three of the other experts have publicly stated that they "do not agree with the six month blanket moratorium" on floating drilling. They envisioned a more limited kind of moratorium, but a blanket moratorium was added after their final review, they complain, and was never agreed to by them. A factor that might cause some apprehension about the probity of the process that led to the Report.

The draft reviewed by the experts, for example, recommended a

3

six-month moratorium on exploratory wells deeper than 1000 feet (not 500 feet) to allow for implementation of suggested safety measures.

The Report makes no effort to explicitly justify the moratorium: it does not discuss any irreparable harm that would warrant a suspension of operations, it does not explain how long it would take to implement the recommended safety measures. The Report does generalize that "[w]hile technological progress has enabled the pursuit of deeper oil and gas deposits in deeper water, the risks associated with operating in water depths in excess of 1,000 feet are significantly more complex than in shallow water."

On May 28, 2010, the Secretary also issued a memorandum to the director of MMS, in which he stated:

> I find at this time and under current conditions that offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment as that is specified in 30 C.F.R. 250.172(b). I also have determined that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment.30 C.F.R. 250.172(b).
> Therefore, I am directing a six-month suspension of all pending, current, or approved offshore drilling operations of new deepwater wells in the Gulf of Mexico and the Pacific regions.

The pattern continues. The one page memorandum, also, fails to explain the reasons for the suspension of operations or the depth of operations to be affected. Then on May 30, 2010, the Deputy Director of MMS abruptly issued a Notice to Lessees in which he

4

directs that:

> The Six-Month Deepwater Moratorium . . . directs you to cease drilling all new deepwater wells . . . and puts you on notice that, except as provided herein, MMS will not consider for six months from the date of this Moratorium NTL drilling permits for deepwater wells and for related activities as set forth herein. For the purposes of this Moratorium NTL, "deepwater" means depths greater than 500 feet.

While the Administrative Record[3] is not yet complete, the government draws attention to several documents that were considered during the creation of the Report (but not necessarily mentioned in it). The Shallow Water Energy Security Coalition Presentation illustrates differences between jack-up rigs, which are used in shallow waters up to 500 feet, and floating rigs, which are used in deeper waters. The presentation also lists factors making the shallow water rigs safer, such as having blowout preventers on the surface and using traditional and proven well control methods.

The plaintiffs' complaint is based on the effect of the general moratorium on their oil service industry business, on the local economy, and puts in play the issue of the robustness of a Gulf-wide industry and satellite trades. Gulf of Mexico drilling activities rely upon a vast and complex network of technology, assets, human capital and experience. Indeed, an estimated 150,000 jobs are directly related to offshore operations. The government

---

[3]The extent of this Court's scope of review is discussed in more detail in Part II.B.

admits that the industry provides relatively high paying jobs in drilling and production activities. Oil and gas production is quite simply elemental to Gulf communities. There are currently approximately 3600 structures in the Gulf, and Gulf production from these structures accounts for 31% of total domestic oil production and 11% of total domestic, marketed natural gas production. Sixty-four percent of active leases are in deepwater, over 1000 feet. The plaintiffs own and operate vessels, shipyards, and supply services companies that support deepwater oil exploration and production in the Gulf. In addition to the vessels and facilities involved in their work, the plaintiffs together employ over 11,875 people. At least nineteen other companies, aside from BP's operations involved with Deepwater Horizon, are presently operating deepwater drilling rigs.

