## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HORNBECK OFFSHORE SERVICES, L.L.C., | * | CIVIL ACTION NO.  10-1663(F)(2) |
| Plaintiff | * | |
| VERSUS | * | SECTION F |
| | * | |
| KENNETH LEE "KEN" SALAZAR, IN HIS OFFICIAL CAPACITY AS | * | JUDGE FELDMAN |
| SECRETARY, UNITED STATES DEPARTMENT OF INTERIOR; | * | |
| UNITED STATES DEPARTMENT OF INTERIOR; ROBERT "BOB" | * | MAGISTRATE 2 MAGISTRATE WILKINSON |
| ABBEY, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR, | * | |
| MINERALS MANAGEMENT SERVICE; AND MINERALS | * | |
| MANAGEMENT SERVICE, | | |
| Defendants | * | |

*     *     *     *     *     *     *

### PLAINTIFFS' SUPPLEMENTAL BRIEF

Plaintiffs, Hornbeck Offshore Services, L.L.C., the Chouest Entities and the Bollinger Entities (collectively, "Plaintiffs"), file this supplemental brief as requested by the Court to address the direct applicability of the Supreme Court's *City of Jacksonville* decision to this matter and to address the three questions set forth in the Fifth Circuit's limited remand order, dated August 16, 2010.  With respect to the Fifth Circuit's question concerning the pre-May 28th

availability of evidence, Plaintiffs provide the Court with the comparison it requested at the conclusion of the August 11, 2010 hearing on Defendants' motion to dismiss.

## **BACKGROUND**

On June 22, 2010, this Court entered an order that "immediately prohibited" Interior from enforcing its May 28, 2010 blanket six-month deepwater drilling moratorium.  Rec. Dec. 68. Within hours of the entry of the preliminary injunction, Secretary Salazar announced that the Court was wrong: "The decision to impose a moratorium on deepwater drilling was and is the right decision" and "I will issue a new order in the coming days that eliminates any doubt that a moratorium is needed, appropriate, and within our authorities."  Rec. Doc. 69-2.  On the day following the entry of the preliminary injunction, June 23, 2010, in testimony before a Senate Subcommittee, Secretary Salazar stated that, in response to the preliminary injunction, he would simply issue another order to prevent deepwater drilling.  In response, Plaintiffs immediately filed a Motion to Enforce the Preliminary Injunction, which this Court denied as premature.  It is no longer premature.

On June 23rd,  Defendants also filed a Notice of Appeal, seeking to have the Fifth Circuit overturn the preliminary injunction order.  They further filed a Motion to Stay, which this Court denied.  Thereafter, Defendants filed a Motion to Stay with the Fifth Circuit.  The Court ordered expedited consideration and held oral argument on July 8, 2010.  Within hours of the hearing, the Fifth Circuit denied the Motion to Stay by a vote of 2 to 1.

Just four days after losing the Motion to Stay, on July 12, 2010, Secretary Salazar reissued a blanket deepwater drilling moratorium and declared that his May 28th moratorium was rescinded and superseded.   In issuing the July 12th decision, the Secretary relied on information and facts that were available prior to the issuance of the May 28th moratorium and

justified it with the same post hoc rationales previously asserted in this litigation in an unsuccessful effort to support the May 28th moratorium. The July 12th decision simply added redundant details and set forth at greater length material from background documents that were before Interior on May 28th.

Simultaneously with the issuance of the July 12th decision, Interior filed motions to stop further judicial review and enforcement of the preliminary injunction. It filed a Motion to Dismiss the Complaint in this Court and a Motion to Vacate the Preliminary Injunction in the Fifth Circuit. Both motions are grounded on Interior's assertion that issuance of its second carbon copy moratorium moots Plaintiffs' claims and justifies vacatur of the preliminary injunction. In essence, Interior asserts that it can moot a controversy or eliminate an adverse decision at any time by simply reissuing the same agency decision and declaring the first agency decision superseded. Interior is wrong.

Interior acted arbitrarily and capriciously and exceeded its authority by "reconsidering" its moratorium and issuing a second moratorium without obtaining leave of the Court. Further, this case is not moot because Interior has repeated it prior misconduct, and Fifth Circuit authority holds that the preliminary injunction should not be vacated.

Two issues remain to be decided in this case: (a) enforcement of the preliminary injunction against the July 12th decision; and (b) judgment on the merits of Plaintiffs' claims.

## RESPONSES TO THE COURTS' QUESTIONS

**I.     The Secretary Acted Arbitrarily and Capriciously and Exceeded His Authority in "Reconsidering" the Moratorium While the Preliminary Injunction Was in Effect Without Having Obtained a Judicial Order Remanding the Matter.**

Plaintiffs are aware of no provision of OCSLA that denies the Secretary authority to reconsider his decisions. Accordingly, this matter is governed by the general rule that an

administrative agency has inherent authority to reconsider its actions.  However, as the Fifth

Circuit recently held in *ConocoPhillips Co. v. U.S. Environmental Protection Agency*, 2010 U.S.

