**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| HORNBECK OFFSHORE SERVICES, LLC, et al. | CIVIL ACTION No.  10-1663(F)(2) |
| **Plaintiffs,** | |
| | SECTION F |
| v. | |
| KENNETH LEE "KEN" SALAZAR, et al, | JUDGE FELDMAN |
| **Defendants.** | MAGISTRATE 2 MAGISTRATE WILKINSON |

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' RENEWED MOTION TO ENFORCE**

Defendants, Kenneth Lee Salazar, United States Department of the Interior, Michael Bromwich, and the Bureau of Ocean Energy Management, Regulation, and Enforcement, ("Defendants"), hereby file this Memorandum in Opposition to Plaintiffs' Renewed Motion to Enforce, Dkt. # 167.

Plaintiffs' renewed motion to enforce seeks an order that would effectively invalidate the Secretary's July 12, 2010, Directive without any evaluation of its merits or consideration of its Administrative Record.  Plaintiffs argue that the July Directive should be summarily enjoined because it violates this Court's June 22, 2010, preliminary injunction of the May 28 Directive.

Plaintiffs' motion, not the Secretary's July Directive, should be rejected.  There is simply no basis for concluding that the July Directive violates this Court's preliminary injunction.  As discussed below, this Court enjoined enforcement of the May 28 Directive and the implementing Notice to Lessees ("NTL").  The Secretary has not only complied with this prohibition, he has in fact officially

rescinded the Directive and the NTL – actions which this Court has already concluded have "administrative force." Dkt. # 165 at 11.

Moreover, the Court's injunction is properly limited and does not enjoin the Secretary from fulfilling his ongoing statutory duty to issue suspensions when warranted to ensure that operations on the Outer Continental Shelf (OCS) are conducted in a safe manner. Pursuant to the express authority and mandates of the Outer Continental Shelf Lands Act (OCSLA) to manage the safety and security of the OCS, the Secretary continued after May 28 (and after this Court's preliminary injunction) to evaluate the ongoing risks associated with OCS deepwater drilling, to analyze management options that were provided to him, and ultimately to issue the July Directive based on a full consideration of the relevant facts. Nothing in this Court's preliminary injunction prohibits the Secretary from fulfilling his ongoing duty to ensure that OCS operations are conducted safely and securely.[1] Nor could it. The Supreme Court recently reinforced the proposition that, even where there is a final judgment finding a statutory violation, a court cannot prevent an agency from acting within its statutory authority. Monsanto Co. v. Geertson Seed Farms, 130 S.Ct. 2743, 2753-54, 2758 (June 21, 2010). Consequently, there is no legitimate basis for asserting that the Secretary has violated this Court's injunction.

Plaintiffs' motion should also be denied because it does not even attempt to establish the elements needed for injunctive relief. Plaintiffs are in essence seeking a separate preliminary injunction of the July 12 Directive without proving the elements necessary to grant such relief. The Supreme Court, however, has made clear that the type of injunction sought by Plaintiffs can be issued only after an assessment of the merits of the July Directive and an analysis of the three other

---

[1] In fact, as the Department of the Interior recently reported, this ongoing evaluation continues to this very day. See Federal Defendants' Status Report, Ensco Offshore Co. v. Salazar, Case No. 10-cv-1941, Dkt. # 95 (Sept. 27, 2010).

factors of irreparable injury, balance of harms, and the public interest.  See Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374 (2008).  The Plaintiffs' motion makes no attempt to satisfy any of these elements.[2]  In fact, Plaintiffs have declined to amend their complaint to challenge the July Directive or move to intervene in Ensco Offshore Co. v. Salazar, which directly challenges the July Directive.

