
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**F I L E D**
April 9, 2013
Lyle W. Cayce
Clerk

No. 11-30936

HORNBECK OFFSHORE SERVICES, L.L.C.; BEE MAR - WORKER BEE, L.L.C.; NORTH AMERICAN FABRICATORS, L.L.C.; BEE MAR, L.L.C.; OFFSHORE SUPPORT SERVICES, L.L.C.; ET AL,

        Plaintiffs-Appellees

v.

KENNETH SALAZAR, SECRETARY, DEPARTMENT OF INTERIOR, also known as Ken Salazar; UNITED STATES DEPARTMENT OF INTERIOR; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; MICHAEL R. BROMWICH, In His Official Capacity as Director, Bureau of Safety and Environmental Enforcement,

        Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

Before WIENER, ELROD and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

    The opinion filed in this case on November 27, 2012,[1] is WITHDRAWN.

    This case arises from the 2010 Deepwater Horizon accident in the Gulf of Mexico. An explosion killed 11 workers, caused the drilling platform to sink, and resulted in an uncontrolled, lengthy and massive release of oil. At Presidential

---

[1] *Hornbeck Offshore Services, L.L.C. v. Salazar*, 701 F.3d 810 (5th Cir. 2012).

direction, those events prompted the Department of the Interior to prohibit all new and existing oil and gas drilling operations on the Outer Continental Shelf for six months. The district court preliminarily enjoined enforcement of the moratorium. The single issue on appeal is whether Interior's subsequent actions violated a specific provision of the court's injunction, justifying a finding of civil contempt. The district court was certainly correct that Interior immediately took steps to avoid the effect of the injunction, but we conclude none of those actions violated the court's order. We REVERSE.

## FACTUAL AND PROCEDURAL HISTORY

The Deepwater Horizon tragedy occurred on April 20, 2010, as the Transocean drilling crew was preparing for a temporary abandonment of BP's discovery-well 52 miles from shore in almost 5,000 feet of water in the Gulf of Mexico. The explosion and fire caused the platform to sink two days later. For almost three months, oil gushed from the wellbore in the sea floor.

On April 30, the President ordered Secretary of the Interior Ken Salazar to review the event and, within 30 days, to report on "what, if any, additional precautions and technologies should be required to improve the safety of oil and gas exploration and production operations on the outer continental shelf." That same day, with Order No. 3298, the Secretary established an Outer Continental Shelf Oversight Board.

About a week later, the Secretary announced that "as a result of the Deepwater Horizon explosion and spill, beginning April 20 – the date of the explosion – no applications for drilling permits [would] go forward for any new offshore drilling activity" until his report to the President. That report – Increased Safety Measures for Energy Development on the Outer Continental Shelf – was released on May 27. In addition to a variety of recommendations calling for new studies, regulations, and inspections, the Safety Report recommended (1) "a six-month moratorium on permits for new wells being

drilled using floating rigs" and (2) "an immediate halt to drilling operations on the 33 permitted wells that [were] currently being drilled using floating rigs in the Gulf of Mexico." This recommendation of a six-month moratorium appeared in the Executive Summary but not in the body of the Safety Report.

The Safety Report stated that its recommendations had "been peer-reviewed by seven experts identified by the National Academy of Engineering." As later became known, five of those experts never reviewed or agreed to the six-month moratorium. Although no wrongdoing was attributed to Interior, an Office of Inspector General report cited by the district court found that after peer review, White House officials had inappropriately modified the report.

On May 28, 2010, the day after the Safety Report's release, the Secretary issued what is referred to as the "May Directive." It stated that based on the

> report to the President, and further evaluation of the issue, [the Secretary] find[s] at this time and under current conditions that offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm to wildlife and the marine, coastal, and human environment as that is specified in 30 C.F.R. 250.172(b).
> . . .
>
> [The Secretary also] direct[s] a six month suspension of all pending, current, or approved offshore drilling operations of new deepwater wells in the Gulf of Mexico and the Pacific regions. . . . For those operators who are currently drilling new deepwater wells, they shall halt drilling activity . . . . [and] the [Mineral Management Service ("MMS")] shall not process any new applications for permits to drill consistent with this directive.

Interior executed this directive by issuing a general Notice to Lessees and Operators of Federal Oil and Gas Leases ("NTL No. 2010-N04" or "Notice to Lessees"), effective May 30, which explained that MMS would not consider any new drilling applications for six months in "deepwater," defined as depths greater than 500 feet. There were roughly 4,500 active leases in the Gulf's deepwater at the time. MMS also transmitted individual letters to the 33

operators of permitted wells that were being drilled at the time, providing notification that their activities were temporarily suspended "consistent with the Secretarial Directive and Notice to Lessees."