On June 7, 2010, Hornbeck Offshore Services sued in this Court for declaratory and injunctive relief against the Secretary, the Department, the MMS, and the Director of the MMS. Two days later, more plaintiffs joined the litigation, and a motion for preliminary injunction prohibiting the government from enforcing the drilling moratorium is now before the Court. The Court, because of the national importance of these issues, ordered an expedited hearing for June 21, 2010. On June 18, 2010, the Florida Wildlife Federation, the Center for Biological Diversity, the Natural Resources Defense Counsel, the Sierra Club, and the Defenders of

Wildlife intervened as defendants.[4]

## Law and Analysis

### I. OCSLA

#### A.

The Outer Continental Shelf Lands Act governs federal offshore oil and gas leasing and declares as national policy that "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safe-guards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. §1332(3). OCSLA establishes four distinct stages in the administrative process: (1) formulation of a five-year leasing plan by the Secretary; (2) lease sales; (3) exploration by the lessees; and (4) development and production. Sec'y of the Interior v. California, 464 U.S. 312, 337 (1984). In the preparation and maintenance of this federal leasing program, OCSLA mandates consideration of the "economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values . . . and the marine, coastal, and human environments." 43 U.S.C. §1344(a)(1).

---

[4]The Court wishes to thank all parties and counsel for their cooperation and assistance in dealing with the expedited schedule.

OCSLA instructs the Secretary of the Interior to prescribe regulations

> for the suspension or temporary prohibition of any operation or activity, including production, pursuant to any lease or permit . . . if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment.

Id. §1334(a)(1). Tracking the statute's mandate, the federal regulations provide that the Regional Supervisor may direct a suspension of operations or a suspension of production "When activities pose a threat of serious, irreparable, or immediate harm or damage. This would include a threat to life (including fish and other aquatic life), property, any mineral deposit, or the marine, coastal or human environment." 30 C.F.R. §250.172(b). The Regional Supervisor can also declare a suspension "when necessary for the installation of safety or environmental protection equipment." Id. §250.172(c).

## B.

OCSLA establishes a private right of action to any person "having a valid legal interest which is or may be adversely affected" by any violation of OCSLA or the regulations promulgated under it. 43 U.S.C. §1349(a)(1). Generally, no suit can be filed "prior to sixty days after the plaintiff has given notice of the alleged violation, in writing under oath, to the Secretary." Id. §1349(a)(2)(A). By way of contrast, however, a lawsuit may also be

brought "immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." Id. §1349(a)(3); compare Chevron, U.S.A., Inc. v. F.E.R.C., 193 F. Supp. 2d 54, 65 (D.C. Cir. 2002) (holding that plaintiffs faced immediate effect to their legal interest where a Federal Energy Regulatory Commission order stated that it would disclose the plaintiffs' commercially sensitive information within five days) with Duke Energy Field Servs. Assets, L.L.C. v. Fed. Energy Regulatory Comm'n, 150 F. Supp. 2d 150, 156 (D.C. Cir. 2001) (holding that the plaintiffs' legal interests would not be immediately affected where FERC had ordered them to publicly file their gas transportation service rates because this order did not mean the information would "instantly be made public" since other FERC regulations provided ways for the information to remain confidential). In the absence of an imminent threat to the public health or safety or an immediate effect on a legal interest, a plaintiff must comply with the sixty-day notice under oath provision. Duke Energy, 150 F. Supp. 2d at 156; see Hallstrom v. Tillamook County, 493 U.S. 20, 25, 33 (1989) (holding that a nearly identical sixty-day notice provision of the Resource Conservation and Recovery Act imposed a mandatory precondition to suit). The D.C. Circuit Court of Appeals has held that where (as has been established here) the plaintiff's legal

interests will be immediately affected, the plaintiff provides adequate notice as long as it gives notice prior to filing the action. <u>Chevron</u>, 193 F. Supp. 2d at 64.

II. Administrative Procedure Act

A.