App. Lexis 15229, *23-24 (5th Cir. revised Aug. 6, 2010):

> An agency's inherent authority to reconsider its decisions is not unlimited.  An agency may not reconsider its own decision if to do so would be arbitrary, capricious, or an abuse of discretion.  Furthermore, . . . notice of the agency's intent to reconsider must be given to the parties.

Here, Interior's "reconsideration" of its prior action was arbitrary, capricious, and an abuse of its

discretion because the agency improperly interfered with the preliminary injunction and its

judicial review and thereby negated its otherwise existing authority to reconsider its actions.  The

agency also failed to follow the proper judicial procedure for seeking remand and took actions to

evade judicial review of its decision.

In exercising his reconsideration authority, the Secretary has no right to take an action

that conflicts with pending judicial proceedings.  *Am. Farm Lines v. Black Ball Freight Serv.*,

397 U.S. 532, 542 (1970) (an agency is "without power to act inconsistently with the Court's

jurisdiction."); *Inland Steel Co. v. United States*, 306 U.S. 153, 160 (1939) (after a court issues

temporary relief against an agency order, the agency may not "act inconsistently with the court's

jurisdiction."); *B.J. Alan Co. v. ICC*, 897 F.2d 561, 563 (D.C. Cir. 1990) ("The Commission has

discretion to reconsider, so long as its resumption does not conflict with proceedings in court.")

"When an agency seeks to reconsider its action, it should move the court to remand or to hold the

case in abeyance pending reconsideration by the agency.  We do not condone the failure to

follow that procedure."  *Anchor Line Ltd. v. Federal Maritime Com.* 299 F.2d 124, 125 (D.C.

Cir. 1962); *see also ConocoPhillips Co.,* 2010 U.S. App. Lexis 15229, *24 (granting a formal

agency request for a voluntary remand to reconsider a rule in light of a Supreme Court decision

in a separate matter).  Providing such notice of intent and seeking judicial authorization also protects the plaintiff's due process right to comment on the proposed action.

For example, in *Doctors Nursing & Rehabilitation Center v. Sebelius*, 2010 U.S. App. Lexis 14575 (7th Cir. 7/16/2010), after a nursing home sued for underpayments, the Department of Health and Human Services reopened its administrative proceeding and sought dismissal of the claim.  The district court dismissed the suit, reasoning that the agency's reopening eliminated the prerequisite final decision and stripped the court of jurisdiction.  The Seventh Circuit reversed, holding that an agency may not reopen its proceedings after judicial review begins without permission from the court.  In so ruling, it recognized that courts have the power to remand to the agency for reconsideration and that remand authority "assumes that an agency may not disrupt federal jurisdiction on its own.  Otherwise, the remand authority . . . would serve no purpose:  the agency would never need to ask the court for a remand."  *Id*. at *9.  The Court further recognized that a real risk of manipulation and abuse upon litigants would exist if an agency could reopen its administrative proceeding at any time to strip a court of jurisdiction and evade review:

> If the agency became concerned that a Court of Appeals—or even the Supreme Court – might issue a decision adverse to its interests, it could reopen its proceedings and yank the case out of the courts, regardless of the amount of resources that had already been expended or the advanced stage of the case. Besides being highly inefficient, **it would allow the agency to manipulate federal jurisdiction to frustrate litigants by increasing the time and expense required to pursue claims, and prevent or at least postpone into perpetuity unfavorable precedent.**

*Id*. at *16 (emphasis added).

In this case, Interior never filed a motion seeking remand of its decision for reconsideration.  Instead, the afternoon the preliminary injunction was issued, the Secretary announced that, despite the issuance of that order, he would issue a second moratorium.  The

next day, he reiterated those statements in testimony before a Senate Subcommittee.  Although Plaintiffs immediately moved to enforce the injunction, the damage already had been done.  The Secretary's statements were intended to and in effect chilled all drilling,[1] which is exactly the result this Court sought to avoid through its preliminary injunction and in particular through its finding that Plaintiffs met their burden to show the existence of a substantial threat of irreparable harm.  Four days after the Fifth Circuit denied Defendants' motion for a stay pending appeal, the Secretary made good on his promise to issue a "new" moratorium.  In an attempt to evade further review, he "rescinded" the May 28th moratorium and moved to dismiss this case as moot.  In doing so, the Secretary overstepped the bounds of his reconsideration authority.

Once this proceeding was commenced and the preliminary injunction issued, the Secretary had no authority, without this Court's permission, to rescind the May 28th moratorium, reissue a moratorium, or otherwise interfere with this litigation.  Without such authorization, his purported reconsideration of the moratorium, issuance of the July 12th decision, and rescission of the moratorium were arbitrary, capricious and exceeded his authority, and therefore were without force and effect.  *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413-14 (1971) ("agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.")