## I.   PROCEDURAL BACKGROUND

Following the explosion of the Deepwater Horizon drilling platform and resulting oil spill, on May 28, 2010, the Secretary of the Interior directed a limited six-month suspension of drilling in more than 500 feet of water because he concluded that the risks of deepwater drilling posed a threat to the marine, coastal, and human environment.  On June 7, 2010, Plaintiffs filed this lawsuit and moved for a preliminary injunction alleging that the Secretary's May 28 Directive was not supported in the record by sufficient "facts, data, or analysis." Dkt. # 5. Briefing and argument on the motion proceeded on an expedited schedule and without the benefit of the full administrative record.  On June 22, this Court granted a preliminary injunction preventing the enforcement of the Secretary's May 28 Directive and the associated NTL after concluding that Plaintiffs would likely prevail on their claim that the Secretary had not supported his action with a sufficient explanation in the administrative record.  The Court did not, however, suggest that a broad suspension of drilling operations inherently violated the substantive requirements of the OCSLA or its implementing regulations.  See Dkt. # 68.

The Department of the Interior immediately complied with the preliminary injunction Order by (1) notifying all Department employees that they were not to take any action to enforce

---

[2]  The motion is also unnecessary because the validity of the July Directive is directly at issue in the Ensco case, and the issue has been fully briefed on cross-motions for partial summary judgment.  If this Court finds fault with the July Directive, it can determine the proper remedy for that violation without need for ruling on Plaintiffs' motion to enforce.

the May 28 Directive and NTL and (2) notifying each operator who had received a suspension letter that "neither the NTL nor the order directing suspension of operations has legal effect on your operations at this time." See Dkt. # 77 at 2.

On June 23, 2010, Interior also filed a notice of appeal with the Fifth Circuit Court of Appeals and a motion for stay pending appeal. On July 8, the Fifth Circuit denied the stay motion. Hornbeck v. Salazar, Case No. 10-30585 (5th Cir. Jul. 8, 2010) (order denying motion for stay pending appeal). Although the Fifth Circuit denied Defendants' motion to stay this Court's preliminary injunction order, the appeals court noted that the denial was premised on the government's lack of showing of imminent injury – it did not appear that any operator was poised to begin drilling immediately. Id. In the event that drilling were to resume, or were about to resume, the Fifth Circuit invited the Secretary to apply for emergency relief at that time. Id.

On July 12, 2010, the Secretary issued a new directive suspending certain deepwater drilling. At that point, the oil spill had already continued unabated for six more weeks, during which time the Secretary collected and reviewed more than 600 new documents relating to the risks associated with deepwater drilling. The July 12 Directive was based, in part, on new information documenting the significant environmental and safety risks associated with continued deepwater drilling under the circumstances. And, though the Secretary did not and does not concede that the May 28 Directive was flawed, the July 12 Directive addressed the errors this Court had preliminarily identified by providing a full, robust explanation for the Secretary's action.

After the Secretary issued his July 12 Directive, Defendants filed with this Court a motion to dismiss as moot or, in the alternative, to stay proceedings. See Dkt. # 125. Defendants simultaneously filed with the Fifth Circuit a motion to vacate the preliminary injunction preventing enforcement of the May 28 Directive as moot. The Court of Appeals

issued a limited remand to this Court with instructions to answer three questions: (1) whether the Secretary had the authority to revoke the May 28 Directive and issue the superseding July 12 Directive; (2) whether the Secretary relied on evidence unavailable as of May 28, 2010, when issuing the July 12 Directive; and (3) whether issuance of the July 12 Directive rendered the preliminary injunction moot. This Court consolidated consideration of those questions with its consideration of our motion to dismiss and issued an order on September 1, 2010, denying the motion to dismiss. Dkt. # 165. Soon after this Court issued its order, Plaintiffs filed their "Renewed Motion to Enforce" the preliminary injunction of the May 28 Directive. Dkt. # 167.

## II.    ARGUMENT

### A.    The Secretary Has Not Violated This Court's Preliminary Injunction Order.

Contrary to Plaintiffs' assertion, Defendants plainly have not "contravened the express terms" of this Court's preliminary injunction Order. See Dkt. #167-1 at 7. That Order states:

> [Defendants] are hereby immediately prohibited from enforcing the Moratorium, entitled "Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells," dated May 28, 2010, and NTL No. 2010-N04 seeking implementation of the Moratorium, as applied to all drilling on the OCS in water at depths greater than 500 feet.