Hornbeck Offshore owns and operates a fleet of vessels that support deepwater exploration. It had contracts with nearly all of the operators of the 33 wells that were being drilled. Hornbeck and about 40 other companies involved in oil and gas exploration and production, filed suit on June 7 seeking declaratory and injunctive relief. The complaint alleged that the May Directive and the Notice to Lessees were not adequately explained and justified in violation of the Administrative Procedures Act ("APA"), and that in issuing the Directive and the Notice the Secretary exceeded his authority under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1332.

Finding only the APA to be pertinent, and not the citizen-suit provision of the OCSLA, on June 22 the district court granted Hornbeck the preliminary injunction at the center of this case. That injunction ordered that Interior, MMS, and

> their servants, agents, successor agencies and employees, and all persons in active concert of participation with them, who receive actual Notice of this Preliminary injunction [were] immediately prohibited from enforcing the Moratorium, entitled "Suspension of Outer Continental Shelf (OCS) Drilling of New Deepwater Wells" dated May 28, 2010, and NTL No. 2010-N04 seeking implementation of the Moratorium, as applied to all drilling on the OCS in water at depths greater than 500 feet.

The Secretary issued a press release responding to the injunction that day, stating that "[t]he decision to impose a moratorium on deepwater drilling was and is the right decision" and that the government would appeal the ruling to the Fifth Circuit. He concluded the release by announcing that on the basis of "ever-growing evidence, I will issue a new order in the coming days that

eliminates any doubt that a moratorium is needed, appropriate, and within our authorities."

Simultaneously, Interior took some steps to comply with the injunction. Interior again sent individually addressed letters to the operators of the 33 wells on which production was to stop, explaining that neither the Notice to Lessees "nor the order directing a suspension of operations [the May Directive] has legal effect on your operations at this time." In contrast to its actions in imposing the moratorium, though, Interior did not notify the industry-at-large, namely the operators and lease holders not currently drilling.

A letter bearing the subject line "Immediate Prohibition from Enforcing the Moratorium on Drilling New Deepwater Wells" went to all Interior employees on June 23. It excerpted the district court's order and explained that employees were "not to take any action to enforce the Moratorium issued on May 28, 2010, or to enforce NTL No. 2010-N04" until the Secretary gave additional orders. Also on that day, the Secretary appeared before the United States Senate Subcommittee on Interior, Environment, and Related Agencies. Though his scheduled topic was bureaucratic reorganizations affecting MMS, the Secretary made several comments about the moratorium that bear on this litigation. We will discuss those below.

Interior immediately appealed the injunction order to this court. It also filed a motion for a stay of the injunction. Interior noted in its filing that it intended to issue a new, similar moratorium. A divided panel of our court denied the stay request without prejudice to the Secretary's "right to apply for emergency relief if he [could] show that drilling activity by deepwater rigs has commenced or [was] about to commence." Four days after that ruling, on July 12, 2010, Interior rescinded the May Directive. A "July Directive" was substituted. Without doubt, the new suspension directive was the same "in scope and substance." The difference was that it contained a more thorough

explanation of reasons and referred to more voluminous evidentiary support. Interior returned to this court that day, arguing that we should vacate the district court's June 22 injunction of the May Directive as moot. We ruled that although the Secretary had "asserted substantial reasons suggesting mootness," our record was inadequate to decide the issue. A limited remand was ordered for the district court to consider the issue of mootness.

On remand, the district court held that the suit was not moot:

> Because this Court has determined that the process leading to the first moratorium lacks probity; because this Court has determined that no rational nexus exists between the fact of the tragic Deepwater Horizon blowout and placing an attainder of universal culpability on every other deepwater rig operator in the Gulf of Mexico; because this Court has determined that the first moratorium is invalid in law; and because the Interior Secretary's second moratorium arguably fashions no substantial changes from the first moratorium, the government has failed to circumvent the voluntary cessation exception to mootness.

The court also stated that the rescission of the May Directive did have "some administrative force," a statement we would interpret later that month to mean that "the moratorium the preliminary injunction enjoined no longer ha[d] any operative effect." Concluding further that any opinion by our "court on the merits and legality of the issuance of the preliminary injunction would address an injunction that is legally and practically dead," we dismissed Interior's merits appeal as moot on September 29.