The Administrative Procedure Act authorizes judicial review of final agency action where there is no other adequate remedy in a court. 5 U.S.C. §704; <u>see</u> <u>id.</u> §702 ("A person suffering a legal wrong because of agency action . . . is entitled to judicial review thereof.").[5] This right to judicial review "applies universally 'except to the extent that (1) the statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.'" <u>Bennett v. Spear</u>, 520 U.S. 154, 174 (1997). In reviewing the Endangered Species Act, the Supreme Court in <u>Bennett</u> concluded that the term "violation" in the Act's citizen suit provision could not "be interpreted to include the Secretary's maladministration of the ESA." <u>Id.</u> The ESA provision permits suits "to enjoin any person . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." <u>Id.</u> at 171; <u>see</u> 16 U.S.C. §1540(g)(1). Guided by <u>Bennett</u>, the Tenth

_____

[5]The APA does not provide an implied grant of subject matter jurisdiction. <u>Califano v. Sanders</u>, 430 U.S. 99, 107 (1977). However, the plaintiffs' claims of injury caused by the defendants' violation of OCSLA are subject to this Court's federal question jurisdiction. <u>See</u> 28 U.S.C. §1331.

Circuit held that the APA, not the citizen suit provision of OCSLA, is the appropriate vehicle for judicial review of a final decision by the Secretary that was made in fulfillment of his duties under OCSLA. Amerada Hess Corp. v. Dep't of Interior, 170 F.3d 1032, 1034 (10th Cir. 1999). The Fifth Circuit has similarly written that the OCSLA citizen suit provision should not be used to challenge agency decisions that "were or will be otherwise subject to judicial review under the APA." OXY USA, Inc. v. Babbitt, 122 F.3d 251, 258 (5th Cir. 1997); but see Duke Energy, 150 F. Supp. 2d 150, 155-56 (D.C. Cir. 2001) (refusing to permit judicial review under APA as a way to circumvent the notice requirement of OCSLA's citizen suit provision).[6]

### B.

The APA cautions that an agency action may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or not otherwise not in accordance with law." 5 U.S.C. §706(2)(A); see Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971). The reviewing court must decide whether the agency acted within the scope of its authority, "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 415-16; see Motor Vehicle Manf. Ass'n of the U.S. v. State Farm Mutual

_____

[6]In this case, it seems the result would be the same, whether the APA applies or OCSLA's citizen suit provisions.

11

Auto. Ins. Co., 463 U.S. 29, 42-43 (1983). While this Court's review must be "searching and careful, the ultimate standard of review is a narrow one." Overton Park, 401 U.S. at 416; see Delta Found., Inc. v. United States, 303 F.3d 551, 563 (5th Cir. 2002). The Court is prohibited from substituting its judgment for that of the agency. Overton Park, 401 U.S. at 416. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

The Supreme Court has explained that:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies . . . . [But the court] will, however, 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.'

State Farm, 463 U.S. at 43 (quoting Bowman Transp. Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286 (1974)). In State Farm, the Supreme Court held the agency's decision was arbitrary and capricious because the agency had failed to give any consideration to an obvious alternative. Id. at 46-47. That rationale resonates in this dispute.

12

A court determining whether some agency action is arbitrary and capricious under the APA makes its decision on the basis of the "whole record." 5 U.S.C. §706; see Dep't of Banking & Consumer Fin. of Miss. v. Clarke, 809 F.2d 266, 271 (5th Cir. 1987). This record "consists of the administrative record compiled by the agency in advance of litigation, not any record thereafter constructed in the reviewing court." AT&T Info. Sys., Inc. v. Gen. Servs. Admin., 810 F.2d 1233, 1236 (D.C. Cir. 1987). Indeed, because the Court's concern is with the rationality of the agency's decision making, "post hoc explanations . . . are simply an inadequate basis for the exercise of substantive review of an administrative decision." United States v. Garner, 767 F.2d 104, 117 (5th Cir. 1985). Those principles will set the parameters of merits-resolution. For now, the Court turns to the propriety of preliminary relief.

III. Preliminary Injunction

It is well settled that "preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has clearly carried the burden of persuasion." Bluefield Water Ass'n v. City of Starkville, Miss., 577 F.3d 250, 253 (5th Cir. 2009) (quoting Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 196 (5th Cir. 2003)); see also PCI Transport., Inc. v. Ft. Worth & W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005). The Court can issue an injunction only if the movant shows:

    (1) a substantial likelihood of prevailing on the merits;
    (2) a substantial threat of irreparable injury if the

13

injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest.