Unlike the situation in *ConocoPhillips*, Plaintiffs have been significantly prejudiced by Defendants' failure to submit a motion for voluntary remand of the moratorium to permit reconsideration.  First, they have been deprived of the opportunity to present their positions

---

[1]   *See.g., Dow Chemical Co. v. U.S. Environmental Protection Agency*, 605 F.2d 673, 679 (3d Cir. 1979) (rejecting an agency's claim that withdrawal of a rule mooted a lawsuit because the agency continued to take a "public posture" in support of the rule and thus left the plaintiff under the "chill" or "non-speculative threat of agency action while delaying any decision on the legality of that action.")

concerning reconsideration. For example, to protect the rights afforded by the preliminary injunction, Plaintiffs could have requested that a remand be permitted only if the May 28th moratorium were vacated and the preliminary injunction made permanent. Further, by its tactics of immediate announcement of a de facto moratorium and then manipulating the process of judicial review by issuing a purportedly superseding order four days after being denied relief by the Fifth Circuit, Interior subverted the status quo (the preliminary injunction), circumvented the judicial process, and nullified this Court's order by Executive action.[2]

The decision in *ConocoPhillips* reinforces Fifth Circuit precedents that have rejected such preemptive tactics and that guard against governmental actions that undermine the effectiveness of injunctive decrees. For example, in *Staley v. Harris County, Texas*, 485 F.3d 305 (5th Cir. 2007) (*en banc*), a citizen obtained a permanent injunction against a county requiring removal of a statue from in front of a courthouse. The county appealed the issuance of the permanent injunction, but before oral argument, the county removed the monument and placed it in storage during renovations of the courthouse. The county argued that the case was moot and requested that the underlying judgment be vacated. Although the Fifth Circuit found the county's appeal moot, it refused to vacate the injunction because the county had pledged to display the monument again (recurrence) and, if the injunction was vacated, Plaintiff would be denied a remedy. 485 F.3d at 313.

Likewise, in *Houston Chronicle Publishing Co. v. City of League City, Texas,* 488 F.3d 613 (5th Cir. 2007), after entry of an injunction against it, the City repealed portions of the ordinance at issue, claimed the Plaintiff's challenge was moot, and moved for vacatur of the

---

[2]  S*ee, e.g., Scott v. Iron Workers Local 118*, 928 F.2d 863, 865 (9th Cir. 1991) (upholding the district court's denial of an agency's motion to vacate for mootness because it was clear that the agency "had 'already made the decision to withdraw . . . at the time the appeal was filed. The only reason, then, for filing this appeal would have been . . . to vacate the adverse lower court judgment by filing the appeal and then causing it to become Moot . . . .'") (internal citations omitted).

injunction.  Plaintiffs objected that the City could not be permitted to evade the injunction by selectively repealing provisions of the ordinance.  The Fifth Circuit agreed.  A party may not "'disturb the orderly operation of the federal judicial system" by using mootness and "vacatur as a refined form of collateral attack on the judgment . . . .'" *Id.* at 619 *quoting U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 27 (1994).  The Fifth Circuit noted that this was not a case where the conduct mooting the controversy was "entirely unrelated" to the lawsuit but rather appeared to be a "response to the district court judgment."  *Id.* at 620 (internal citations omitted).

Here, Interior is seeking to evade the Court's preliminary injunction by using "vacatur as a refined form of collateral attack," in violation of governing Fifth Circuit precedent.  The Secretary lacked authority to declare unilaterally, without authorization from the Court, that the provisions of the May 28th moratorium were withdrawn, cancelled and no longer in effect, given that the moratorium is the subject of a preliminary injunction and an appeal filed by the Secretary.  Accordingly, his actions were arbitrary, capricious, an abuse of discretion and exceeded the limits on his power of reconsideration, and therefore are null and void.

II.     **The Scope and Substance of the May 28th Order and the July 12th Decision Are, in All Material Respects, Identical.**

The July 12th Decision Memorandum, in all materials respects, is a mirror image of the May 28th order.  A comparison of the two reveals that the only true "difference" reflected in the July 12th decision is that it provides <u>post hoc</u> justifications – which are in large part identical to those provided in this litigation to oppose Plaintiffs' preliminary injunction motion – for the imposition of the blanket deepwater drilling moratorium.

A.      The Scope and Substance of the May 28th Order.

On May 27, 2010, Interior issued a report entitled "Increased Safety Measures for Energy Development on the Outer Continental Shelf" (the "May 27th Safety Report").  Rec. Doc. 5-1 at 9-52.  The Safety Report, in its "Executive Summary," but nowhere in its text, contained a recommendation for "a six-month moratorium on permits for new wells being drilled using floating rigs" and for "an immediate halt to drilling operations on the 33 permitted wells . . . that are currently being drilled using floating rigs in the Gulf of Mexico."  Executive Summary at 2 (emphasis added).

On May 28, 2010, Secretary Salazar, in a one-page Memorandum, directed "a six month suspension of all pending, current, or approved offshore drilling operations of new deepwater wells in the Gulf of Mexico and Pacific regions" and that "MMS shall not process any new applications for permits to drill consistent with this directive."  Rec. Doc. 5-1 at 2 (emphasis added).

To implement the Secretary's May 28th directive, on May 30, 2010, the Minerals Management Service (the department now known as the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEM")), issued a Notice to Lessees, NTL No. 2010-N04 ("NTL-04"), directing lessees and operators to "cease drilling all new deepwater wells" and notifying them that "MMS will not consider for six months from the date of this Moratorium NTL" or until November 30, 2010 "drilling permits for deepwater wells."  NTL-04 defines "deepwater" as "depths greater than 500 feet."  Rec. Doc. 5-1 at 4-7 (emphasis added).