Dkt. #68 at 2-3. To implement the terms of the Order, Interior immediately notified all Department employees that they were not to take any action to enforce the May Directive and NTL. Interior also notified each affected operator that "neither the NTL nor the order directing suspension of operations has legal effect on your operations at this time." See Dkt. # 77 at 2. Finally, on July 12, 2010, Interior rescinded the May Directive – an administrative action that this Court recently confirmed has "administrative force." See Dkt. # 165 at 11. That rescission remains effective today. Defendants, therefore, are in full compliance with the express terms of the Court's injunction.

Of importance, this Court properly limited its injunction to a prohibition against enforcing a specific decision (i.e., the May 28 decision and its implementing NTL).  This Court did not enjoin the Secretary from fulfilling his ongoing statutory duties with respect to the OCS. The OCSLA imposes on the Secretary a "continuing duty to guard all the resources of the outer Continental Shelf," See Gulf Oil Corp. v. Morton, 493 F.2d 141, 146 (9th Cir. 1974), including the responsibility to ensure that operations are "conducted in a safe manner by well-trained personnel using technology, precautions, and techniques sufficient to prevent or minimize the likelihood of blowouts, loss of well control, fires, spillages, . . . or other occurrences which may cause damage to the environment or to property, or endanger life or health."  43 U.S.C. § 1332(6).  As this Court has concluded, neither the preliminary injunction nor the Secretary's appeal of that injunction prevented the Secretary from exercising his inherent authority to reconsider his decisions. See Dkt. # 165 at 11.

Consistent with these ongoing statutory duties, the Secretary requested Michael R. Bromwich, Director of the Bureau of Ocean Energy Management, Regulation, and Enforcement ("BOEMRE"), to gather facts, assess ongoing risks, and provide options for the management of the OCS.  On June 29, 2010, Director Bromwich began this process by directing BOEMRE to gather information relevant to a number of topics including: (1) the potential risks of deepwater drilling; (2) the presence or absence of these risks on current operations; (3) the potential mitigating effect of the twenty-two safety measures described in the Safety Report; (4) the estimated length of time necessary to implement each of the twenty-two safety measures; (5) the current status of deepwater containment capabilities; (6) the current status of oil spill response plans; (7) the relative risks presented by the failure of safety and operational equipment at various depths; and (8) improvements or changes that could be made to current inspection

6

procedures to enhance safety.    B18-00001-0054 at 2-3[3] (attached as Exhibit 1).    Director

Bromwich further instructed BOEMRE to:

> [P]rovide options for proposed actions to ensure safe and environmentally protective drilling in the OCS, including the viability of an option for addressing these issues on a case-by-case basis.  Please make sure each of your options considers the following factors, if applicable: . . .
>
> Whether the proposed action should be applied to rigs individually or more broadly. . . .
>
> Whether operations must be suspended to implement the proposed action, and if so, for how long.  In addition, are there terms and/or conditions that an operator could fulfill that would justify a lifting of the suspension for that particular operator?

B18-00001-0054 at 3.

On July 10, BOEMRE finalized a memorandum examining the options available for

managing the OCS in a safe and environmentally sound manner ("Options Memorandum"),

which was based on the data and analysis prepared in response to Director Bromwich's June 29

instructions.  See B44-00001-0001 (attached as Exhibit 2).  The Secretary then issued the July 12

Directive, based on the analysis of the risk factors identified in the Options Memorandum and

the other factual information and analyses before him.  B50-00001-0001 at 7-17 (attached as

Exhibit 3) (hereinafter, "July Directive").  The July Directive incorporates BOEMRE's rationale

and analysis, in addition to explaining why the Secretary decided not to implement the other

options presented by BOEMRE.  July Directive at 17-22.