After the district court denied Interior's motion to dismiss for mootness, but before this court's ruling on the appeal, Hornbeck filed a motion to enforce the preliminary injunction. In that motion, Hornbeck argued that by rescinding and replacing the May Directive, Interior had chosen to disobey the district court's order rather than permit it to undergo an orderly process of judicial review. On September 30, the district court determined that "[i]n light of the United States Court of Appeals for the Fifth Circuit's September 29th opinion

declaring moot the appeal of the preliminary injunction, the plaintiffs' motion is DENIED."

The Secretary lifted the July Directive on October 12, 2010, which was a few weeks before the moratorium's anticipated six-month expiration. This effectively mooted the Hornbeck suit. Hornbeck moved for attorneys' fees on two bases: (1) civil contempt and (2) bad-faith litigation tactics. The district court expressly declined to reach the bad-faith basis. Instead, it concluded that "the plaintiffs have established the government's civil contempt of its preliminary injunction order" by clear and convincing evidence. It would later approve an award of both fees and costs of approximately $530,000. We now consider the actions the district court identified as contemptuous and analyze whether they violated its written order.

## DISCUSSION

Federal courts have the inherent power to punish for contempt. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980). The availability of that power promotes "the due and orderly administration of justice" and safeguards the court's authority. *Id.* (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)). "Because inherent powers are shielded from direct democratic controls," the Supreme Court instructs that "they must be exercised with restraint and discretion." *Id.* Rather than stemming from a "broad reservoir," they are "implied power[s,] squeezed from the need to make the court function." *Crowe v. Smith*, 151 F.3d 217, 226 (5th Cir. 1998).

We review contempt findings for abuse of discretion, but "review is not perfunctory." *Id.* Facts found by the district court will be accepted as true unless clearly erroneous, but "the interpretation of the scope of the injunctive order[] is a question of law to be determined by the independent judgment of this Court." *Drummond Co. v. Dist. 20, United Mine Workers*, 598 F.2d 381, 385 (5th Cir. 1979).

A. *Civil Contempt Finding*

"A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995). For civil contempt, this must be established by clear and convincing evidence. *Id.*

> Clear and convincing evidence is that weight of proof which produces in the mind of the trier of fact a firm belief or conviction . . . so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of precise facts of the case.

*Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 396 (5th Cir. 2004) (quotation marks and citations omitted).

Though the court order must be clear, a court "need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000). The order must "state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required," Fed. R. Civ. P. 65(d), but a district court is entitled to a degree of flexibility in vindicating its authority against actions that, while not expressly prohibited, nonetheless violate the reasonably understood terms of the order.

The district court identified the proper burden of proof and legal standards, then laid out the reasons for its contempt finding. The court identified three categories of action that it held, when viewed "in tandem" with the national importance of the case and the reimposition of the moratorium, supported a civil contempt finding. Specifically, it found "defiance" and "determined disregard" in (1) Interior's failure to seek a remand from the district court to the agency before taking new administrative action; (2) its continuously stated public resolve to restore the moratorium; and (3) its communications to industry that a new moratorium was in the offing. We note that we see no clear

8

effect favoring either side's arguments arising from the national significance of the environmental disaster. The executive and judicial branches are co-equal, and just as the executive branch responds to national emergencies, the judiciary ensures that it does so in compliance with the law.

Hornbeck and Interior dispute whether our law required that the case have been remanded to the agency before it could issue a new directive. Each side has marshaled authorities.[2] The outcome does not hinge on whose view is correct. Although a district court need not "spell out in detail the means in which its order must be effectuated," the injunction's provisions must be "clear in what conduct they [have] mandated and prohibited." *Am. Airlines*, 228 F.3d at 578-79. The injunction did not state that Interior had to seek permission for a remand before developing additional rules on offshore drilling in the Gulf. The only mandate about returning to the court was that Interior provide a report describing "the manner and form" of its compliance with the injunction within 21 days. There has been no allegation that it failed in that duty. For Interior to have been in contempt, the injunction would have had to include an express or clearly inferrable obligation to petition for a remand. *Cf. Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (vacating civil contempt against federal agencies because district court's "order did not expressly direct" cited conduct).

There were several communications to the industry manifesting Interior's "public resolve" to overcome the injunction. Six days after the injunction was entered, Interior convened a meeting in Washington, D.C., attended by Secretary

---

[2] *Compare Broussard v. U.S. Postal Serv.*, 674 F.2d 1103, 1108 n.4 (5th Cir. 1982) (stating that "prevailing jurisprudence" holds "that once a judicial suit is filed, an agency should not unilaterally reopen administrative proceedings – the agency should first ask the court to remand the case to it"), *with Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 542 (1970) (noting that "since the stay order did not forbid it from acting . . . , it was not necessary for the [agency] to seek permission of the court" before ruling).