Ridgely v. FEMA, 512 F.3d 727, 734 (5th Cir. 2008).

"Speculative injury is not sufficient [to make a clear showing of irreparable harm]; there must be more than an unfounded fear on the part of the applicant." Holland Am. Ins. Co. v. Succession of Roy, 77 F.2d 992, 997 (5th Cir. 1985); see Wis. Gas Co. v. F.E.R.C., 758 F.2d 669, 674 (D.C. Cir. 1985) ("[Irreparable] injury must be both certain and great; it must be actual and not theoretical."). Where the injury is merely "financial" and "monetary compensation will make [the plaintiff] whole if [the plaintiff] prevails on the merits," there is no irreparable injury. Bluefield, 577 F.3d at 253. But when the nature of economic "rights makes 'establishment of the dollar value of the loss . . . especially difficult or speculative,'" a finding of irreparable harm is appropriate. Allied Mktg. Group, Inc. v. CDL Mktg., Inc., 878 F.2d 806, 810 n.1 (5th Cir. 1989) (quoting Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 630 n.12 (5th Cir. 1985)).

IV.

A. Jurisdiction

The plaintiffs focus on the APA as providing the basis for the judicial review they seek.[7] They seem to abandon attention to the presuit requirements of OCSLA's §1349 because they urge they do not seek to enforce the OCSLA regulations, nor do they seek to recover the civil penalties provided under OCSLA. Instead, plaintiffs insist, they simply seek judicial review of final agency action as provided by the APA. The Court agrees that the APA certainly applies here.

The central thrust of the plaintiffs' argument is that the Secretary was arbitrary and capricious in fulfilling his duties under OCSLA. Indeed, the issue does not seem to be whether the Secretary is in "violation" of OCSLA or its regulations. See OXY, 122 F.3d at 257 (observing that the citizen suit provision

---

[7] In the alternative, the plaintiffs insist that the "notification" requirement of §1349(a)(3) has been met in this case. They point out that no particular type of notice is specified in the statute and that the defendants in this case were on notice of the dispute over the validity of the moratorium because direct appeals on behalf of all Louisiana citizens, including the plaintiffs, were made to the President and the Secretary in advance of the filing of this lawsuit in a June 2, 2010 letter by Governor Jindal and meetings between Louisiana's senators and the Administration. Plaintiffs underscore §1349(a)(3)'s requirement that the defendants' action "immediately affects" their legal interests has also been met. The Court agrees. The moratorium is already in effect and has already caused the cancellation and threatened cancellation of some of the plaintiffs' contracts. Further effects are imminent because of the far-reaching scope of the edict.

establishes a mechanism for citizens to participate in OCSLA's *enforcement*). Rather, as the Tenth Circuit has held, the APA, and not the citizen suit provision under OCSLA, is the appropriate vehicle to challenge a decision by the Secretary rendered in fulfillment of his OSCLA duties. See <u>Amerada Hess</u>, 170 F.3d at 1034; <u>see</u> <u>Bennett</u>, 520 U.S. at 174. The D.C. Circuit's seemingly contrary conclusion in <u>Duke Energy</u> is based on the determination that all OCSLA cases are subject to the presuit conditions in §1349(a). <u>See</u> 150 F. Supp. 2d at 155-56. That decision is not helpful. A closer reading of §1349(a) reveals that the conditions apply only to actions brought under subsection §1349(a)(1). The judicial review of a final agency action that the plaintiffs seek must proceed under the APA, making the requirements of §1349(a) irrelevant.[8]

## B. Arbitrary and Capricious

The federal moratorium expansively suspends all pending, current or approved drilling operations of new deepwater wells in the Gulf of Mexico and in the Pacific for six months. As declared by the MMS, "deepwater" is defined as depths greater than 500 feet. The Secretary based his decision on a finding that new deepwater