NTL-04 provides that the moratorium does not apply to:  (a) intervention or relief wells for emergency purposes; (b) operations that are necessary to sustain reservoir pressure from production wells; (c) workover operations; (d) waterflood, gas injections or disposal wells; and

(e) drilling operations that are necessary to safely close or abandon a well or to accomplish well completion operations.

      **B**.     **The Scope and Substance of the July 12th Decision.**

On July 12, 2010, Secretary Salazar reissued a mirror image of the moratorium.  His Decision Memorandum directed BOEM "to direct the suspension of any authorized drilling of wells using subsea BOPs [blowout preventers] or surface BOPs on a floating facility" and "to cease the approval of pending and future applications for permits to drill wells using subsea BOPs or surface BOPs on a floating facility."  The Decision Memorandum itself admits that the July 12th moratorium based on equipment and technology is identical in result to the May 28th order based on water depth:

> In my May 28 suspension decision, I used a 500-foot water depth delineation as part of the description of the suspension.  This 500-foot delineation served as a **shorthand proxy** for the risks associated with using subsea BOP's or surface BOP's on floating facilities.  To avoid any confusion over the use of the proxy, I have chosen to make this new suspension decision in reference to the types of blowout prevention equipment used in deepwater operations, rather than in reference to the **functionally equivalent** concept of water depth.

Decision Memorandum at p. 9, n. 6 (emphasis added); *see also id.* at 2 (discussing the "temporary pause in deepwater drilling"); *id.* at 9 ("beyond approximately 500 feet in depth, floating facilities . . . typically are used").  At the August 11, 2010 hearing on Interior's Motion to Dismiss, Interior's counsel reconfirmed that the "end result" of the May 28th order and the July 12th decision "is, in fact, substantially similar."  August 11, 2010 Hearing Transcript at 15.

The Decision Memorandum sets forth that the stated end-date for the July 12th moratorium is November 30, 2010.  Decision Memorandum at 19-20.  Further, the Decision Memorandum provides that the July 12th moratorium does not apply to:  (a) production activities; (b) drilling operations that are necessary to conduct emergency activities; (c) drilling operations

that are necessary for completions and workovers; (d) abandonment and intervention operations; and (e) waterflood, gas injection or disposal wells.  Decision Memorandum at 19.

The May 28th order and the July 12th decision are mirror images of each other in all material features:

- The July 12th decision restates the same basic blanket one-size-fits-all prohibition as the original moratorium.  It prevents all deepwater drilling, treating the industry leader and industry laggard exactly the same.  The second moratorium has the same exceptions as the first and does not apply to production activities, drilling operations necessary to conduct emergency activities or for completions and workovers, abandonment and intervention operations and waterflood, gas injection and disposal wells.

- The July 12th decision mirrors the duration of the original moratorium, with each having the same purported "end date," November 30, 2010.

- The July 12th decision made a superficial change in approach from the original moratorium.  It nominally prohibits drilling based on the use of a subsea blowout preventer or a surface blowout preventer on a floating facility, rather than explicitly prohibiting drilling in water depths beyond 500 feet as did the first moratorium.  But, as Secretary Salazar himself acknowledged, the effects of the two are identical.[3]  All drilling in depths beyond 500 feet is prohibited.  Accordingly, notwithstanding that the Decision Memorandum states that it "replaces and supersedes the memorandum dated May 28, 2010, entitled 'Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells'" and that NTL No. 2010-N04 "is hereby rescinded," the Decision Memorandum explicitly admits that the parameters of the "new" decision are identical in scope to the original moratorium.

- The July 12th decision, like the May 28th order, provides no substantive safety requirements that an operator can satisfy and qualify to resume drilling.  The new decision, like the prior order, provides no procedures by which an operator can apply for, and obtain authorization to, resume drilling.

As a comparison of the parameters, duration and exclusions of the May 28th order and the July 12th decision reveals, the two are identical in both scope and substance.

---

[3]   *See* Decision Memorandum at p. 9, n.6.

**III.    All Facts and Information Asserted as Bases for the July 12th Moratorium Were Known or Available to Interior On or Before May 28, 2010.**

Attached hereto as Exhibit 1 is a detailed analysis of the July 12th Decision Memorandum, which demonstrates line by line that every major statement made in it is based on information that was available to the Secretary on or before May 28th.  What is apparent from this chart is that there is nothing new in the Decision Memorandum.  There is only repetition at greater length of material presented to support the May 28th decision in this litigation, redundant detail, re-characterizations of facts and cumulation of previously available information coupled with unsupported conclusions.  In essence, Interior followed the well-worn path by which agencies seek to survive judicial review.  Its staff rewrote and expanded the prior justification to produce a document that appears, at least superficially, well-supported.   Interior's effort, however, was fruitless because, once examined, it offers no new facts and offers instead only the long form version of the same, inadequate rationale.

Exhibit 1 demonstrates that facts were available to Interior before May 28th addressing each of the three major themes identified by Secretary Salazar as justifications for the July 12th moratorium – namely, (1) "systemic" drilling and workplace safety issues; (2) inadequacies of a variety of attempted wild well intervention and blowout containment strategies; and (3) the shortcomings of current oil spill response plans and resources.  Decision Memorandum at 2.