Through these actions, the Secretary fulfilled his continuing duty to manage the safety

and security of the OCS by evaluating new information, reanalyzing the adequacy of safety and

environmental protection standards for OCS lease operations, and issuing a new decision.  See

---

[3] Defendants' citations to B__-_____-____ refer to the document identification numbers for the Department of the Interior's Administrative Record for the July Directive, which has been lodged with the Court in Ensco Offshore Service Co. v.  Salazar.  Defendants attach the cited documents as exhibits to this opposition.

Union Oil Co. v. Morton, 512 F.2d 743, 752 (9th Cir. 1975) ("Because of the Secretary's continuing supervisory obligations, injunctive relief against further interference with Union's operations would be inappropriate."). All of these actions were done under the express authority and mandates provided by the OCSLA and its implementing regulations. Nothing in this Court's injunction prohibits the Secretary from using this statutory authority or prevents him from fulfilling his duty to ensure that OCS operations are conducted safely. In fact, prior to filing this motion, even Plaintiffs recognized that the Secretary may properly take these actions, conceding that even if a preliminary injunction were issued, "if [Interior] could marshal appropriate facts to support such an action, [it] would retain [its] authority" to issue a new suspension decision. Dkt. #7-1 at 22.

 **B.  Plaintiffs Improperly Attempt To Expand The Court's Preliminary Injunction Against The May 28 Directive Into A Blanket Injunction Against Any Moratorium**

In an attempt to avoid the conclusion above, Plaintiffs paint the Court's June 22 Order as an unqualified prohibition on deepwater "moratoriums" in general, and they argue that Defendants have violated it by issuing a new one. See Plf's Br. at 4-5 (interpreting the June 22 Order as one prohibiting the suspension of "all drilling on the OCS in water at depths greater than 500 feet," regardless of how well reasoned the decision may be); see also id. at 6 ("Because the July 12th moratorium maintains the same 'blanket moratorium against all companies involved in deepwater drilling in the Gulf of Mexico,' it continues to be 'invalid in law.'").

Of course, Plaintiffs' argument fails because this Court's injunction is not a blanket prohibition against the use of the OCSLA's suspension authority, as discussed above. In addition, Plaintiffs' argument fails to acknowledge that they have pursued, and this Court has endorsed, only procedural arguments. See Dkt. # 165 at 17 ("[Defendants] correctly point out that the plaintiffs' complaint challenges the decision-making *process* leading up to the May 28

moratorium . . .") (emphasis added).  Specifically, this Court's June 22 Order held only that Plaintiffs would likely succeed on the merits of their claims because Interior had failed *to explain* adequately the basis for its decision.

This Court did not hold that a broad suspension order, if fully and adequately explained, would violate the OCSLA.  As the Supreme Court explained in <u>Monsanto</u>, after a judicial determination that the order in question was procedurally defective "it was for the agency to decide whether and to what extent it would pursue" an interim solution while correcting its procedural errors and issuing a new final decision. <u>Monsanto</u>, 130 S. Ct. at 2758.  If a final judgment in <u>Monsanto</u> could not prevent the agency from exercising its statutory authority to adopt an interim solution while addressing a procedural error, then an interlocutory order in this case could not prevent the Secretary from addressing purported errors in the May 28 Directive by issuing a new decision in an emergency situation.

**C.     The Secretary's Extensive Re-Evaluation Process Demonstrates That The July Directive Was not Issued To Circumvent This Court's Injunction.**

No one would dispute that agencies may not circumvent injunctions merely by changing the enjoined action's name or date.  That point is made in the D.C. Circuit's decision in <u>International Ladies' Garment Workers' Union v. Donovan</u>, 733 F.2d 920 (D.C. Cir. 1984) ("<u>Donovan II</u>"), where the court held that an agency could not issue "precisely the same rule" after the court had found the original rule to be arbitrary and capricious.  <u>Id.</u> at 923.  This Court endorsed <u>Donovan II</u> in its Order denying Defendants' Motion to Dismiss, indicating that it provides the relevant standard for determining whether a subsequent agency action violates a court's order remanding the prior one. <u>See</u> Dkt. # 165 at 20-21 n.10.  The circumstances in <u>Donovan II</u>, however, do not resemble the facts of this case.