No. 11-30936

Salazar and other high-ranking Interior officials. According to an affidavit from an attendee,[3] the question was posed to the government representatives "whether deepwater drilling in the Gulf could resume at that time, given the existence of an injunction against the previously issued deepwater drilling moratorium." The response by an Interior Assistant Secretary was that it was his Department's intention "to issue a second moratorium," a statement the affiant understood as "a signal that the cost and expense of resuming drilling should not be undertaken by industry because the second moratorium would prevent that activity from continuing once it was issued."

The relevant public communications, acknowledged by Interior, are the Secretary's press release responding to the injunction and his testimony to Congress the next day. The press release does, as the district court recognized, evince a resolve to reissue the moratorium. That intent was made explicit before the Senate Subcommittee, just as it would be in Interior's motion for a stay in this court:

> Q. Mr. Secretary, do you plan to issue a new moratorium on all exploration of oil in the Gulf of Mexico at depths of more than 500 feet?
>
> A. The answer to that is yes, Senator Alexander.

Hornbeck also directs us to an answer the Secretary provided Senator Murkowski, in which he stated:

> [W]ith respect to the moratorium, I believe it was the correct decision. I believe it's a correct decision today. And with all due respect to the honorable court, we disagree with the court. And so we are taking that decision on appeal.
> At the same time, it is important that this . . . moratorium stay in place until we can assure that deepwater drilling can be

---

[3] Interior has not disputed the accuracy of this account, provided by James W. Noe. Noe was Senior Vice President, General Counsel, and Chief Compliance Officer of Hercules Offshore, Inc. as well as the Executive Director of the Shallow Water Drilling Coalition.

done in a safe way. We're not there today. And so we move forward with the executive authority which I have to make sure that the moratori[um] does, in fact, stay in place.

Here, as well as in responding later to Senator Feinstein, the Secretary referred to the moratorium as "in place." Hornbeck argues that terminology is a sign of contumacious defiance because an injunction prohibiting enforcement of the moratorium had issued. Interior regards the choice of words as a misstatement at worst. Moreover, because the May Directive had not been rescinded, saying the moratorium was "in place" was in some sense accurate.

Taken together, the comments to industry, to the Senate, and to the public support the district court's factual finding (the fact was hardly contested) that Interior was intent on reinstating a moratorium that imposed the same limitations as the May Directive from the moment the court enjoined it. Neither harboring that intent nor imposing a new moratorium, though, was a violation of the court order. The district court did not conclude otherwise. Hornbeck's motion for contempt focused "on the government's imposition of a second blanket moratorium hurried on the heels of the first." According to the district court, using the issuance of the July Directive as a reason for contempt would require reading its "preliminary injunction Order too broadly."

The district court explained that the injunction had been based on a finding that "the plaintiffs were substantially likely to prove that the process leading to the first moratorium was arbitrary and capricious" in violation of the Administrative Procedure Act. *See, e.g., Jupiter Energy Corp. v. FERC*, 407 F.3d 346, 349 (5th Cir. 2005) (explaining that the Act requires "reasoned analysis" and a cogent explanation for agency action). In "answer to the plaintiffs' quarrel with the second moratorium," the court explained that Interior took the position that it had "met the Court's concerns and resolved each of the procedural deficiencies in the first." Although the court expressed skepticism about whether that would be borne out, it then ruled that under "these facts alone," it

"could not, at least not clearly and convincingly, find the government in contempt of the preliminary injunction Order." We agree. *See Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005).

Hornbeck's complaint also asserted that a six-month moratorium on all drilling exceeded the authority delegated to Interior under the Outer Continental Shelf Act. The court never reached that issue. Had the May Directive been enjoined on that basis, this would be a very different case. Instead, the sole justification for the preliminary injunction that did issue as to the first Directive was a procedural failure to explain. The court order did not explicitly prohibit a new, or even an identical, moratorium. It is true that the district court identified additional potential APA deficiencies in the process surrounding the July Directive,[4] but those potential defects are not presented here as a basis supporting the contempt. Hornbeck's "victory" was fleeting and frustrating to its goal of actually allowing drilling to proceed.

In essence, the company argues that by continuing in its pursuit of an effective moratorium, the Interior Department ignored the purpose of the district court's injunction. If the purpose were to assure the resumption of operations until further court order, it was not clearly set out in the injunction. A more broadly worded injunction that explicitly prohibited the end-run taken by Interior would have set up issues more clearly supportive of contempt.