---

[8]The Court adds that it seems the defendants had notification of the "violation" (if it can be construed as such) before the plaintiffs filed suit, and that the plaintiffs have suffered an immediate effect to their legal interests in the form of business relationships that have already been lost. Thus trumping the "under oath" requirement.

wells pose an unacceptable risk of serious and irreparable harm to life and property and a finding that the installation of additional safety or environmental protection equipment is necessary to prevent injury or loss of life and damage to property and the environment. The government also suggests that the Secretary's decision was influenced by a concern that the government's resources, stretched thin by the oil spill, could not cope with another blowout were one to occur.[9]

After reviewing the Secretary's Report, the Moratorium Memorandum, and the Notice to Lessees, the Court is unable to divine or fathom a relationship between the findings and the immense scope of the moratorium. The Report, invoked by the Secretary, describes the offshore oil industry in the Gulf and offers many compelling recommendations to improve safety. But it offers no time line for implementation, though many of the proposed changes are represented to be implemented immediately. The Report patently lacks any analysis of the asserted fear of threat of irreparable injury or safety hazards posed by the thirty-three permitted rigs also reached by the moratorium. It is incident-specific and driven: Deepwater Horizon and BP only. None others. While the Report notes the increase in deepwater drilling over the past ten years and the increased safety risk associated with

---

[9]The Report notes that the Deepwater Horizon disaster "is commanding the Department of Interior's resources." A disturbing admission by this Administration.

deepwater drilling, the parameters of "deepwater" remain confused. And drilling elsewhere simply seems driven by political or social agendas on all sides. The Report seems to define "deepwater" as drilling beyond a depth of 1000 feet by referencing the increased difficulty of drilling beyond this depth; similarly, the shallowest depth referenced in the maps and facts included in the Report is "less than 1000 feet." But while there is no mention of the 500 feet depth anywhere in the Report itself, the Notice to Lessees suddenly defines "deepwater" as more than 500 feet.

Of course, the present state of the Administrative Record includes more than the Report, the Notice to Lessees, and the Memorandum of Moratorium. It includes a great deal of information consulted by the agency in making its decision. The defendants have submitted affidavits and some documents that purport to explain the agency's decision-making process. The Shallow Water Energy Security Coalition Presentation attempts at some clarification of the decision to define "deepwater" as depths greater than 500 feet. It is undisputed that at depths of over 500 feet, floating rigs must be used, and the Executive Summary to the Report refers to a moratorium on drilling using "floating rigs." Other documents submitted summarize some of the tests and studies performed. For example, one study showed that at 3000psi, the shear rams on three of the six tested rigs failed to shear their samples; in the follow up study, various ram models were tested on 214 pipe samples and

7.5% were unsuccessful at shearing the pipe below 3000psi. How these studies support a finding that shear equipment does not work consistently at 500 feet is incomprehensible. If some drilling equipment parts are flawed, is it rational to say all are? Are all airplanes a danger because one was? All oil tankers like Exxon Valdez? All trains? All mines? That sort of thinking seems heavy-handed, and rather overbearing.

The Court recognizes that the compliance of the thirty-three affected rigs with current government regulations may be irrelevant if the regulations are insufficient or if MMS, the government's own agent, itself is suspected of being corrupt or incompetent.[10] Nonetheless, the Secretary's determination that a six-month moratorium on issuance of new permits and on drilling by the thirty-three rigs is necessary does not seem to be fact-specific and refuses to take into measure the safety records of those others in the Gulf.[11] There is no evidence presented indicating that the

---

[10] If the MMS and the Department truly were incompetent and corrupt, as the intervenors insist, the Court fails to see how this conclusion supports the government's position. Indeed, while the government makes light of the fact that several of the experts disagree with the recommendations in the Report by noting that they do not disagree with the findings, of greater concern is the misleading text in the Executive Summary that seems to assert that all the experts agree with the Secretary's recommendation. The government's hair-splitting explanation abuses reason, common sense, and the text at issue.