While Exhibit 1 compares over 100 statements set forth in the July 12th decision with information and conclusions that were known or available before May 28th, Plaintiffs present the following examples of what the chart shows, which are directed to the Court's specific questions at the August 11th hearing about the pre-May 28th availability of information:

- The Decision Memorandum asserts:  "[i]t is clear that the apparent performance problem with the Deepwater Horizon's BOP is not an isolated incident," and "[i]t

is unlikely that these problems are unique to BP." The Secretary, however, admits his conclusion is speculative – "we simply do not know if the BP situation is unique." *Compare* Decision Memorandum at 4 and 9. In fact, Dr. Robert Bea, one of Interior's National Academy of Engineering peer-review experts on the May 27th Safety Report, indicated as early as May 24, 2010 that his review and analysis of the evidence showed that the BP situation was unique in that it "was preventable had existing progressive guidelines and practices been followed." Exhibit 1-B, "Failures of the Deepwater Horizon Semi-Submersible Drilling Unit," by Professor Robert Bea, PhD, PE, dated May 24, 2010 (further indicating that available information demonstrated that BP and MMS had "failed to properly assess the natural hazards and human fallibilities in a prudent manner.")

- The Decision Memorandum further suggests that there are "systemic drilling and workplace safety issues," *id.* at 2, but no new evidence of any systemic problem is identified. Indeed, Interior admitted in connection with the May 28th moratorium that "the historical record for large spills from offshore blowouts and drilling operations shows very few large incidents previous to DWH . . . ." Hayes Dec. ¶ 3; *see also* May 27th Safety Report 5-6. Moreover, the post-incident inspection of 29 of the 33 rigs found no systemic problems. Plaintiffs also found no new evidence of "systemic" safety issues in the Administrative Record for the July 12th Decision Memorandum filed in the *Ensco* matter. Exhibit 1 chronicles just a few of the extensive studies commissioned by MMS since 1990 concerning drilling practices and safety issues in deepwater operations. Of particular note are extensive studies of the reliability, performance and testing of deepwater BOPs.

These studies were predictive of the kinds of BOP failures that are believed to have occurred in connection with the Deepwater Horizon incident.  Whether or not indicative of "systemic" issues, these studies were known to MMS long before May 28th.

- Interior also states that "industry executives have admitted that industry is unprepared to effectively stop deepwater oil well blowouts, and that many of the containment methods attempted with respect to the Macondo blowout have been improvised and untested." Decision Memorandum at 13.  As support for this statement, Interior relies in part on the May 11, 2010 Congressional Testimony of Lamar McKay, testimony that accordingly was available for consideration prior to issuance of the May 28th moratorium.  *Id.* at n. 15.  Moreover, retired Admiral Thad Allen advised early on that the "ultimate solution" was going to be the drilling of relief wells and that their completion would take until sometime in August.  *Press Briefing by Press Secretary Robert Gibbs, Admiral Thad Allen & Assistant to The President for Energy & Climate Change Carol Browner*, May 24, 2010 (statement by Admiral Thad Allen);[4] *see also* May 12, 2010 McKay Statement at p. 4 ("On Sunday, May 2nd, we began drilling the first of these wells . . . This relief well operation could take approximately three months.")  Thus, Interior knew before it issued the first moratorium that effective blowout containment was an issue that would take some time.  In fact, Interior admits that the 6-month duration of the May 28th moratorium took into account the expected timeline for killing the Macondo well.  Decision Memorandum at 6-7.  As with

---

[4]  *available at* http://www.whitehouse.gov/the-press-office/press-briefing-press-secretary-robert-gibbs-admiral-thad-allen-and-assistant-presid (last visited Aug. 24, 2010).

drilling practices, the facts show that MMS has for years studied how a deepwater blowout will behave and predicted the various containment strategies attempted by BP. A 1999 study predicted with remarkable accuracy that containment of a deepwater blowout would take up to 120 days and would require the drilling of a relief well. Indeed, the alternative intervention and containment strategies attempted by BP were discussed and predicted in MMS studies. Moreover, as of May 28th, several had been attempted with limited or no success. Thus, the frustration of not achieving containment by July 12th was not a new fact. More revealing from Exhibit 1 is that it was a predicted fact.

- Interior makes the conclusory statement that, **"While all offshore drilling for oil and gas involves various risk . . . certain equipment and drilling conditions undertaken in the deepwater environment carry heightened risks of producing an event such as the BP Oil Spill."** Decision Memorandum at 7. Deepwater drilling has always carried heightened risks as the May 27th Safety Report recognized. *See, e.g.,* Safety Report at 2 ("[T]he risks associated with operating in water depths in excess of 1,000 feet are significantly more complex than in shallow water.") Other than its frequent reference to the BP oil spill, Interior fails to specify what equipment or drilling conditions purportedly carry previously unknown risks, although it frequently refers to blowouts and BOPs. Yet, since at least 1999, MMS has been studying BOP performance, reliability and effectiveness as reflected in a number of MMS commissioned studies, including: *Shear Ram Capabilities Study for U.S. Mineral Management Service* (dated 2004), TA&R Project 463, *Evaluation of Secondary Intervention Methods in well*

*Control for U.S. Minerals Management Service* (dated March 2003), TA&R Project 431, *Mini Shear Study for U.S. Minerals Management Service* (dated Dec. 2002), TA&R Project 455, *Deepwater Kicks and BOP Performance* (dated July 24, 2001), TA&R Project 383, and *Reliability of Subsea BOP Systems for Deepwater Application* (dated July 11, 1999).  All of the studies are identified in the May 27th Safety Report.  Safety Report at 7-8.  There is nothing new.

- Despite Interior's long standing knowledge of risks associated with BOPs, Interior indicates that "unexpected performance problems" identified "in recent weeks with the BOPs on the relief wells that BP is drilling," provide more evidence that prior testing requirements were inadequate and problems were not unique to BP.  Decision Memorandum at 4, 9.  Notably, Interior fails in the Decision Memorandum to identify: (1) when the problems were discovered, (2) the nature of the "performance problems," or (3) their significance, if any.  As detailed in Exhibit 1 at pp. 4-7, the "performance problems" with the relief well BOPs were known before May 28, 2010.  Testing of those BOPs, under MMS oversight, occurred between May 15 and May 24.  Indeed, by May 24, 2010, all issues appear to have been resolved as evidenced by the White House's report that BP was proceeding with the relief wells:  "BP continues to make progress in drilling both relief wells—more that 10,000 feet down for the first and more than 8,500 feet for the second."  *The Ongoing Administration-Wide Response to the Deepwater BP Oil Spill,* The White House Blog,[5] attached to Exhibit 1 as Exhibit E, at p. 36.  The fact that drilling was allowed to commence undermines Interior's

---

[5]    *available at* http://www.whitehouse.gov/blog/2010/05/05/ongoing-administration-wide-response-deepwater-bp-oil-spill (last visited Aug. 24, 2010).

current position.  It is inconceivable that Interior would allow BP to continue using BOPs on the relief wells if indeed Interior had serious concerns about their performance capability.  In fact, Dr. Marcia McNutt, Director of the U.S. Geological Survey, wrote of tests conducted in mid-May:  "If EVERY BOP had to go through the same exhaustive check-out procedure that the two BOPs for the relief wells have gone through, with BOEM providing thorough oversight, including an in situ deadman test, there probably wouldn't be another BOP failure."  *See* Interagency Memorandum from Dr. Marcia McNutt to Mike Bromwich, dated June 28, 2010 at 5, attached to Exhibit 1 as Exhibit H.  It is simply not rational for Interior to suggest that "performance problems" with BOPs are a ground for an indiscriminate blanket moratorium when check-out procedures exist that are so exhaustive that Dr. McNutt concludes "there probably wouldn't be another BOP failure."  Interior simply ignored this significant information in the Decision Memorandum.

- The threat of a second spill straining existing resources was a theme articulated by Interior in its briefs filed at the time of the Court's preliminary injunction and in the Fifth Circuit.  What is abundantly clear and shown in Exhibit 1 is that all of the information necessary for Interior to raise a concern about spill response resources was available before May 28th.  The BP spill has been treated from the start as a "worst case" catastrophic spill.  BP's spill response plan, as well as the plans of all OCS operators, were on file with MMS as of May 28th.  In BP's case, according to its spill response plan, that means a spill of 250,000 bbls/day.  Moreover, as noted, it was predicted at the outset that this condition would persist

until mid-August.  The spill response assets of the United States are centrally planned and accounted for in a national database maintained by the U.S. Coast Guard Force Coordinator Center.  On any given day, Interior could have ascertained from the national database the availability of spill response assets if the BP worst case scenario were amplified by a second spill.  While Interior might not have conducted this calculation until after May 28th, it could have done so and reached the same conclusion as it contends now.

A review of the index to the Administrative Record for the July 12th Decision Memorandum recently filed by Interior into the record in the matter entitled "*Ensco Offshore Company v. Salazar*," No. 2:10-cv-01941, on the docket of this Court, further illustrates that the documents generated after May 28th are in large measure duplicative and/or cumulative of information that was known or available before May 28th.  Of the 28,063 pages filed, 21,350 pages, or 76.1% of the documents, pre-date May 28th, with an additional 553 pages undated.  Of the 6,160 pages of documents that post-date May 28th, 1,207 pages, or 19.6%, are the pleadings filed in this case.  Another 155 pages relate to economic data that Interior disregarded.  The remaining 4,798 pages consist of Congressional testimony, MMS Daily Incident Reports, DOI Daily Emergency Management Reports, API Suggestions, Media Related pages and miscellaneous pages.  Exhibit 2 attached hereto contains charts depicting:  (1) the number of pages that pre-date and post-date May 28th and their relative percentages; (2) the general categories of post-May 28th documents, the number of pages in those categories and their relative percentages; and (3) the general categories of post-May 28th documents, excluding the pleadings in this case and the economic impact documents, the number of pages in those categories and their relative percentages.  A preliminary examination of the post-May 28th paper shows that the

information contained in the 4,798 pages is generally duplicative or cumulative and most is Deepwater Horizon specific.

As generally reflected by Exhibits 1 and 2, in issuing the July 12th decision, the Secretary relied on information that existed before May 28th, and he justified the July 12th decision with the same post-hoc rationales asserted in this litigation.  In the absence of new or non-cumulative facts, neither of which is evident in the Decision Memorandum, the only conclusion that can be reached is that the Decision Memorandum reflects nothing more than the same post hoc justifications offered for the first.  It is well established under the Administrative Procedure Act that post hoc explanations cannot justify an agency action.  *U.S. v. Garner*, 767 F.2d 104, 122 (5th Cir. 1985) ("'[s]peculations about what might have been good reasons had the agency thought of them do not suffice.'") (quoting *Global Van Lines, Inc. v. ICC*, 714 F.2d 1290, 1298 (5th Cir. 1983)).  Thus, the second moratorium, based on the same post hoc rationalizations, without any new fact finding or analysis, is as arbitrary and capricious as the first.  Indeed, it is precisely the same moratorium, fundamentally lacking any rational basis.

**IV.     Under *City of Jacksonville*, This Case Is Not Moot and There Is a Live Controversy to Be Decided by This Court.**

The Supreme Court, in *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), rejected a mootness challenge nearly identical to that made here by Interior.  The courts retain jurisdiction in this case because the allegedly wrongful conduct already has recurred with issuance of the July 12th decision.  There remain two live issues for the Court to decide.

In *City of Jacksonville*, the plaintiffs alleged that a municipal ordinance denied them equal protection of the law.  After the Supreme Court had granted certiorari, the city repealed the challenged ordinance and replaced it with a new ordinance that differed in three respects from

the prior law.  The city then moved to dismiss the case as moot, arguing that there no longer was

a live controversy with respect to the constitutionality of the repealed ordinance.  The Supreme

Court rejected the mootness challenge and held that it retained subject matter jurisdiction relying

on *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982).

In *City of Mesquite*, the plaintiff successfully challenged an ordinance in district court,

and the city repealed the challenged provision while its appeal was pending in the Fifth Circuit.

Applying its well-settled rule that a defendant's voluntary cessation of a challenged practice does

not deprive the federal courts of their power to determine the validity of a law, the Supreme

Court held that the lawsuit was not moot.  455 U.S. at 289.

> Such abandonment is an important factor bearing on the question whether a court
> should exercise its power to enjoin the defendant from renewing the practice, but
> that is a matter relating to the exercise rather then the existence of judicial power.

*Id*.  The Court observed that "the city's repeal of the objectionable language would not preclude

it from reenacting precisely the same provision if the District Court's judgment were vacated,"

noting that there was no certainty that the city would not pursue that course "if its most recent

amendment were effective to defeat federal jurisdiction."  *Id*.  Indeed, "the city ha[d] announced

just such an intention" at oral argument.  *Id*. at 289 n.11.  The Court accordingly held that the

case was not moot, that the courts retained subject matter jurisdiction, and that it was "a matter

for the trial judge" to determine whether an injunction should be issued against the revised law.

*Id*. at 289 n.10.

In *City of Jacksonville*, the Supreme Court applied the *City of Mesquite* rule to a situation

in which the city had repealed the challenged ordinance while the matter was on appeal and had

replaced it with a second ordinance that differed from the original only in minor respects.  The

Court applied the voluntary cessation rule and found that the case was not moot. *Id*. at 662. In reasoning that is particularly important for this case, the Supreme Court concluded:

> This is an *a fortiori* case. There is no mere risk that Jacksonville will repeat is allegedly wrongful conduct; it has already done so.

*Id.*

The Court further ruled that it did not matter for the mootness analysis "that the new ordinance differs in certain respects from the old one." *Id*.

> *City of Mesquite* does not stand for the proposition that it is only the possibility that the *self-same* statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect.

*Id*. Although the second ordinance had been changed "in certain respects, it "disadvantage[d] [plaintiffs] in the same in the same fundamental way" as the first law. *Id*. The majority concluded, over a dissent by two Justices, that the case was not moot because "the new ordinance is sufficiently similar to the repealed ordinance that it is permissible to say that the challenged conduct continues . . . ." *Id*. at 662 n.3. In reaching this conclusion, the court distinguished its prior decisions in which it found that cases were moot when the statutes at issue "were changed substantially [from the prior enactment], and that there was therefore no basis for concluding that the challenged conduct was being repeated." *Id*.

This is an *a fortiori* case. *City of Jacksonville* squarely establishes that this case is not moot. Both features are present here that led the Supreme Court to conclude there that a second governmental action does not moot the challenge to the first action – issuance of a second order while the matter is on appeal that substantially duplicated the first order, and a mootness challenge by the government based on its replacement of its challenged action with one "that differs only in some insignificant respect" but that injures Plaintiffs "in the same fundamental way." *Id.* at 162.

Consistent with the city's conduct in *City of Mesquite*, Secretary Salazar announced – within hours of the entry of the preliminary injunction – that the moratorium "was and is the right decision" and that he would issue a "new order in the coming days that eliminates any doubt that a moratorium is needed, appropriate, and within our authorities."  Rec. Doc. 69-2. The next day, Secretary Salazar confirmed his intention to reissue a moratorium that was identical in scope to the enjoined one.  Rec. Doc. 134-1 at 9.   Secretary Salazar's public statements served as a *de facto* moratorium until, consistent with the conduct of the city in *City of Jacksonville*, he formally followed through by issuance of the July 12th decision, which, in all material respects, is a mirror image of the May 28th moratorium, which this Court has enjoined. The Decision Memorandum repackaged the May 28th order and provided the same post hoc justifications for its imposition.

Under *City of Jacksonville*, the case is not moot because the July 12th decision has not been "sufficiently altered" from the original   moratorium "so as to present a substantially different controversy . . . ."  508 U.S. at 662 n. 3.  "There is no mere risk that [the government] will repeat its alleged wrongful conduct; it has already done so."  *Id.*  at 662.  Because the voluntary cessation exception to the mootness doctrine applies here, there is a live controversy, and this Court retains subject matter jurisdiction to resolve it.[6]

When a court concludes that a case is not moot despite the government's repeal and replacement of the challenged government action, the result is that there is a live controversy for the court to decide.  *See, e.g., Nextel West Corp. v. Unity Township*, 282 F.3d 257, 259 (3d Cir.

---

[6]    As set forth in Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss Complaint (Rec. Doc. 134), the "capable of repetition, yet evading review" exception to the mootness doctrine also applies here.  *See Weinstein v. Bradford*, 423 U.S. 147 (1975) (per curiam); *Moore v. Hoseman*, 591 F.3d 741, 744 (5th Cir. 2009); *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 661-62 (5th Cir. 2006); *Vieux Carre Property Owners v. Brown*, 948 F.2d 1436, 1447, 1448 (5th Cir. 1991).  Further, in his dissent to the August 16, 2010 limited remand order, Judge Dennis indicated that, besides the voluntary cessation and the capable of repletion yet evading review exceptions to the mootness doctrine, the collateral consequences doctrine also likely applies.

2002) (holding that Nextel's challenge to a township's zoning decision for two alleged violations of the federal Telecommunications Act was not moot despite the township's amendment to the zoning ordinance while the case was pending and, accordingly, reversing and remanding to the district court "for adjudication on the merits of Nextel's two TCA claims.");[7] *Union Pacific R.R. Co. v. Louisiana Pub. Serv. Comm'n*, 2010 WL 3168064 * 1-2 (M.D. La. 2010) (determining that an amendment to the challenged law during the litigation did not prevent an adjudication of the claims asserted because, despite the revised language in the law, the railroad's challenge to the act at issue "based on categorical preemption remains unchanged" and that therefore the issue of categorical preemption "remains an actual controversy capable of being adjudicated.")

Under *City of Jacksonville*, this Court has jurisdiction to resolve this matter.  The facts have now been developed to demonstrate that the May 28th order and the July 12th decision are mirror images of one another and that they both suffer from the same substantive and procedural illegalities in violation of OCSLA and the APA.

Two issues remain to be decided by the Court:  (a) consideration of a renewed motion to enforce preliminary injunction to extend its application to Interior's carbon copy July 12th decision; and (2) an ultimate decision on the merits of Plaintiffs' claims.

## CONCLUSION

The Court should enter findings of fact and conclusions of law determining that the case is not moot under *City of Jacksonville*; that Interior acted arbitrarily, capriciously, and exceeded its authority in purporting to "reconsider" the May 28th moratorium without authorization from the Court; that the scope of the May 28th moratorium and the July 12th decision are essentially

---

[7]    In *Nextel*, the court further observed that the township's position that, rather than continuing its litigation, Nextel needed to go back to square one and reapply for a permit under the amended ordinance "would enable a municipality to trap a telecommunications plaintiff in litigation limbo" because "as long as the municipality passed an insignificant amendment after each TCA action was filed, it could block telecommunications plaintiffs' access to court . . . ." *Id.*  at 264.  To accept Interior's mootness theory here would result in the same plight for Plaintiffs.

identical; and that the material facts supporting that decision were available to Interior when it issued the May 28th moratorium.

Respectfully submitted,

*s/ Carl D. Rosenblum*
_____

CARL D. ROSENBLUM, T.A. (2083)
GRADY S. HURLEY (13913)
ALIDA C. HAINKEL (24114)
MARJORIE A. MCKEITHEN (21767)
JONES, WALKER, WAECHTER,   POITEVENT,
       CARRÈRE & DENÈGRE
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana  70170
Telephone: (504) 582-8000
Fax:  (504) 589-8170
crosenblum@joneswalker.com

And

JOHN F. COONEY
(admitted Pro Hac Vice)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
Telephone:  (202)344-4812

*Attorneys for Plaintiffs,*
*Hornbeck Offshore Services, L.L.C.,*
*The Chouest Entities, and*
*The Bollinger Entities.*

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that a copy of the above and foregoing pleading has been served upon all parties by email or by using the CM/ECF system which will send a Notice of Electronic filing to all counsel of record, this 24th day of August, 2010.

                       *s/ Carl D. Rosenblum*