The plaintiffs in the <u>Donovan</u> cases originally challenged a rule rescinding a decades-old prohibition on the employment of industrial workers in their homes.  <u>See</u> <u>Int'l Ladies' Garment Workers' Union v. Donovan</u>, 722 F.2d 795, 799 (D.C. Cir. 1983) ("<u>Donovan I</u>").  In vacating the rule, the circuit court explained that the agency had failed to consider factors relevant to, *inter alia*, the enforcement of fair labor standards for homeworkers.  <u>Id.</u> at 823-24.  The court then remanded the matter to the agency for further proceedings, and ordered that "[t]he restriction against industrial homework shall be reinstated and remain in effect *unless properly modified pursuant to 'reasoned decisionmaking'* consistent with the opinion of this court."  <u>Id.</u> at 828 (emphasis added).

The agency sought a rehearing *en banc*, which was denied, and then requested a stay pending petition for certiorari on grounds that an immediate reinstatement of the ban on homeworking would cause hardship for people then engaged in the practice.  <u>Donovan II</u>, 733 F.2d at 921.  When that motion was denied, the agency issued an emergency rule which once again rescinded the ban on homeworking but without first addressing any of the procedural errors identified in <u>Donovan I</u>.  The function of the emergency rule was to prevent the ban from being reinstated for 120 days.  In effect, the agency's emergency rule unilaterally stayed implementation of the court's order, and did so on the same grounds that had been advanced and rejected in its motion to stay.  <u>Id.</u> at 923.  This finding is in large part what motivated the court to enforce its prior order.

No such circumstances exist in the present case.  To the contrary, Defendants immediately implemented this Court's injunction order even during the pendency of its Motion for Stay pending appeal.  Dkt. # 77.  Moreover, the current case is very different because, unlike the second rule in <u>Donovan II</u>, the July Directive addresses rather than repeats the potential errors attributed to the May Directive by this Court's June 22 Order.

For example, this Court observed in its June 22 Order that the May Directive appeared to extrapolate improperly from the BP Oil Spill to conclude that all deepwater drilling operations pose

an unacceptable risk.  See Dkt. # 67 at 21 (concluding that May Directive "seems to assume that because one rig failed . . . all companies and rigs drilling new wells over 500 feet also universally present an imminent danger").  The July Directive addresses this issue by explaining that the oil and gas industry's spill containment, wild-well intervention, and oil spill response capabilities were, at that time, systemically deficient.  See July Directive at 12-15.  Specifically, it explains that the entire industry was unprepared to effectively stop deepwater oil well blowouts.  See July Directive at 12-13.  It also explains that the fleet of skimmers and other oil spill response resources relied on by virtually every other operator in the Gulf of Mexico were occupied at the time, and then-known to be inadequate because they were capable of capturing only a tiny fraction of the oil spewed by the Macondo well despite claiming to have a much greater skim and removal capacity of almost 500,000 barrels per day.  See July Directive at 14-15; B44-00001-0001 at 16-18.  See also 30 C.F.R. Part 254 subparts A, B (establishing mandatory oil spill response requirements as a pre-requisite to conducting operations).  The Secretary's July 12 decision to impose a broad ranging suspension of drilling was therefore based on a demonstrated need for significant improvements in containment and response capacities *industry-wide*.  See id. at 19; B44-00001-0001 at 26-29.  Even Plaintiffs have conceded that a systemic failure of this sort would justify a broad suspension of drilling operations.  See Dkt. 72 (Transcript of June 21, 2010, hearing) at 24-25.[4]

---

[4]  This Court cited a lack of inspection data specific to equipment and operators other than those involved in the Deepwater Horizon blowout as part of his decision to enjoin the May Directive.  See Dkt. # 67 at 17.  The July Directive addresses this issue by explaining that performance problems also were identified in the BOPs used to drill BP's two relief wells, and that these problems are likely to recur elsewhere due to the small number of BOP manufacturers, as well as the industry-wide use of standardized components.  More important, however, is that the Secretary's July 12 decision to suspend drilling operations is based on three separate and independently adequate rationales: the safety risks posed by deep water drilling, the industry-wide inadequacy of containment and wild well intervention capabilities, and the industry-wide

As part of its basis for enjoining the May Directive, the Court also cited a lack of explanation for two of the suspensions' parameters: the six-month duration and the depth of 500 feet. See Dkt. # 67 at 4, 18-19. Here, again, the July Directive fully and adequately explains the Secretary's rationale for using those parameters in his new decision. With respect to depth, it explains that the 500-foot figure had been used only as a proxy in the May Directive to denote operators that use the riskiest equipment configurations, *i.e.*, subsea BOPs and BOPs on floating platforms. Moreover, it ultimately abandons the proxy so as to avoid any confusion by the regulated community or the general public. See, e.g., July Directive at 8-9 & n.6. As to duration, the July Directive explains that the November 30, 2010, end-date is based on the amount of time then projected to be needed to, *inter alia*, improve containment and response capabilities, complete relevant investigations, implement new safety requirements, and develop interim rules to address recently discovered safety issues. See July Directive at 20-21. Unlike the May Directive, the July Directive also notes the potential for lifting the suspension prior to November 30 if safety, containment, and response issues have been resolved. See July Directive at 21.

The Court also previously faulted the Secretary for failing to demonstrate that he had considered, prior to issuing the May Directive, an alternative whereby individual rigs would be suspended until they achieved "compliance with the new regulations said to be recommended for immediate implementation." Dkt. # 67 at 20. Although such consideration of "alternatives" is not required prior to invoking the OCSLA's suspension authority, Interior nevertheless addressed the Court's concern by conducting the referenced analysis prior to issuing the July Directive. On June 29, 2010, Director Bromwich instructed BOEMRE to:

---

inadequacy of oil spill response capabilities. The latter two rationales unquestionably identify systemic flaws that reach far beyond the Deepwater Horizon.

> [P]rovide options for proposed actions to ensure safe and environmentally protective drilling in the OCS, including the viability of an option for addressing these issues on a case-by-case basis.  Please make sure each of your options considers the following factors, if applicable: . . .  Whether the proposed action should be applied to rigs individually or more broadly. . . .  Whether operations must be suspended to implement the proposed action, and if so, for how long.  In addition, are there terms and/or conditions that an operator could fulfill that would justify a lifting of the suspension for that particular operator?

B18-00001-0054 at 3.  BOEMRE later prepared the Options Memorandum, relying, in part, on the information gathered pursuant to the June 29 instruction, discussing the relative merits of a series of potential options for managing the OCS, including the one proposed by this Court.  See B44-00001-0001 at 24-29.  The Secretary ultimately explained on July 12 that he could not implement such an alternative because Interior had not yet determined what criteria, if met, might justify relieving individual operators from the suspension prior to November 30, 2010.  The Secretary, however, instructed the Director of BOEMRE to identify such criteria through continued analysis, and to submit a report on his findings for the Secretary's consideration no later than October 31.  See July Directive at 18, 21

Finally, this Court expressed a concern relating to the economic impacts of the May Directive.  In response, BOEMRE and the Secretary conducted the relevant analysis, including consideration of comments by the State of Louisiana.[5]  See July Directive at 16-17; B44-00001-0001.

The above are examples only, but they clearly illustrate that the July Directive does not repeat whatever potential infirmities this Court may have attributed to the May Directive.

---

[5]    Although this economic analysis was completed, the Secretary has been careful to explain that the OCSLA does not require him to conduct a balancing of harms analysis in connection with the suspension of drilling operations. July Directive at 16.  The statute requires only that the Secretary conclude that there is a threat of serious or irreparable harm to life, property, or the marine, coastal or human environment.  Compare 43 U.S.C. § 1334(a)(1) with 43 U.S.C. § 1334(a)(2)(i)-(iii).

Donovan II, therefore, bears no resemblance to this case, and Plaintiffs have no basis for seeking to "enforce" this Court's preliminary injunction.

The other cases upon which Plaintiffs rely are merely examples of defendants directly violating court orders and have no relevance to this case because none involve facts remotely analogous to those before the Court.  In Walker v. City of Birmingham, 388 U.S. 307 (1967), for example, protest marchers had been enjoined from engaging in mass demonstrations without first obtaining a parade permit from the City of Birmingham.  Id. at 309.  The protesters purposely ignored the injunction and went ahead with the planned marches without applying for a permit. Id.  Unlike the protesters in Walker, the Secretary fully complied with this Court's injunction on the May 28 Directive and also directly addressed the potential legal infirmities the Court had identified.  Plaintiffs' reliance on Norman Bridge Co. v. Banner, 529 F.2d 822, 829 (5th Cir. 1976), is similarly flawed.  In that case, drug enforcement agents simply refused to return confiscated property in direct violation of the court's temporary restraining order requiring the return of the confiscated property.  Id. at 825.  Here again, Defendants have not ignored the Court's injunction but have complied in all respects with its terms.  Simply put, there has been no violation of this Court's preliminary injunction on the part of Defendants.

**D.      The July Directive Cannot Be Enjoined Without Review Of The Administrative Record.**

As noted in the introduction, Plaintiffs' renewed motion to enforce seeks an order that would summarily enjoin the Secretary's July 12 Directive without any evaluation of its merits; in essence, Plaintiffs seek a preliminary injunction of the July 12 Directive without meeting any of the standards for such extraordinary relief.  But the Supreme Court has made clear that such an injunction can be issued, even in the context of a preliminary injunction, only after an assessment of the merits and an analysis of the three other factors of irreparable injury, balance of harms, and the public interest.  See

Winter, 129 S.Ct. at 374; Munaf v. Green, 128 S.Ct. 2207, 2219 (2008) (emphasizing that a likelihood of success on the merits is necessary for injunctive relief). The Plaintiffs' motion makes no attempt to satisfy any of these elements.

The Plaintiffs' request is even more remarkable because this Court, in denying Defendants' motion to dismiss, recognized that it will not be assessing the merits of the July Directive in the context of this particular case. See Dkt. # 165 16-17 & n.7. The assessment of the merits of any agency action must be presented in an appropriate challenge under the Administrative Procedure Act. Here, the merits of the July Directive have been fully briefed in the Ensco case, Civil Action 10-1941. It is only in this context that the Court can properly review the July Directive. See Fund for Animals v. Norton, 390 F. Supp. 2d 12 (D.D.C. 2005) (holding that a motion to enforce the Court's order enjoining the National Park Service's 2003 decision to allow snowmobiling could not be used to challenge an interim rule allowing snowmobiling).

## III.   CONCLUSION

In sum, the June 22 Preliminary Injunction applies only to the May Directive, which no longer exists. Moreover, the July Directive is not before this Court; it cannot be enjoined without an assessment of its merits in an appropriately presented challenge under the APA. For the foregoing reasons, the renewed Motion to Enforce should be denied.

Respectfully submitted this 28th day of September, 2010.

IGNACIA S. MORENO
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

/s/ *Kristofor R. Swanson*
GUILLERMO A. MONTERO (T.A.)                 PETER MANSFIELD
BRIAN COLLINS                               Assistant United States Attorney
KRISTOFOR R. SWANSON                        Eastern District of Louisiana

Natural Resources Section                     Hale Boggs Federal Building
PO Box 663                                    500 Poydras Street, Suite B-210
Washington, DC 20016                          New Orleans, Louisiana 70130
Tel: (202)305-0443                            Tel: (504)680-3000

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2010, I caused a copy of the foregoing to be served

through the Court's CM/ECF System to all parties.

                                    *s/ Kristofor R. Swanson*
                                    Kristofor R. Swanson