The district court dealt expeditiously and forcefully with extremely significant litigation. The potential APA violations that led to the initial

---

[4] In its September 1, 2010, order refusing to dismiss the Hornbeck suit as moot, the district court raised questions regarding whether the "618 new documents and over 6000 pages" that Interior pointed to as evidence of the deliberative process that went into the second moratorium truly evidenced such deliberations. It noted that nearly every statement in the July Directive had been "anticipated by documents in the May 28 record, or by documents that were otherwise available to the Secretary before May 28." It also recognized, though, that since the Hornbeck complaint did not concern the July Directive, the issue of whether the second moratorium complied with the APA was not part of this suit.

injunction are not at issue today, but such violations, if significant, would justify a district court's consideration of an injunction. Our decision is a narrow one. We conclude that Interior's actions did not violate the injunction as drafted and reasonably interpreted. Therefore, there was no civil contempt.

B.   *Bad Faith Litigation*

In the alternative, Hornbeck suggests the Equal Access to Justice Act ("EAJA") as a basis for the award of attorneys' fees. *See* 28 U.S.C. § 2412(b), (d). Interior counters that this alternative is inadequately briefed. *See* Fed. R. App. P. 28(a)(9), (b). We agree.

Hornbeck's bare-bones briefing of this issue fails to explain how the substantive and procedural requirements for an award under EAJA are satisfied. First, we have held that to impose that sanction the "court must make a specific finding that the sanctioned party acted in bad faith." *Matta v. May*, 118 F.3d 410, 416 (5th Cir. 1997).[5] The court refrained from reaching the issue of bad faith and Hornbeck has offered no argument as to why that fact is not dispositive. Second, the party wishing to recover under this Act must "within thirty days of a final disposition in the adversary adjudication, submit to the agency an application which shows that the party is a prevailing party and is eligible to receive an award." *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1006 (5th Cir. 1995). In *Boland*, we declined to resolve whether a party was entitled to attorneys' fees without evidence in the record that these procedures had been met. *Id.* Hornbeck has not alleged it complied.

Finally, without analysis, Hornbeck declares itself to be a prevailing party citing to *Dearmore v. City of Garland*, 519 F.3d 517, 521-24 (5th Cir. 2008).

---

[5] *See generally Sanchez v. Rowe*, 870 F.2d 291, 293 (5th Cir. 1989) (explaining that EAJA authorizes attorneys' fees when the Government runs afoul of the common-law rule prohibiting parties from acting "vexatiously, wantonly, or for oppressive reasons") (quotation and citation omitted). Further, the district court characterized Hornbeck's claim as a "common-law claim of bad faith," although its motion had invoked the statute.

*Dearmore* announces a three-factor test for determining whether a plaintiff who receives a preliminary injunction is a prevailing party under a civil rights provision, 42 U.S.C. § 1988(b), when "the district court makes an unambiguous indication of probable success on the merits of his claim and the defendant subsequently moots the case before trial in direct response to the court's preliminary injunction order." *Id.* at 521, 524. Hornbeck has not engaged with any of those considerations. Importantly, it has not explained how it can escape from its decision to stipulate to dismiss the case or from the district court's conclusion that the July Directive did not moot the case because the voluntary-cessation exception applied. *E.g.*, *Pederson v. La. State Univ.*, 213 F.3d 858, 873 (5th Cir. 2000).

This potential basis for maintaining the award is waived because it has not been meaningfully briefed. *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 531 n.2 (5th Cir. 2012) (citing Fed. R. App. P. 28).

The finding of contempt and the award of fees and costs are REVERSED.

No. 11-30936

JENNIFER WALKER ELROD, Circuit Judge, dissenting:

The revised majority opinion addresses some of the most troubling issues raised in my original dissent, but still reaches the wrong result. Although the majority opinion now recognizes this circuit's well-established precedent that a court may look to the totality of the circumstances in determining whether a litigant violated the reasonably understood terms of its order, the majority opinion's cramped application of that standard disregards the deference owed to the district court's contempt findings. Moreover, the majority opinion's approach may give incentive for litigants creatively to circumvent district court orders. This is especially troubling where, as here, the contemnor represents a co-equal branch of government.[1] As the least dangerous branch among equals, the Judiciary must be vigilant regarding compliance with its orders, lest it become toothless.

---

[1] *See* The Federalist No. 78 at 227 (Alexander Hamilton) (Roy P. Fairfield ed., 1961) ("[T]he judiciary is the weakest of the three departments of power . . . all possible care is requisite to enable [the Judiciary] to defend itself."); *see also N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) ("The Federal Judiciary was . . . designed by the Framers to stand independent of the Executive and Legislature—to maintain the checks and balances of the constitutional structure.").