[11] Most of the currently permitted rigs passed MMS inspection after the Deepwater Horizon exploded. According to the Report, since 1969, before Deepwater Horizon, only some three blowouts have occurred . . . all in other parts of the world, not

19

Secretary balanced the concern for environmental safety with the policy of making leases available for development. There is no suggestion that the Secretary considered any alternatives: for example, an individualized suspension of activities on target rigs until they reached compliance with the new federal regulations said to be recommended for immediate implementation. Indeed, the regulations themselves seem to contemplate an individualized determination by authorizing the suspension of "all or any part of a lease or unit area." 30 C.F.R. §250.168. Similarly, OCSLA permits suspension of "any operation or activity . . . pursuant to any lease or permit." 28 U.S.C. §1334(a)(1). The Court cannot substitute its judgment for that of the agency, but the agency must "cogently explain why it has exercised its discretion in a given manner." <u>State Farm</u>, 463 U.S. at 48. It has not done so.[12]

The Deepwater Horizon oil spill is an unprecedented, sad, ugly and inhuman disaster. What seems clear is that the federal government has been pressed by what happened on the Deepwater Horizon into an otherwise sweeping confirmation that all Gulf deepwater drilling activities put us all in a universal threat of irreparable harm. While the implementation of regulations and a new

_____

the Gulf.

[12]Of interest to the Court is the Report's conflicting observation that while "the rate of blowouts per well has not increased . . . the experience of the BP Oil Spill illustrates the significant challenges in deepwater drilling."

culture of safety are supportable by the Report and the documents presented, the blanket moratorium, with no parameters, seems to assume that because one rig failed and although no one yet fully knows why, all companies and rigs drilling new wells over 500 feet also universally present an imminent danger.

On the record now before the Court, the defendants have failed to cogently reflect the decision to issue a blanket, generic, indeed punitive, moratorium with the facts developed during the thirty-day review. The plaintiffs have established a likelihood of successfully showing that the Administration acted arbitrarily and capriciously in issuing the moratorium.

## C. Irreparable Harm

The plaintiffs assert that they have suffered and will continue to suffer irreparable harm as a result of the moratorium. The Court agrees. Some of the plaintiffs' contracts have been affected; the Court is persuaded that it is only a matter of time before more business and jobs and livelihoods will be lost. The defendants trivialize such losses by characterizing them as merely a small percentage of the drilling rigs affected, but it does not follow that this will somehow reduce the convincing harm suffered. Furthermore, courts have held that in making the determination of irreparable harm, "both harm to the parties and to the public may be considered." In re Nw. Airlines Corp., 349 B.R. 338, 384 (S.D.N.Y. 2006) (quoting Long Island R.R. v. Int'l Ass'n of

<u>Machinists</u>, 874 F.3d 901, 910 (2nd Cir. 1989)). The effect on employment, jobs, loss of domestic energy supplies caused by the moratorium as the plaintiffs (and other suppliers, and the rigs themselves) lose business, and the movement of the rigs to other sites around the world will clearly ripple throughout the economy in this region.

This Court is persuaded that the public interest weighs in favor of granting a preliminary injunction. While a suspension of activities directed after a rational interpretation of the evidence could outweigh the impact on the plaintiffs and the public, here, the Court has found the plaintiffs would likely succeed in showing that the agency's decision was arbitrary and capricious. An invalid agency decision to suspend drilling of wells in depths of over 500 feet simply cannot justify the immeasurable effect on the plaintiffs, the local economy, the Gulf region, and the critical present-day aspect of the availability of domestic energy in this country.

Accordingly, the plaintiffs' motion for preliminary injunction is GRANTED. An Order consistent with this opinion will be entered.


New Orleans, Louisiana, June 22, 2010.


MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE